No. 25-1417

# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝖋𝖔𝖗 𝖙𝖍𝖊 𝕱𝖎𝖗𝖘𝖙 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

ARIELLA HELLMAN, on their own behalf and as next friend of their child, E.H.;
DAVID HELLMAN, on their own behalf and as next friend of their child, E.H.; JOSH
HARRISON on their own behalf and as next friend of their child, H.H.;
and MIRIAM SEGURA-HARRISON, on their own behalf and as next friend of their
child, H.H.,

*Plaintiffs-Appellants*,

v.

MASSACHUSETTS DEPARTMENT OF ELEMENTARY AND SECONDARY EDUCATION;
KATHERINE CRAVEN, in the official capacity as Chair of the Board; MATTHEW B.
HILLS, in the official capacity as Vice-Chair of the Board; DR. ERICKA FISHER, in
the official capacity as a member of the Board; ELA GARDINER, in the official
capacity as a member of the Board; FARZANA MOHAMED, in the official capacity
as a member of the Board; MICHAEL MORIARTY, in the official capacity as a
member of the Board; DÁLIDA ROCHA, in the official capacity as a member of the
Board; PAYMON ROUHANIFARD, in the official capacity as a member of the Board;
MARY ANN STEWART, in the official capacity as a member of the Board; DR.
PATRICK TUTWILER, in the official capacity as a member of the Board; DR.
MARTIN WEST, in the official capacity as a member of the Board; RUSSELL D.
JOHNSTON, in the official capacity as Acting Secretary of the Board and
Commissioner of DESE; MASSACHUSETTS BOARD OF ELEMENTARY AND
SECONDARY EDUCATION,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Massachusetts

## APPELLANTS' OPENING BRIEF

John C. La Liberte
PIONEER PUBLIC INTEREST
LAW CENTER
185 Devonshire Street,
11th Floor
Boston, MA 02110
Tel: (617) 819-1010
*Consulting Counsel*

Tiffany Stichel
SCHLOSSBERG, LLC
35 Braintree Hill Park,
Suite 401
Braintree, MA 02184
Tel: (781) 848-5028

David G. Hodges
Renée D. Flaherty
INSTITUTE FOR JUSTICE
901 N. Glebe Road,
Suite 900
Arlington, Virginia 22203
(703) 682-9320
dhodges@ij.org

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), there is no parent corporation or any publicly held corporation that owns 10 percent or more of the Institute for Justice's stock.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. v

STATEMENT REGARDING ORAL ARGUMENT ............................................. xii

INTRODUCTION ................................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 4

STATEMENT OF ISSUES FOR THIS COURT'S REVIEW ................................. 4

STATEMENT OF THE CASE ........................................................ 4

SUMMARY OF THE ARGUMENT ..................................................... 11

STANDARD OF REVIEW .......................................................... 13

ARGUMENT .................................................................... 14

   I.    Parents stated a valid claim that the restriction violates the Due Process Clause ................................................................. 14

        A.    The district court misread the special education statute and failed to apply binding unconstitutional conditions precedent ................... 15

             1.    The district court's interpretation of the special education statute is erroneous ............................................. 15

             2.    Parents plausibly alleged that their right to enroll their children in private school is unlawfully conditioned by Appellees' regulation under binding Supreme Court precedent that the court ignored ......................... 17

        B.    *Gary S.* is inapplicable ................................................. 23

             1.    *Gary S.* is distinguishable ................................... 24

             2.    The caselaw supporting *Gary S.* is distinguishable, no longer good law, or dicta .............................................. 26

       3.     *Loffman v. California Department of Education* is
             instructive ............................................................................... 29

    C.    No matter the level of scrutiny, Parents stated valid claims that the
        restriction fails ............................................................................. 31

       1.     Parents plausibly alleged that Appellees have no compelling
           interest in denying services to children and, even if they did, the
           restriction is not narrowly tailored to that interest ................... 31

       2.     Parents plausibly alleged that Appellees do not rationally
           advance their interest in not aiding private schools by barring
           children from receiving services in school .............................. 36

II.    Parents stated a valid claim that the restriction violates the Equal Protection
    Clause ..................................................................................................... 39

    A.    Binding Supreme Court precedent holds that a law that denies a
        benefit because of a constitutional right cannot survive strict
        scrutiny ....................................................................................... 40

    B.    Parents do not need to demonstrate that Appellees acted with intent
        to punish their exercise of a right .................................................. 44

    C.    Parents plausibly alleged the restriction fails rational basis
        review .......................................................................................... 46

       1.     Binding Supreme Court precedent bars laws, like this one, that
           make it more difficult for one group of citizens to seek aid from
           the government ......................................................................... 46

       2.     The ratification history of the Fourteenth Amendment shows it
           would be perverse to give effect to the regulation ................... 49

III.   Parents properly preserved for appeal their claim that the Privileges and
    Immunities Clause is an appropriate alternative source of protection for
    parental rights ......................................................................................... 53

CONCLUSION ................................................................................................. 54

CERTIFICATE OF COMPLIANCE ....................................................................... 56

CERTIFICATE OF SERVICE ................................................................................ 57

ADDENDUM ................................................................................................ Add. i

# TABLE OF AUTHORITIES

Page(s)

### CASES

*Armour v. City of Indianapolis*,
    566 U.S. 673 (2012)..................................................................36

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................13

*B & T Masonry Constr. Co., v. Pub. Serv. Mut. Ins. Co.*,
    382 F.3d 36 (1st Cir. 2004) ......................................................54

*Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.*,
    246 F.3d 1 (1st Cir. 2001) .......................................40, 41, 44

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................13

*Carson v. Makin*,
    596 U.S. 767 (2022).................................19, 21, 28, 33

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)..................................................................40

*Creative Env'ts, Inc. v. Estabrook*,
    680 F.2d 822 (1st Cir. 1982) .......................................44, 46

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022)..................................................................54

*Duncan v. Louisiana*,
    391 U.S. 145 (1968)..................................................................33

*Dunn v. Blumstein*,
    405 U.S. 330 (1972)..................................................................20

*Edelman v. Jordan*,
    415 U.S. 651 (1974)..................................................................19

*Espinoza v. Mont. Dep't of Rev.*,
  591 U.S. 464 (2020) ..................................................................*passim*

*Fed. Land Bank of Springfield v. Farm Credit Admin.*,
  676 F. Supp. 1239 (D. Mass. 1987) ...................................................38

*Foote v. Ludlow Sch. Committee*,
  128 F.4th 336 (1st Cir. 2025) ...............................................18, 31, 34

*Frost v. R.R. Comm'n*,
  271 U.S. 583 (1926)................................................................................21

*Garrity v. New Jersey*,
  385 U.S. 500 (1967) ...............................................................................22

*Gary S. v. Manchester Sch. Dist.*,
  241 F. Supp. 2d 111 (D.N.H. 2003) ............................................24, 25

*Gary S. v. Manchester Sch. Dist.*,
  374 F.3d 15 (1st Cir. 2004) ....................................................*passim*

*Good News Club v. Milford Cent. Sch.*,
  533 U.S. 98 (2001)..................................................................................20

*Harris v. McRae*,
  448 U.S. 297 (1980)................................................................................28

*Kittery Motorcycle, Inc. v. Rowe*,
  320 F.3d 42 (1st Cir. 2003) ................................................................42

*Koontz v. St. Johns River Water Mgmt. Dist.*,
  570 U.S. 595 (2013)................................................................................22

*Lamb's Chapel v. Cent. Moriches Union Free Sch. Dist.*,
  508 U.S. 384 (1993)................................................................................20

*Loffman v. Cal. Dep't of Educ.*,
  119 F.4th 1147 (9th Cir. 2024) ...........................................................29

*Maher v. Roe,*
    432 U.S. 464 (1977)............................................................28

*Mahmoud v. Taylor,*
    No. 24–297, 606 U.S. ___ (2025)................................................20

*McCullen v. Coakley,*
    573 U.S. 464 (2014)............................................................31

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010)............................................................54

*Meléndez–García v. Sanchez,*
    629 F.3d 25 (1st Cir. 2010) ...................................................45

*Mem'l Hosp. v. Maricopa Cnty.,*
    415 U.S. 250 (1974)..............................................19, 20, 43, 44

*Meyer v. Nebraska,*
    262 U.S. 390 (1923)............................................................17

*Norwood v. Harrison,*
    413 U.S. 455 (1973)........................................................27, 28

*Obergefell v. Hodges,*
    576 U.S. 644 (2015)............................................................33

*Pierce v. Soc'y of Sisters,*
    268 U.S. 510 (1925)......................................................*passim*

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015)............................................................35

*Romer v. Evans,*
    517 U.S. 620 (1996)........................................46, 47, 48, 49

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995)............................................................20

*Rubinovitz v. Rogato*,
  60 F.3d 906 (1st Cir. 1995) ...................................................................44

*Saenz v. Roe*,
  526 U.S. 489 (1999)....................................................................19, 20

*Shapiro v. Thompson*,
  394 U.S. 618 (1969)..............................................19, 21, 42, 43, 44

*Sherbert v. Verner*,
  374 U.S. 398 (1963)...........................................18, 19, 20, 26

*Signs for Jesus v. Town of Pembroke*,
  977 F.3d 93 (1st Cir. 2020) ...................................................................40

*Slochower v. Bd. of Higher Educ.*,
  350 U.S. 551 (1956)....................................................................20

*Strout v. Albanese*,
  178 F.3d 57 (1st Cir. 1999) ...................................................................28

*Thomas v. Rev. Bd.*,
  450 U.S. 707 (1981)...........................................................20, 21, 26

*Troxel v. Granville*,
  530 U.S. 65 (2000)....................................................................36, 42

*United States v. Zapata*,
  18 F.3d 971 (1st. Cir. 1994) ...................................................................13

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)....................................................................18, 22, 32

*Wayte v. United States*,
  470 U.S. 598 (1985)....................................................................45

*Widmar v. Vincent*,
  454 U.S. 263 (1981)....................................................................33

*Zobel v. Williams*,
457 U.S. 55 (1982)........................................................................20, 43

*Zobrest v. Catalina Foothills Sch. Dist.*,
509 U.S. 1 (1993)................................................................................37

## CONSTITUTIONAL PROVISIONS

Mass. Const. amend. art. XVIII, § 2 ....................................................8, 32

## STATUTES

20 U.S.C. §§ 1400 *et seq.*................................................................... 6

20 U.S.C. § 1412(a)(10)(A) ............................................................6, 24

28 U.S.C. § 1291 ................................................................................4

28 U.S.C. § 1331 ................................................................................4

28 U.S.C. § 1343(a)(3) ........................................................................4

28 U.S.C. § 2201(a) ............................................................................4

28 U.S.C. § 2202 ................................................................................4

42 U.S.C. § 1983 ................................................................................4

Act of July 16, 1686, ch. 200, §§ 6, 13, 14 Stat. 176...............................51

M.G.L. c. 71B, § 1 .......................................................................*passim*

M.G.L. c. 71B, § 3 ..........................................................................5, 6

M.G.L. c. 71B, § 4 ..............................................................................7

M.G.L. c. 71B, § 5 ......................................................................5, 7, 41

## RULES AND REGULATIONS

603 CMR § 28.03(1)(e)(3)...................................................7, 8, 11, 18, 45

## OTHER AUTHORITIES

Akhil Reed Amar,
*The Bill of Rights and the Fourteenth Amendment*, 101 Yale L.J. 1193
(1992) ................................................................................................ 50

Andrew Johnson,
*Veto Message to the Senate* (Feb. 19, 1866), *in Veto Messages of the Presidents
of the United States, with the Action of Congress Thereon* 289 (Washington,
Government Printing Office 1886) .................................................... 52

Campbell F. Scribner,
*Surveying the Destruction of African American Schoolhouses in the South,
1864–1876*, 10 J. Civil War Era 469 (2020) .................................... 50

Cong. Globe, 39th Cong., 1st Sess. 1092 (1866) .................................. 53

Cong. Globe, 39th Cong., 1st Sess. 322 (1866) .................................... 51

Cong. Globe, 39th Cong., 1st Sess. 91 (1865) ...................................... 52

Jacobus tenBroek,
*Equal Under Law* 201 (1965) ........................................................... 53

James D. Anderson,
*The Education of Blacks in the South, 1860-1935* (2010) (ebook) ...... 50

John Richard Dennett,
*The South As It Is*, 1 The Nation 779 (1865) ..................................... 50

Mark A. Graber,
*The Second Freedmen's Bureau Bill's Constitution*, 94 Tex. L. Rev. 1361
(2016) ................................................................................................ 52

Martin Abbott,
*The Freedmen's Bureau in South Carolina, 1865-1872* 93 (1967) ...... 50

Michael W. McConnell,
*Originalism and the Desegregation Decisions*, 81 Va. L. Rev. 947 (1995) ....... 53

Nicholas May,
  *Holy Rebellion: Religious Assembly Laws in Antebellum South Carolina and Virginia*, 49 Am. J. Legal Hist. 237 (2007) ........................................................50

Richard A. Epstein,
  *Unconstitutional Conditions, State Power, and the Limits of Consent*, 102 Harv. L. Rev. 5 (1988) ................................................................................................19

Richard J. Gabel,
  *Public Funds for Church and Private Schools* (1937) .................................50, 51

Ron Chernow,
  *Grant* (2017) ..........................................................................................................51

## STATEMENT REGARDING ORAL ARGUMENT

This is a federal constitutional challenge to Massachusetts's denial of special education services to children whose parents exercise their fundamental right to enroll them in private school. *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925). Although Massachusetts statutorily entitles all children with special needs to services, the challenged regulation makes access to those services harder, even impossible, for these children (and only these children). This case asks important questions about the right of parents to direct the education of their children, including by sending them to private school. The parties are represented by experienced counsel who routinely litigate cases concerning education and constitutional rights. Appellants believe oral argument will be of significant assistance to this Court in resolving this case.

# INTRODUCTION

Massachusetts guarantees *all* children with special needs a statutory entitlement to special education services in the least restrictive environment. Appellees, however, have subverted that guarantee with a regulation that penalizes children whose parents have enrolled them in private schools. These parents have a fundamental constitutional right to educate their children in private schools and a state may not deny or restrict an otherwise available benefit simply because the parent of the would-be recipient exercises a constitutional right. Yet the regulation does exactly that with a "place" restriction that bars their children from receiving critical special education services in their schools and effectively makes these needed services unavailable to them because their parents exercised a right. The district court failed to reckon with Plaintiffs-Appellants' ("Parents") allegations that the place restriction violates their fundamental right to educate their children in private schools. Instead, the court applied a distinguishable case to this one and used rational-basis review, rather than strict or some other form of heightened scrutiny, to dismiss Parents' claims. This was in error.

Parents' allegations are grounded in an unbroken line of U.S. Supreme Court cases that have "repeatedly" held that the government may not restrict a benefit solely because of how a person exercises a constitutional right. *Espinoza v. Mont. Dep't of Rev.*, 591 U.S. 464, 485 (2020). Those cases are no different from this one.

Here, Massachusetts law entitles *all* children with special needs to services in their "regular educational environment" "to the maximum extent appropriate" given the severity and nature of their disabilities. M.G.L. c. 71B, § 1. E.H., the child of Parents David and Ariella Hellman, and H.H., the child of Parents Josh Harrison and Miriam Segura-Harrison, are two children entitled to these services. But because Parents exercise their right to educate them in private schools, their children cannot receive services in their schools, which makes the services effectively unavailable. Thus, even though E.H. and H.H. require hours of services every week for impairments like anxiety, dyslexia, and social-emotional delays, they cannot receive them. Appendix ("App.") 22, ¶¶ 47–49; 26, ¶¶ 66–67. Yet if Parents sent their children to public schools, E.H. and H.H. could receive services inside their public schools. Likewise, if the *government* enrolled their children in private schools, E.H. and H.H. could receive services inside their private schools. It is only because Parents send their children to private schools—*i.e.*, because they exercise a fundamental constitutional right—that E.H. and H.H. are denied services inside their schools.

Given these facts, Parents plausibly alleged that the place restriction violates the federal Constitution. Indeed, the Supreme Court has repeatedly invalidated similar conditions as unconstitutional. A state cannot deny or restrict otherwise available public benefits based on the would-be recipient's exercise of a

fundamental right. The district court was wrong to hold otherwise, just as it was wrong to hold that this Court's decision in *Gary S. v. Manchester School District*, 374 F.3d 15 (1st Cir. 2004) was "directly on point." Add. 10. Unlike the generally available entitlement in this case, *Gary S.* involved a challenge to a program that was exclusively available to public school students. There is a world of difference between a benefit that the legislature limits to public school students, on one hand, and, on the other, a generally available benefit that the legislature extends to *all* students but that a state agency then denies to any child whose parents have exercised their fundamental right to send that child to a private school. U.S. Supreme Court precedent makes that clear, as does persuasive precedent from the Ninth Circuit.

In short, Parents plausibly alleged the place restriction is unconstitutional. Accordingly, this Court should reverse the district court and find that Parents stated valid claims that the restriction violates the Due Process and Equal Protection clauses of the Fourteenth Amendment.[1]

---

[1] Parents also pled a Privileges or Immunities claim, acknowledging it was likely foreclosed but preserving it for eventual review. Parents acknowledge in this Court that the claim is foreclosed but again preserve the issue for review. *See infra* Section III.

3

## JURISDICTIONAL STATEMENT

Parents appeal from the United States District Court for the District of Massachusetts' final judgment dismissing their federal constitutional challenge to a regulation barring all parentally placed private school students from receiving special education services in their schools. Parents filed this action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201(a) and 2202. The court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and entered final judgment on March 31, 2025. Parents timely noticed their appeal on April 28, 2025. This Court's jurisdiction arises from 28 U.S.C. § 1291.

## STATEMENT OF ISSUES FOR THIS COURT'S REVIEW

Whether Parents have stated valid claims, under the Due Process, Equal Protection, and Privileges or Immunities Clauses of the Fourteenth Amendment, that a Massachusetts regulation that singles out and bars all parentally placed private students from receiving statutorily guaranteed special education services in their schools violates the right of parents to direct the education of their children, including by enrolling them in private school.

## STATEMENT OF THE CASE

### Massachusetts makes a guarantee to children with special needs.

Massachusetts provides all school-aged children with special needs a statutory guarantee that no matter where they attend school, their local school committee will provide them with special education services to address their

disabilities. M.G.L. c. 71B, § 3. "[T]he school committee of every city, town or school district" is required to "identify the school age children residing therein who have a disability." *Id.* Once a student has been identified as having special needs, the committee must "diagnose and evaluate" the child's special needs, "propose a special education program to meet those needs," and "provide or arrange for the provision of such special education program." *Id*. In providing or arranging for a special education program, the school committee must "pay for such special education personnel, materials and equipment, tuition, room and board, transportation, rent and consultant services as are necessary for the provision of special education." *Id.* § 5.

To provide such services, Massachusetts requires that students with disabilities be educated, "to the maximum extent appropriate," in their "regular educational environment." *Id.* § 1. This means that "children with disabilities, including children in public or private institutions or other care facilities, are [to be] educated with children who are not disabled" whenever possible. *Id.* It is "*only* when the nature or severity of the disability of a child is such that education in regular classes . . . cannot be achieved satisfactorily" that "special classes, separate schooling or other removal of children with disabilities from the regular educational environment" may occur. *Id.* (emphasis added).

Massachusetts' disability law is more generous than its federal counterpart, the Individuals with Disabilities Education Act, ("IDEA") Act, 20 U.S.C. §§ 1400 *et seq.* Unlike the IDEA, Massachusetts provides *all* children with disabilities—including children whose parents enroll them in private schools—with an individual, statutory right to special education services. M.G.L. c. 71B, § 3. By contrast, the IDEA provides no such individual right for children with disabilities whose parents enroll them in private schools. 20 U.S.C. § 1412(a)(10)(A). Instead, the IDEA requires local education agencies to use a proportionate share of federal funds received under Part B of the IDEA, *id.*, to provide special education and related services for the *group* of children with disabilities who are enrolled by their parents in private schools. Which of the children in that group receive services, and what services they receive, are decisions left to the discretion of local education agencies; thus, no child parentally placed in a private school has an *individual* right to a particular level of—or to any—special education services under the IDEA. *Id.* Under Massachusetts law, by contrast, such children do have an individual entitlement—the *same* entitlement as children attending a public school. M.G.L. c. 71B, § 1, 3.

### Appellees' regulation undermines the guarantee.

Despite the generous nature of the Massachusetts law, Appellees have promulgated and enforced a regulation that imposes a blanket "place" restriction

solely on children whose parents enroll them in private schools. This restriction bars them from receiving state- or locally funded special education services at their schools. 603 CMR 28.03(1)(e)(3). By contrast, Appellees have not mandated a similar restriction for children who attend public schools or whom school committees have placed in private schools, such as when school committees provide for a child's "special education in an approved private day or residential school," or "enter into an agreement with any . . . private school, agency, or institution to provide the necessary special education within the city, town or school district." M.G.L. c. 71B, §§ 4, 5.

The "place" restriction uniquely applies to children whose *parents* enroll them in private schools. 603 CMR 28.03(1)(e)(3). Again, there is no similar restriction on children whose parents enroll them in public schools or children whom the government enrolls in a private school. Thus, if a parent enrolls her child in a public school, the child can receive services at the school. Likewise, if the government enrolls a child in a private school, the child can receive services at her school. But if a parent decides to send her child to a private school—*i.e.*, if a parent exercises her constitutional right to enroll her child in a private school—then those benefits are denied. *Id.*

Specifically, Appellees' place restriction provides that, in the case of parentally placed private school students, "school districts shall ensure that special

education services funded with state or local funds are provided in a public school facility or other public or neutral site." 603 CMR 28.03(1)(e)(3). The restriction does not explain why a private school is not a "neutral site." By contrast, "[w]hen services are provided using only federal funds, services may be provided on private school grounds." *Id.* Practically speaking, this means that parentally placed private school students can receive state- or locally funded special education throughout Massachusetts so long as it is not in one place: the school they attend.

Appellees promulgated this regulation to comply with the state constitutional bar on "aiding any . . . primary or secondary school . . . not publicly owned and under the exclusive control" of the Commonwealth. Mass. Const. amend. art. XVIII, § 2. *See also* 603 CMR 28.03(1)(e)(1) ("The school district shall provide to such students genuine opportunities to participate in the public school special education program consistent with state constitutional limitations.")

### The impact of the "place" restriction on families.

Parents and their children are some of the thousands of families impacted by Appellees' place restriction. Parents want to provide their children with a Jewish education, and to that end, they have enrolled them in Jewish day schools. App. 23, ¶ 51; 27, ¶ 68. Parents' children are statutorily entitled to hours of services each week, including academic support, reading assistance, occupational therapy, and more. *Id.* at 24, ¶ 54; 26, ¶¶ 66–67. But due to the place restriction, Parents'

8

children cannot get the services they need in their schools—services, like reading assistance and academic support, that are best provided *in school*. Instead, the only way they can access services is if they travel to and from a public or "neutral" location multiple times per week. *Id*. at 23–24, ¶¶ 50, 52–55; 27–28, ¶¶ 69–73, 76. And the only way their children can travel to these sites is if Parents leave their own busy jobs to drive their children to those sites or pay someone else to transport them. *Id.* But even if they could leave their jobs multiple times per day and week, or afford the cost of transporting their children, it would be "stigmatizing and stressful" to their children, who are already "anxi[ous]" and withdrawn, to be repeatedly removed from their classrooms in front of their classmates. *Id*. at 24, ¶ 54; 27, ¶ 72. And for Parents, it would defeat the purpose of enrolling their children in Jewish day schools if their children are constantly being shuttled in and out of their classrooms and not receiving the full benefits of the education that Parents have chosen for them. *Id*. at 25–26, ¶ 63; 28, ¶ 78.

This "place" restriction has forced a dilemma upon Parents. They "must choose between a school where [their children] can receive all the services to which [they are] entitled but not get the education that is best for [them], or a school that provides the best education for [them] without all the services to which [they are] entitled." *Id*. at 25, ¶ 62; 28, ¶ 77. Each of the Parents has made their choice: "Because traveling to and from a public or 'neutral' location would have

been impracticable, unduly burdensome, disruptive, stigmatizing, stressful, inefficient, and counterproductive; and would have thwarted [Parents'] conviction to educate [their children] at a Jewish, rather than public, school, [Parents] decided to forgo the services financed with state and local funds." *Id.* at 25–26, ¶ 63; 28, ¶ 78.

### Parents challenge the restriction.

On May 6, 2024, Parents challenged the restriction, alleging that it abridged their right to direct the education of their children in violation of the Due Process, Equal Protection, and Privileges or Immunities Clauses of the Fourteenth Amendment. App. 29–34, ¶¶ 83–112. The Appellees moved to dismiss and, on March 31, 2025, the district court dismissed Parents' claims. Add. 18.

The court disposed of Parents' claims as follows. First, the court held the case was controlled by this Court's decision in *Gary S.* and Parents' Due Process claim was foreclosed because there was "no fundamental right that the state law burdens." *Id.* at 14. Accordingly, Parents "fail[ed] to state a violation of their substantive due process rights." *Id.* Second, the court held that because Parents did not show Appellees intended to punish them for exercising a right, mere rational basis review for their Equal Protection claim was appropriate. The court then held that barring aid to some (but not all) private school students was rationally related to a provision of the Massachusetts Constitution that bars aid to private schools. *Id.*

at 15. Third, the court held that Parents' Privileges or Immunities claim, which

Parents preserved for appeal, was foreclosed by U.S. Supreme Court precedent. *Id.*

at 17.

On April 28, 2025, Parents timely noticed their appeal.

## SUMMARY OF THE ARGUMENT

All children in Massachusetts have a statutory right to special education

services in their "regular educational environment" "to the maximum extent

appropriate." M.G.L. c. 71B, § 1. But a "place" restriction bars children whose

parents have enrolled them in private schools—that is, parents who have exercised

their constitutional right to send their children to private school—from receiving

these services in their regular educational environment: their schools. 603 CMR

28.03(1)(e)(3).

The purported justification for the place restriction is the state constitution's

anti-aid amendment, which bars the government from "aiding" private schools. But

Massachusetts' special education guarantee does not aid private schools; it aids

students, and the governing statute requires aid be made available to *all* children

with special needs, in their regular educational environment, regardless of the

schools they attend. Yet the restriction flouts this requirement, flatly barring

services for parentally placed private school students in their schools. Indeed, the

regulation falls *solely* on these children and their parents; it does not apply to

children in public schools, nor does it apply to children the *government* places in private schools when it determines a public school is unable to educate them. As a result, even though *all* children are statutorily guaranteed special education services, it is *only* parentally placed children who cannot get services in their schools. This restriction not only defeats the purpose of the services, but violates at least two provisions of the Fourteenth Amendment, which Parents plausibly alleged and the district court improperly dismissed.

First, Parents plausibly alleged the restriction violates the Due Process Clause, whose substantive guarantees include the fundamental right of parents to direct the education and upbringing of their children. The restriction infringes that right with a condition it places only on children whose parents exercise that right by enrolling them in private school. For these reasons, along with a mistaken reading of the relevant special education statute, the district court was wrong, and its application of a decision from this Court, *Gary S.*, 374 F.3d 15, misses the mark. While Massachusetts had no duty to provide special education services to all children with special needs, once it did, it could not discriminate against recipients because of their parents' exercise of a constitutional right. Parents have plausibly alleged such discrimination and that Appellees have no legitimate interest, let alone a compelling one, in barring their children's receipt of services in their schools.

12

Second, Parents plausibly alleged the regulation violates the Equal Protection Clause. Supreme Court precedent does not permit a state to deny or severely restrict an otherwise available benefit simply based on the would-be recipient's parents' exercise of a fundamental right. Yet, as Parents alleged, Massachusetts' regulation does precisely that. And, as they have further alleged, the regulation is not rationally related—much less narrowly tailored—to a compelling or even legitimate state interest. Barring *students* from receiving services in their schools is not rationally related to a ban on aiding private *schools*. The history of the Equal Protection Clause reinforces these points.

Third, to the extent that substantive protection for parental rights lies in the Privileges or Immunities Clause, rather than the Due Process Clause, Parents properly preserved a Privileges or Immunities Clause claim for appeal.

## STANDARD OF REVIEW

This Court reviews all questions of constitutional law *de novo*. *United States v. Zapata*, 18 F.3d 971, 975 (1st. Cir. 1994). A party survives a motion to dismiss if their complaint alleges "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

13

# ARGUMENT

Parents' argument proceeds in three parts. In Section I, Parents show they stated a valid claim that the place restriction violates their fundamental right to direct the education of their children under binding Due Process Clause precedent and that the district court was wrong to apply *Gary S.* to dismiss this case. In Section II, Parents demonstrate they stated a valid claim that the restriction violates the Equal Protection Clause by denying their children the same benefit compared to those who are like them in every relevant respect except for Parents' exercise of a constitutional right. In Section III, Parents assert they properly preserved their Privileges or Immunities Clause claim for appeal.

## I.   Parents stated a valid claim that the restriction violates the Due Process Clause.

The district court dismissed Parents' due process claim and held that the place restriction does not implicate a federal constitutional right. This was in error. In Part A, Parents first show that the court misinterpreted the special education statute and failed to apply binding unconstitutional conditions precedent. In Part B, Parents demonstrate that the case the court relied upon instead is inapposite. In Part C, Parents show that they plausibly alleged that the restriction cannot survive any level of scrutiny.

14

**A. The district court misread the special education statute and failed to apply binding unconstitutional conditions precedent.**

**1. The district court's interpretation of the special education statute is erroneous.**

The district court's interpretation of the special education law is unsound. The court held the law does not require services to be provided at a child's school, but rather that students "be integrated, to the maximum extent appropriate, with students not requiring [special education] services." Add. 13. This is an incorrect reading caused, in part, by the court's errant conflation of the regulatory definition of "least restrictive environment" (which uses the broader term "general education environment") with the statutory one (which uses the more specific term "*regular* education*al* environment"). *Compare id.* at 13, *with* M.G.L. c. 71B, § 1.

The correct reading starts with the statute, which governs the regulation. The statute defines "least restrictive environment" as a directive to provide special education services to disabled children in their "regular educational environment" "to the maximum extent appropriate." M.G.L. c. 71B, § 1. The statute provides <u>one</u> exception to this rule: "[W]hen the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services[] cannot be achieved satisfactorily." *Id.* In that circumstance, and "only" that circumstance, "special classes, separate schooling or other removal of children with disabilities from the regular educational environment" may occur. *Id.*

The "place" restriction is utterly incompatible with the statute and the court was wrong to hold otherwise. After all, if a parentally placed student in private school must *always and as a rule* be removed from her class or school to receive services, then why would the statute specify that a student can "only" be "remov[ed]" and put in "special classes" or "separate schooling" "when the nature or severity of the disability of a child is such that education in regular classes . . . cannot be achieved satisfactorily"? *Id.* Likewise, if the statute requires a student to receive services in her "regular classes" and "regular educational environment" "to the maximum extent appropriate," why should a parentally placed student in private school *never* receive services in those places—and not because of the "nature or severity" of her disability, which the statute mentions, but simply because of where she goes to school, which it doesn't? *Id.*

But even if the court was right about the term "least restrictive environment," Parents still have stated a claim. According to the district court, Appellees satisfy the least restrictive environment requirement "so long as they seek to ensure that private school students, just like public school students, are integrated into learning environments with nondisabled students 'to the maximum extent appropriate.'" Add. 14. But Appellees do *not* ensure such equal integration of parentally placed private school students. Instead, Appellees' place restriction forces such students to travel to a public school or other "neutral site," where they

receive special education services *not* in "regular classes" "with children who are not disabled," M.G.L. c. 71B, § 1, but, rather, in isolation or alongside other students with special needs.

All to say, the district court's understanding of the special education statute is wrong as a matter of textual analysis and common sense. The statute requires ***all*** children to receive services in their "regular educational environment" "to the maximum extent appropriate" and it permits a child to be removed from her class or school only in one specific circumstance. *Id.* It does not permit a child to always, and as a rule, be removed from her "regular classes" and "regular educational environment" based on where her parents send her to school. *Id.* The place restriction not only contravenes the statute, but also penalizes children based on their parents' exercise of a constitutional right. The court was wrong to hold otherwise.

### 2. Parents plausibly alleged that their right to enroll their children in private school is unlawfully conditioned by Appellees' regulation under binding Supreme Court precedent that the court ignored.

The district court ignored binding Supreme Court precedent when it dismissed Parents' plausibly alleged due process claim. *See* Add. 9–14. The Hellmans and Harrisons, like all parents, have a fundamental right, or liberty interest, in directing the education and upbringing of their children. *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923). This right, which enjoys substantive

protection in the Due Process Clause of the Fourteenth Amendment, specifically includes the right to send one's children to a private school. *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925). The U.S. Supreme Court has described the right as "fundamental" and akin to "the specific freedoms protected by the Bill of Rights." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). And this Court, in turn, has explained that the right is "broad[ly] well-established" and "uncontrovertibly protect[ed] against governmental infringement." *Foote v. Ludlow Sch. Committee*, 128 F.4th 336, 344–45, 348 (1st Cir. 2025).

Yet despite the right's hallowed place in the Constitution, the district court sanctioned Appellees' infringement of the right. Add. 14. The place restriction penalizes parents who exercise that right by denying services to their children—and only their children—in their schools. And it does so for no other reason than because parents have exercised the fundamental right, recognized in *Pierce*, to send their children to a private school. 268 U.S. at 534–55; 603 CMR 28.03(1)(e)(3).

"It is too late in the day to doubt" that the Constitution does not countenance a state's "denial of or placing of conditions upon a benefit" in this manner. *Sherbert v. Verner*, 374 U.S. 398, 404 (1963). Indeed, the Supreme Court has repeatedly condemned laws for denying or placing conditions on a benefit that

require the recipient to surrender a constitutional right to fully enjoy the benefit.[2] It has done so where a state asserts a policy reason for the condition, and it has done so even where, as here, a state insists that the state's constitution requires the condition. *See Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 269 (1974) (voiding policy justified on fiscal grounds); *Espinoza*, 591 U.S. at 487 (invalidating restriction originating in the Montana Constitution). And it has nullified these conditions regardless of whether the right they infringed was enumerated, such as the right to free exercise, *Sherbert*, 374 U.S. at 405, or unenumerated, such as the right to travel, *Shapiro v. Thompson*, 394 U.S. 618, 642 (1969), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974).[3] For example, the Court has held a state may not:

- condition tuition benefits on a parent's surrender of her right to obtain a religious education for her child, *Carson v. Makin*, 596 U.S. 767, 789 (2022); *Espinoza*, 591 U.S. at 488–89;

---

[2] *See* Richard A. Epstein, *Unconstitutional Conditions, State Power, and the Limits of Consent*, 102 Harv. L. Rev. 5, 10–11 (1988) (listing unconstitutional conditions cases involving Congress' spending power, the states' police power, individual liberties, property rights, and the due process and equal protection clauses).

[3] *See Saenz v. Roe*, 526 U.S. 489, 498 (1999) (explaining that while "[t]he word 'travel' is not found in the text of the Constitution," "the 'constitutional right to travel from one State to another' is firmly embedded in our jurisprudence.")

- deny otherwise available public resources based on the viewpoint of speakers who wish to use them, *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) (school facilities); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) (student activity funds); *Lamb's Chapel v. Cent. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) (school facilities);

- condition public employment on the surrender of one's right against self-incrimination, *Slochower v. Bd. of Higher Educ.*, 350 U.S. 551 (1956);

- deny unemployment benefits because of a worker's adherence to her religion, *Thomas v. Rev. Bd.*, 450 U.S. 707, 716 (1981); *Sherbert*, 374 U.S. at 404; or

- deny the right to vote, or withhold welfare, medical, or dividend benefits, based on a resident's exercise of her right to travel, *Saenz v. Roe*, 526 U.S. 489, 502–07 (1999) (welfare benefits); *Zobel v. Williams*, 457 U.S. 55, 58–61, 65 (1982) (dividend benefits); *Mem'l Hosp.*, 415 U.S. at 269 (medical benefits); *Dunn v. Blumstein*, 405 U.S. 330, 338–43, 360 (1972) (voting).

In fact, only 11 days ago, the Supreme Court reaffirmed this line of cases when it held that even "[p]ublic education is a public benefit, and the government cannot 'condition' its 'availability' on parents' willingness to accept a burden on their religious exercise." *Mahmoud v. Taylor*, No. 24–297, 606 U.S. ___ (2025), slip op. at 32–33.

The district court did not consider any of these cases. Instead, the court faulted Parents for seeking to vindicate a right "conferred by state statute, as opposed to a 'fundamental right' protected by the U.S. Constitution." Add. 12. But as the above cases show, the Supreme Court has *repeatedly* invalidated laws that infringe rights "conferred by state statute" when the infringement turned on a person's exercise of a constitutional right.[4] *Id.* Indeed, if it were otherwise, the government could reward and punish the citizenry by providing benefits where the amount depended entirely on whether the recipient exercised her right to vote, speak, or raise her children in accordance with the government's wishes. But the Constitution does not allow the government to do this. As the Supreme Court put it nearly a century ago: "It would be a palpable incongruity to strike down an act of state legislation which . . . seeks to strip the citizen of rights guaranteed by the federal Constitution, but to uphold an act by which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege which the state threatens otherwise to withhold." *Frost v. R.R. Comm'n*, 271 U.S. 583, 593 (1926).

---

[4] *See, e.g.*, *Carson*, 596 U.S. at 773–74 (invalidating restriction on tuition assistance conferred by state statute); *Thomas*, 450 U.S. at 709–10 (voiding condition on unemployment benefits provided by state statute), *Shapiro*, 394 U.S. at 621–22 (invalidating restriction on welfare benefits authorized by state statute).

In this case, providing special education services in school is the "valuable privilege" that Appellees withhold from children because their parents enroll them in private school. *Id.* If Parents exercised their right "to direct the education and upbringing of their children" in a manner approved by the government, their children would receive this privilege. *Glucksberg*, 521 U.S. at 720. It is *only* because they exercise their right to enroll their children in private school that their children cannot access special education services in their schools—even though they have the same statutory entitlement to receive the services in their schools as any other child with disabilities. And it is this "exaction of a price" to which Parents object, *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967), and which they would not have to pay if they exercised their right in a manner approved of by Appellees. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604–06 (2013) (explaining that just as the government may not directly order someone to stop exercising his rights, it also may not coerce a person into "giving them up" by denying him a benefit, or penalizing him, when he exercises those rights).

Moreover, it is no defense to suggest, as the district court did, that the condition can be justified by the Massachusetts Constitution's bar on aid to private schools. Add. 16. When a court is "called upon to apply a state [constitutional] provision" in a way that restricts or penalizes a federal constitutional right, as it is here, "it [i]s obligated by the Federal Constitution to reject the invitation."

*Espinoza*, 591 U.S. at 487–88 (holding Montana Supreme Court's application of the "no aid" provision of the Montana Constitution violated the Free Exercise Clause of the U.S. Constitution). Once the Massachusetts legislature entitled all special needs children to services, Appellees could not restrict the entitlement because Parents exercised a constitutional right in a way that Appellees disfavored—even if the Massachusetts Constitution required them to do so (which it did not).

In sum, Parents plausibly alleged the place restriction is unconstitutional. It singles out and targets Parents, preventing them from accessing "otherwise available benefits" because they exercised a constitutional right "and for no other reason." *Espinoza*, 591 U.S. at 486; *see id.* at 487 ("A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious."). Parents plausibly alleged as much and the district court was wrong to hold otherwise.

**B. *Gary S.* is inapplicable.**

Part A demonstrated that the district court erred in its analysis by misconstruing the regulation and ignoring the unconstitutional conditions line of cases. But it also erred in holding this Court's decision in *Gary S.* to be "directly on point." Add. 10. In fact, *Gary S.* is plainly distinguishable from this case for three reasons. First, the unique facts in that case control the holding and do not apply

here. Second, the precedent underlying *Gary S.* does not govern this case because it is distinguishable, no longer good law, or irrelevant. Third, persuasive precedent from the Ninth Circuit illuminates the difference between benefits provided solely to one group of students, as in *Gary S.*, and those given to all students.

### 1. *Gary S.* is distinguishable.

The district court was wrong to find this Court's holding in *Gary S.* to be "directly on point." Add. 10. In fact, *Gary S.* is easily distinguishable from this case.

*Gary S.* concerned a challenge, under the Free Exercise Clause and the *Pierce* right, to the IDEA's differential provision of services to public school students and parentally placed private school students. 241 F. Supp. 2d 111 (D.N.H. 2003). Under the IDEA, public school students are entitled to special education services. Parentally placed private school students, by contrast, are not. Instead, the services these children receive are largely a matter of chance. Under the IDEA, school districts are required to use a proportionate share of federal IDEA funds they receive to provide special education and related services for the *group* of children who are enrolled by their parents in private schools. 20 U.S.C. § 1412(a)(10)(A). No parentally placed private school student has an *individual* right to services, as public school students do.

It was the IDEA's differential provision of services that was challenged in *Gary S.* A student's parents alleged the IDEA was unconstitutional to the extent that disabled private school students were "not entitled by law to the panoply of services available to disabled public school students." 374 F.3d at 17. The court rejected that argument. It held that since "private school students do not have an individually enforceable right to obtain services," there was no injury to their right, under *Pierce*, to send their children to private school. *Gary S.*, 241 F. Supp. 2d at 119.[5] This Court affirmed. It explained that because private school students did not have a statutory entitlement to services, they were "not being deprived of a *generally available* public benefit," and thus could not "lay claim" to "benefits the federal government has earmarked solely for students enrolled in the nation's public schools." 374 F.3d at 19–20 (emphasis in original).[6]

In short, in *Gary S.*, parents were "not forced to [forgo] . . . their right to control their child's education to obtain [] government benefits" that Congress had made "*equally available to all*." 374 F.3d at 20, 23 (emphasis added). In defining and conferring the benefits at issue, Congress had limited them to public school students only. *Id.* at 19 (contrasting the "state unemployment benefits

---

[5] *See also id.* at 117 ("[P]arents do not base their substantive due process claim on the assumption that either state or federal law gives parents an entitlement[.]").

[6] The Court made this point in its First Amendment analysis.

[unconstitutionally] denied in *Hobbie, Thomas, Sherbert*," which "were public benefits, available to all," with IDEA benefits that Congress "has earmarked solely for students enrolled in the nation's public schools").

Here, by contrast, the Massachusetts legislature conferred the relevant benefit to *all* children with special needs, regardless of the type of school their parents choose for them, and yet Appellees deny the benefit to every such child whose parents exercise their fundamental right to choose a private school. Unlike in *Gary S.*, these children are "being deprived of a *generally available* public benefit"—one "equally available to all." *Id.* at 19–20 (emphasis in original). That distinction makes the difference.

### 2. The caselaw supporting *Gary S.* is distinguishable, no longer good law, or dicta.

Part B.1 showed the district court did not grapple with the distinctions between this case and *Gary S.* But it also misunderstood—and misapplied—the caselaw underlying *Gary S.* That caselaw led the court to erroneously conclude that this case is "controlled" by precedent that "consistently refused to invalidate laws which condition a parent's ability to obtain educational benefits on the parent's relinquishment of her right to send her child to private school." Add. 11. But as shown below, this caselaw is distinguishable, no longer good law, or irrelevant dicta.

To start, the primary case the court cites for that claim—*Norwood v. Harrison*, 413 U.S. 455, 462 (1973)—is inapposite. In *Norwood*, a group of parents challenged, on equal protection grounds, a program that provided textbooks to public and private schools without regard to whether the private school practiced segregation. In response, segregated private schools argued that if the program was invalidated because it aided segregation (not because it aided private schools), the remedy would violate the rights of parents under *Pierce* because children in those schools would no longer be receiving a state subsidy. The Supreme Court rejected this argument. It held that "a State's special interest in elevating the quality of education in both public and private schools does not mean that the State *must* grant aid to private schools *without regard to constitutionally mandated standards forbidding state-supported discrimination*." *Id.* at 462–63 (emphasis added). In other words, the Court held that otherwise available aid could be withheld to comply with the federal constitutional prohibition on state-supported discrimination, not because of a school's private status.

*Norwood* is thus fundamentally different from this case in two respects. First, the denial of the aid in *Norwood* was not being undertaken because the schools were private, but because providing aid to them, according to the Court, would amount to state-sponsored segregation, in violation of the federal Constitution. *Id.* at 465–67. Second, the place restriction here is targeted at private

schooling, not racial discrimination (*i.e.*, it targets a fundamental right). In other words, it penalizes parents who exercise their *Pierce* right to educate their children in private schools *because* they exercise this right and not because they engage in racial discrimination. *Id.* at 461.

The district court's reliance on the remaining cases fares no better. Add. 11. To start, this Court's decision in *Strout v. Albanese*, 178 F.3d 57, 66 (1st Cir. 1999), is no longer good law. In that case, this Court upheld, on First and Fourteenth Amendment grounds, a Maine statute that barred students attending sectarian private schools from receiving tuition assistance. *Id.* But in *Carson*, the U.S. Supreme Court invalidated that very same statute on Free Exercise grounds in a holding that easily maps onto other constitutional rights. 596 U.S. at 781. Thus, just as it is "unremarkable" that a state may not "expressly discriminate[] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious [exercise]," a state also may not discriminate against those beneficiaries based on their exercise of other constitutional rights—including the fundamental right recognized in *Pierce*. *Id.* at 779.

The district court's citations (at Add. 11) to *Harris v. McRae*, 448 U.S. 297, 318 (1980), and *Maher v. Roe*, 432 U.S. 464, 477 (1977), also miss the mark. The citations presumably refer to dicta in those cases that the government has no affirmative obligation to fund the rights of parents under *Pierce*. But Parents do not

28

contend that the government *must* fund their rights. They only argue that when the legislature chooses to provide a *generally available* benefit, as it has done here, Appellees cannot deny that benefit simply because would-be recipients exercise their *Pierce* right in a way Appellees disfavor. Just as *Gary S.* doesn't support the district court's holding, neither do these cases.

### 3. *Loffman v. California Department of Education* is instructive.

As shown above, the district court erred in applying the precedent that underlies *Gary S.* In doing so, the court made the same error as California in *Loffman v. California Department of Education*, in which the Ninth Circuit unanimously rejected its argument that *Gary S.* has force when the government denies a generally available benefit to those who exercise a fundamental right. 119 F.4th 1147 (9th Cir. 2024). This Court should follow the Ninth Circuit's persuasive authority.[7]

As explained above, *supra* pp. 5–6, the IDEA requires states to place certain children with disabilities in private schools to receive special education services. Although California generally complied with this requirement, it also refused to place children in "sectarian" private schools on the grounds that it had a compelling interest in "neutrality." In attempting to defend its "sectarian"

---

[7] The district court denied Parents the ability to file a notice of supplemental authority about this case. Add. 23.

prohibition, California argued that "when the government appropriates funds to establish a program it is entitled to define the program's limits, and that a State's decision not to subsidize the exercise of a fundamental right does not equate to an infringement of that right." *Id.* at 1169. The Ninth Circuit rejected this defense, stressing that "'the definition of a particular program can always be manipulated to subsume the challenged condition,' and to allow States to 'recast a condition on funding' in this manner would be to see 'the First Amendment . . . reduced to a simple semantic exercise.'" *Id.* (citation omitted).

Building on this point, the Ninth Circuit rejected California's argument that *Gary S.* supported the "sectarian" prohibition. *Gary S.* was inapplicable, it explained, because the private school student in that case was "not being deprived of a *generally available* public benefit," but rather "benefits the federal government has earmarked solely for students enrolled in the nation's public schools." *Id.* (citation omitted). In other words, it was that distinction—between generally available public benefits and those available solely to certain recipients—that made the difference in its analysis.

So too here. Massachusetts' depriving some students of a generally available benefit robs *Gary S.* of any precedential power over this case. A state can no more deny a would-be recipient a generally available benefit based on her *Pierce* rights than her First Amendment rights.

### C. No matter the level of scrutiny, Parents stated valid claims that the restriction fails.

As detailed above, the district court ignored binding Supreme Court precedent on unconstitutional conditions and misapplied *Gary S.* The court apparently applied rational basis review and found the restriction only caused children to have "burdened access" to special education services. Add. 14. This was in error. No matter the level of scrutiny, Parents plausibly alleged that Appellees have no legitimate interest, let alone a compelling one, in making it harder, even impossible, for children with special needs to get services to which they are statutorily entitled. The restriction cannot survive any level of scrutiny and the court's airy description of the impact of the regulation on families as mere "burdened access" to services is wrong. Add. 14.

#### 1. Parents plausibly alleged that Appellees have no compelling interest in denying services to children and, even if they did, the restriction is not narrowly tailored to that interest.

The district court did not specify the level of scrutiny it applied in its analysis, but it did not apply strict (or even some other form of heightened) scrutiny. Under that standard, a law that burdens a fundamental right must be "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). That standard applies here. Parents have a "fundamental" right to direct their children's education, *Foote*, 128 F.4th 336 at

344–45, and a law that infringes such a right must be subject to strict scrutiny. *Glucksberg*, 521 U.S. at 721.

Here, the district court erred in not applying strict scrutiny, but even if it had, the place restriction would have failed. Appellees claim an interest in complying with the state constitution's bar on "aiding any . . . primary or secondary school . . . which is not publicly owned." Add. 21 (quoting Mass. Const. amend. art. XVIII, § 2). But as the plain text of the provision demonstrates, the constitution prohibits aid to *schools*, whereas the restriction denies aid to *students*. The purported justification for the restriction—complying with a ban on aiding schools—is therefore no justification at all.

Moreover, even assuming compliance with a state constitutional provision rises to the level of a compelling interest for federal constitutional purposes (which Parents do not concede), when a state constitutional provision (or a regulation effectuating it) "conflict[s] with federal law[]," compliance is not compelling. *See Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 488 (2020); *id.* at 484–85 ("The Montana Supreme Court asserted that the [Montana Constitution's] no-aid provision serves Montana's interest in separating church and State more fiercely than the Federal Constitution. But that interest cannot qualify as compelling in the face of the infringement of free exercise here." (cleaned up)). To that end, the Supreme Court has repeatedly invalidated state laws that are purportedly necessary

to comply with discriminatory state constitutional provisions.[8] Likewise, it has held unenforceable state constitutional provisions that restrict or infringe federal constitutional rights, whether enumerated (*e.g.*, to a jury trial[9]) or, as here, unenumerated (*e.g.*, to marriage[10]). And it has invalidated laws, grounded in a "state interest," that "exclude some members of the community from an otherwise generally available public benefit because of their" exercise of a federal constitutional right. *Carson*, 596 U.S. at 781.

As with other laws that have been held unconstitutional, Appellees have no compelling interest in a regulation that "disqualif[ies] otherwise eligible recipients from a public benefit" based entirely on their exercise of a federal constitutional right. *Espinoza*, 591 U.S. at 475. It has no compelling—or even legitimate— interest in barring children "from receiving services financed with state and local funds at their schools"—services to which they are statutorily entitled—simply

---

[8] *See, e.g.*, *Espinoza*, 591 U.S. at 489 (holding that a state constitution's no-aid amendment could not justify withholding or denying a benefit based on the would-be recipient's free exercise right); *Widmar v. Vincent*, 454 U.S. 263, 276 (1981) ("[T]he state interest . . . in achieving greater separation of church and State than is already ensured under the Establishment Clause . . . is limited by the Free Exercise . . . and Free Speech Clause[.]").

[9] *Duncan v. Louisiana*, 391 U.S. 145, 146 (1968) (invalidating state constitutional provision "grant[ing] jury trials only in cases in which capital punishment or imprisonment at hard labor may be imposed").

[10] *See also Obergefell v. Hodges*, 576 U.S. 644, 681 (2015) (invalidating state constitutional provisions barring the right to marry).

because their parents exercised their right to enroll them in private school. App. 13,

¶ 2. And it has no good reason to force parents to "remove their children from

school to obtain special education, pay out of pocket for the special education their

children are entitled to by law or, in the alternative, entirely forgo special

education." *Id.* at 29, ¶ 80. Simply put, when a regulation penalizes children by

cutting them off from "otherwise available benefits if [their parents] choose" a

private school rather than a public school, *Espinoza*, 591 U.S. at 486, the law must

be justified with a compelling interest.[11] That interest is not present here.

Moreover, the place restriction is not narrowly tailored. Even if, as Appellees

contend, special education services constitute aid to schools, rather than students, it

is not because of *where* they are provided. If there are certain characteristics of aid

to children that transform it into aid to schools, the state could have adopted

narrower regulations to deal with those. But, instead, it imposed a categorical ban

that turns on location, which is the thing *least* likely to convert special education

services for children into "aid" to schools.

The place restriction is not narrowly tailored for another reason. As in

*Espinoza*, Appellees asserted that the place restriction advances an interest in

---

[11] For this reason, the case must be judged by a higher standard than one where a
party is asserting parental rights inside a public school. *Foote*, 128 F.4th at 351
n.19.

complying with the state's no-aid provision. *Id.* at 486. But if that were true,

Appellees would bar *all* special education services from being provided in private

schools. Yet they do not. As detailed above, if the *government* enrolls a child in a

private school—even the same private school a parentally enrolled child attends—

the child can receive services in the school. It is *only* when a parent does the

enrolling that the child cannot receive services in school. That dooms the

restriction. A law does not—and cannot—advance "an interest of the highest order

when it leaves appreciable damage to that supposedly vital interest unprohibited."

*Espinoza*, 591 U.S. at 486; *see also Reed v. Town of Gilbert*, 576 U.S. 155, 171–72

(2015) (holding a town cannot restrict one kind of sign for aesthetic and safety

reasons "while at the same time allowing unlimited numbers of other types of signs

that create the same problem"). Since Appellees' "proffered objective[]"—

complying with the no-aid amendment—only requires parents exercising a right to

"bear [the restriction's] weight," even as the government does the same thing it

forbids parents from doing, the restriction is "fatally underinclusive." *Espinoza*,

591 U.S. at 486.

All to say, Parents properly alleged the restriction "triggers"—and then

fails—strict scrutiny. *Id. at* 476. Appellees do not have a compelling interest in a

restriction that "expressly discriminates" against children whose parents have

enrolled them in private school "and for no other reason." *Id.* at 486–87. But even

35

if they did have such an interest, the place restriction is not narrowly tailored, because it (1) does not turn on any characteristic that supposedly transforms aid to children into prohibited aid to schools and (2) allows the state to provide the same aid to children that *it* places in private schools, while denying it to children whose *parents* place them in those same schools. In sum, even if Appellees have been "called upon to apply a state law no-aid provision to exclude" children from obtaining special education services in their schools—something that is hardly clear, *infra* I.C.2— they were "obligated by the Federal Constitution to reject the invitation." *Id.* at 488–89.

> ## 2. Parents plausibly alleged that Appellees do not rationally advance their interest in not aiding private schools by barring children from receiving services in school.

As Part I.C.1 demonstrated, strict scrutiny applies to laws that infringe a fundamental right and the restriction is such a law. But even if strict scrutiny does not apply to the restriction, Parents plausibly alleged it cannot survive rational basis review.[12]

A law fails rational basis review when "the relationship of the classification to its goal is [] so attenuated as to render the distinction arbitrary or irrational." *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012). The district court held

---

[12] But if strict scrutiny doesn't apply, that doesn't mean that rational basis does; instead, the scrutiny must be "heightened." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). But here, Appellees can't even satisfy rational basis.

that "complying with the Anti-Aid Amendment . . . is a legitimate interest to survive rational basis review." Add. 16. This justification fails for several reasons.

First, Parents plausibly alleged that denying services in school to disabled children whose parents placed them in private schools does not advance the state constitution's bar on aiding private schools. As the U.S. Supreme Court recognized with respect to special education services under the IDEA, such services are "aid not to schools but to individual handicapped children." *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 13 (1993). Thus, by any measure, denying services to children in their schools does not advance the state's goal of not "aiding" private schools. Indeed, the state would no more rationally advance its goal of denying aid to institutions if it banned low-income students from eating state-subsidized meals in their schools than it does by denying them special education services in their schools.

Second, Parents plausibly alleged it is irrational to treat special education services as impermissible aid to a school, rather than permissible aid to a child, based on who made the decision to place the child in school. Again, when the *government* places a child in a private school, Appellees allow a child to get services there; it is *only* when a parent places a child in private school that Appellees conclude the services suddenly transform into aid to schools. App. 20, ¶¶ 40–41. This is irrational. Relatedly, Appellees never explain why only private

37

schools that parents select are "non-neutral" locations. *Id.* at 21, ¶ 42. The geographic location where a special education service is provided does not magically convert it from aid to a student into aid to an institution. If speech pathology is aid to a child, then it is aid to a child in a public school, in a library, or in a private school. Appellees' conspicuous failure to explain how a private school becomes non-neutral when a parent chooses it shows they cannot articulate a plausible reason for the regulation.

Third, Parents plausibly alleged that the regulation is irrational because it contravenes the statute it implements. *See Fed. Land Bank of Springfield v. Farm Credit Admin.*, 676 F. Supp. 1239, 1250 (D. Mass. 1987) ("In order to be substantively valid, a regulation must be consistent with the statute under which it has been promulgated."). As detailed in Part I.A.2., *supra*, the statute says services can be provided outside the "regular educational environment" setting "*only when the nature or severity of the disability of a child is such* that education in regular classes . . . cannot be achieved satisfactorily." M.G.L. c. 71B, § 1 (emphasis added). Yet the place restriction *always* and as *a rule* prohibits services from being provided in the regular educational environment to certain children, with no regard at all to the "nature or severity of the disability." *Id.* Appellees justify it by arguing it is necessary to "balance" the statute with the no-aid clause, but a statute cannot be "balanced" by contravening it. Add. 22.

In short, Parents properly alleged that the regulation is irrational. It denies private school *students* their statutory right to receive services, "to the maximum extent appropriate," in their "regular educational environment" in the name of not aiding private *schools*; it allows some (but not all) private schools to supposedly "benefit" from services provided to children; and it contravenes the very law it purports to implement. Therefore, even assuming rational basis review applies, Parents plausibly alleged a viable due process claim.

## II.     Parents stated a valid claim that the restriction violates the Equal Protection Clause.

The district court improperly dismissed Parents' equal protection claim. In its skeletal analysis, the court erroneously held that no constitutional right was infringed by the restriction, that it evinces no intent to discriminate, and that it therefore warrants rational basis scrutiny. Add. 14–16.

Below, Parents make three points. First, they show they properly alleged that they were denied the same benefit compared to those who are like them in every relevant respect except for their exercise of a constitutional right, which makes strict scrutiny the proper level of scrutiny. Second, they demonstrate that they plausibly alleged that since the regulation is overtly discriminatory that they do not need to show Appellees intentionally discriminated against them. Third, they show that they properly alleged that Appellees do not have a rational basis—much less a

39

compelling interest—for discriminating against some private school children,

particularly given the history behind the adoption of the Fourteenth Amendment.

**A. Binding Supreme Court precedent holds that a law that denies a benefit because of a constitutional right cannot survive strict scrutiny.**

The district court's holding that the restriction does not violate a

constitutional right and is therefore not subject to strict scrutiny is incorrect. Add.

15. As this Court has explained, an equal protection claim "requires identifying a

similarly situated individual who has been subject to a different classification, and

thus different treatment, under the relevant law." *Signs for Jesus v. Town of

Pembroke*, 977 F.3d 93, 113 (1st Cir. 2020). If the individual identifies an

appropriate comparator, the classification will be subject to strict scrutiny if it

"impinge[s] on personal rights protected by the Constitution." *City of Cleburne v.

Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

Parents' allegations easily meet both prongs of this test.

*First*, Parents plausibly alleged that they are treated differently compared to

others who are similarly situated under the law. To show that groups of people are

similarly situated for equal protection purposes, the party must demonstrate that in

"all relevant respects," they are the same. *Barrington Cove Ltd. P'ship v. R.I. Hous.

& Mortg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001) (emphasis omitted). If "a

prudent person . . . would think them roughly equivalent," the party has successfully demonstrated that the groups are comparators. *Id.*

Here, it is undisputed that every child in Massachusetts has an equal, statutory right to services that "are necessary for the provision of special education." M.G.L. c. 71B, § 5. Every child, moreover, is entitled to receive those services in their "regular educational environment" (unless, and "only" unless, "the nature or severity of the disability of a child" precludes it). *Id.* at §§ 1, 5. It is also beyond debate that, in providing the benefit, Massachusetts law does not distinguish between public school and private school students. *Id.* It does not say— like the IDEA—that the benefits are different for public and private school students. App. 18–20, ¶¶ 35–40. It does not say that children placed by a school committee receive different benefits than do parentally placed children. *Id.* It simply says that all children have a statutory right to receive special education benefits in their regular educational environment. *Id.*

Given these facts, Parents easily satisfy the "similarly situated" test for equal protection purposes. Their children qualify for special education services in their regular educational environments for the sole reason every other child qualifies for services: they have special needs. *Id.* Thus, their comparators are not just "roughly equivalent" to their children, which is all that equal protection requires—they are identical to them under the statute. *Barrington*, 246 F.3d at 8.

41

***Second***, Parents plausibly alleged the restriction impinges upon the federal constitutional right to direct the education of one's children and that strict scrutiny applies. A parent's "fundamental" right to direct the education of her child—including, specifically, by sending her to a private school, is "perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel*, 530 U.S. at 65. And when a law burdens a "fundamental right," "a reviewing court will strictly scrutinize that statute, upholding it only if the government can clearly demonstrate a compelling interest incapable of being served by less intrusive means." *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 47 (1st Cir. 2003).

The restriction fails that test. It singles out one category of recipients: children whose parents exercise the fundamental right to send them to a private school. *Pierce*, 236 U.S. at 524–35. Such a classification "is unconstitutional" on equal protection grounds because it "serves to penalize the exercise of [a] right"—here, by denying services in their schools, which makes it harder (indeed, impossible) to access the benefit. *Shapiro*, 394 U.S. at 634. And a state can no more provide a benefit, on equal terms, to all except those who raise their children in a certain way than it can do so to all but those who vote or speak in a particular way.

The Supreme Court's "right to travel" cases illustrate the point.[13] In *Shapiro*, the Court invalidated a one-year waiting-period provision for new residents to receive welfare benefits to which they were otherwise entitled. 394 U.S. at 634. Although Pennsylvania proffered a justification for the restriction—to encourage new residents to promptly join the labor force—the Court held the justification failed *every* level of scrutiny for a simple reason: It did not apply to all residents. "A state purpose to encourage employment," the Court explained, "provides no rational basis for imposing a one-year waiting-period restriction on new residents" when there is no "similar waiting period for long-term residents of the state." *Id.* at 637–38. Further, since the regulation applied solely to new residents who were "exercising a constitutional right"—the right to travel—it failed strict scrutiny because it "penalize[d] the exercise of that right." *Id.* at 634.

The restriction here fails for the same reason as the one in *Shapiro*: it applies *only* to those who exercise a constitutional right. If Appellees were serious about complying with the state constitution's bar on aid to private schools, and if the restriction effectuated that bar (which it does not), it would apply to *all* students in private schools. But there is "no rational basis for imposing" a restriction, even one

---

[13] *See also Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 261–63 (1974) (invalidating a law restricting benefits based on durational residency); *Zobel v. Williams*, 457 U.S. 55 (1982) (same).

grounded in a state constitution, that applies *only* to people "exercising a constitutional right." *Shapiro*, 394 U.S. at 634, 638. Even assuming Massachusetts has "a valid interest in" complying with the state constitution's bar on aiding private schools (which Parents do not concede), "the challenged provision is ill-suited to that purpose." *Mem'l Hosp.*, 415 U.S. at 268.

In sum, Parents plausibly alleged that Appellees' restriction cannot survive strict scrutiny. Appellees' interest in complying with the state constitution's bar on aiding private schools is not served by barring some (but not all) private school students from receiving services in their schools.

### B. Parents do not need to demonstrate that Appellees acted with intent to punish their exercise of a right.

The district court was also wrong to require Parents to demonstrate that Appellees acted with the "*inten*[*t*] to inhibit or punish" parents for exercising their fundamental right to choose a private education for their children. Add. 15 (emphasis added) (quoting *Barrington*, 246 F.3d at 7). That test does not apply here since this is not a "selective treatment" claim. *Barrington*, 246 F.3d at 7. A typical selective treatment claim may arise in an administrative context where, for example, a zoning regulation is arbitrarily enforced. *Rubinovitz v. Rogato*, 60 F.3d 906, 909–10 (1st Cir. 1995). The situation here, by contrast, is one "where recognized fundamental constitutional rights are abridged by official action or state regulation." *Creative Env'ts, Inc. v. Estabrook*, 680 F.2d 822, 832 n.9 (1st Cir.

1982). In cases like this, the Supreme Court has held that "[a] showing of discriminatory intent is not necessary when the equal protection claim is based on an overtly discriminatory classification." *Wayte v. United States*, 470 U.S. 598, 608 n.10 (1985).

Further, no party disputes—or could dispute—that this case involves a classification that is "overtly discriminatory." *Id.*; *see* 603 CMR 28.03(1)(e)(3) (imposing place restriction only on "students enrolled in private schools at private expense"). The place restriction was set forth in a "written" regulation that "is discriminatory on its face" and "applie[s] specifically" to parents and not to others who are similarly situated. *Meléndez–García v. Sanchez*, 629 F.3d 25, 38 (1st Cir. 2010). *See, e.g.*, App. 32, ¶ 99 (The regulation "mak[es] it more difficult— sometimes impossible—for parentally placed private school students than all others to seek and obtain aid from the government."). For these reasons, it is also no defense to justify the regulation as necessary to comply with the state constitution. *Contra* Add. 15. Under the federal Constitution, a state can no more absolve itself of the discriminatory nature of a law by pointing to a state constitutional provision that discriminates based on the *Pierce* right than it can do so with one that discriminates based on the free exercise right. *See Espinoza*, 591 U.S. at 487–88 ("When the Court was called upon to apply a state law no-aid provision to exclude religious schools from the program, it was obligated by the

Federal Constitution to reject the invitation."). Parents have plausibly alleged that their rights are infringed by "official action." *Estabrook*, 680 F.2d at 832 n.9.

### C. Parents plausibly alleged the restriction fails rational basis review.

As explained above, Parents have plausibly alleged that the restriction fails strict scrutiny and the district court was wrong to hold otherwise. But, for two reasons, the court was also wrong to hold that the restriction satisfies rational basis review. First, the Supreme Court's decision in *Romer v. Evans*, 517 U.S. 620, 633 (1996), bars a state from enforcing a state constitutional provision, like this one, that "singl[es] out a certain class of citizens for disfavored legal status or general hardships." Second, the history of the Fourteenth Amendment demonstrates that it is perverse to say that the same amendment meant to constitutionalize public aid for private school students also allows government to discriminate against private school students.

### 1. Binding Supreme Court precedent bars laws, like this one, that make it more difficult for one group of citizens to seek aid from the government.

In *Romer*, the Court applied rational basis review to invalidate an amendment to the Colorado Constitution that barred state and local governments from enacting quota preferences, anti-discrimination protections, or similar benefits for gays and lesbians. The Court explained the amendment imposed a "special disability" on a class of people by restricting the legislature's power to

provide them—and them alone—with benefits and protections enjoyed by everyone else. *Id.* at 631. For that reason, the Court held that Colorado's constitutional provision could not satisfy even rational basis review. As the Court explained, "A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense." *Id.* at 633.

Parents plausibly alleged that Appellees' regulation is like what the Court condemned in *Romer*. In *Romer*, a state law defined a group of people by their sexuality and, based on that classification, denied them the ability to obtain certain benefits. *Id.* Here, a state law identifies a group of children by how their parents exercise a constitutional right and then denies them the ability to access an otherwise generally available benefit. App. 32, ¶¶ 98–99. In each case, the law imposes a "special disability" on a group of people that makes it harder for them to obtain aid from the government. *Romer*, 517 U.S. at 631. In *Romer*, the "special disability" was so manifestly "not within our constitutional tradition" that the Court invalidated it even though there was no fundamental right implicated. Here, the place restriction *is* based on the exercise of a fundamental right, which makes it even more problematic. What's more, even if the restriction here were somehow necessary to comply with the Massachusetts Constitution (which it is not), making it harder for one group of citizens—certain children with special needs—to get

47

services to which they are statutorily entitled is "a denial of equal protection of the laws in the most literal sense." *Id.* at 633.

The district court's failure to address *Romer* was in error. But the court's analysis also fails because it is tautological: Because Massachusetts has a rational basis in complying with its state constitution, the court reasoned, the regulation has a rational basis because it complies with the state constitution. *See* Add. 16 ("[Appellees] aver that the challenged regulation was promulgated for the purpose of complying with the Anti-Aid Amendment and this Court finds that is a legitimate interest to survive rational basis review."). This analysis might suffice when it comes to an anodyne constitutional provision, but not one that has been applied to restrict benefits to a class of people (much less based on their exercise of a constitutional right). Indeed, no one would point to a state constitutional provision interpreted to bar aid to redheads and breezily conclude that a law effectuating the provision had a rational basis simply because it complied with the provision. *Espinoza*, 591 U.S. at 487–88. So too here.

What's more, and as explained above (*supra* at pp. 37–38), Massachusetts' interest in complying with a bar on aiding private *schools* is not achieved by barring some (but not all) private school *students* from getting services in schools. And again, it is irrational for the government to assert an interest in complying with the state constitution's bar on aiding private schools but *only* when it concerns

48

parentally placed children. Either the constitution bars aid to private schools or it does not; the bar cannot apply solely to some (but not all) children who attend private school.

All to say, Parents plausibly alleged that Appellees do not have a rational basis for denying children services in their schools which, in turn, makes services harder to access. As the Supreme Court put it in *Romer*, "singling out a certain class of citizens for disfavored legal status . . . is itself a denial of equal protection of the laws in the most literal sense." 517 U.S. at 633. Since the regulation first singles out parentally placed children and then imposes a "special disability" on them, it does not have "a rational relationship to legitimate state interests." *Id.* at 631–32.

### 2. The ratification history of the Fourteenth Amendment shows it would be perverse to give effect to the regulation.

The arguments in Section II, *supra*, suffice to reverse the district court. But there is an additional, independent reason that reinforces why the regulation is unconstitutional: The history of the Fourteenth Amendment.

When the framers of the Fourteenth Amendment convened, they were particularly concerned with protecting access to education, including private education. That is because among the many cruelties of slaveholders to the

enslaved was the criminalization of education.[14] Before the Civil War, "Southern

state legislatures enacted laws restricting slave religion and literacy out of fear that

the Bible offered a moral foundation for emancipation."[15] "Teaching slaves to read

(even *The Bible*) was a criminal offense punished severely in some states."[16] But

even after Emancipation, there were no public school systems serving freedmen.[17]

Accordingly, if newly freed slaves were to be educated, private schools, run by

Northern aid societies or by freedmen themselves, would be the ones to educate

them.

Like so many things during Reconstruction, these efforts were marred with

tragedy. Across the South, anti-Reconstructionists harassed, beat, and murdered

thousands of teachers,[18] and "the maintenance of Negro schools was made possible

only by the presence of Federal troops in the locality."[19] But mere protection

against hostile Southerners was not enough. Freedmen schools needed buildings

---

[14] James D. Anderson, *The Education of Blacks in the South, 1860-1935* 2 (2010) (ebook).

[15] Nicholas May, *Holy Rebellion: Religious Assembly Laws in Antebellum South Carolina and Virginia*, 49 Am. J. Legal Hist. 237, 237 (2007).

[16] Akhil Reed Amar, *The Bill of Rights and the Fourteenth Amendment*, 101 Yale L.J. 1193, 1216 (1992).

[17] Richard J. Gabel, *Public Funds for Church and Private Schools* 393 (1937).

[18] Campbell F. Scribner, *Surveying the Destruction of African American Schoolhouses in the South, 1864–1876*, 10 J. Civil War Era 469, 473 (2020).

[19] Martin Abbott, *The Freedmen's Bureau in South Carolina, 1865-1872* 93 (1967); *see also* John Richard Dennett, *The South As It Is*, 1 The Nation 779 (1865).

and money. So, in 1866, Congress directed the Freedmen's Bureau to fund and provide for schoolhouses (and to continue to provide "protection as may be required for the safe conduct of [freedmen] schools").[20] And just one year later, the Bureau signed up 130,735 freedmen, prompting one observer to quip that "they will soon be the best educated *class* in the South."[21] The Bureau ultimately furnished hundreds of schoolhouses across the South,[22] and by 1871, it spent over $5 million on black private schools.[23]

Republicans justified the Bureau's activities, including its educational efforts, under the Thirteenth Amendment's Section 2 enforcement powers. They knew that without federal aid to education, the South would in effect re-enslave freedmen by continuing to bar them from education, as they did before the war. According to Senator Lyman Trumbull, the goal of the Bureau was to erase the "incidents of slavery"—including Black Codes that "did not allow" freedmen "to be educated."[24] For Senator Charles Sumner, access to education, among other

---

[20] Act of July 16, 1686, ch. 200, §§ 6, 13, 14 Stat. 176.

[21] Ron Chernow, *Grant* 588 (2017) (emphasis in original).

[22] Gabel, *supra* note 17, at 519.

[23] *Id.*

[24] Cong. Globe, 39th Cong., 1st Sess. 322 (1866).

rights, was "essential to complete Emancipation. Without it[,] Emancipation will only be half done."[25]

But educational efforts, including northern missionary schools, were highly unpopular. Democrats "vigorously" rebuked the Bureau, which supported these private schools, as unconstitutional.[26] President Johnson even twice vetoed bills to extend the Bureau in 1866, in part because Congress had "never founded schools for any class of our own people . . . but has left the care of education to the much more competent and efficient control of the States, of communities, of private associations, and of individuals."[27]

So, before overriding Johnson's second veto, Congress approved the Fourteenth Amendment and proposed it to the states. The debates over the amendment make clear that its object, in part, was to provide a constitutional footing for the Freedmen's Bureau Act of 1866 and the Bureau itself: "The one point upon which historians of the Fourteenth Amendment agree, and, indeed which the evidence places beyond cavil, is that the Fourteenth Amendment was

---

[25] Cong. Globe, 39th Cong., 1st Sess. 91 (1865).

[26] Mark A. Graber, *The Second Freedmen's Bureau Bill's Constitution*, 94 Tex. L. Rev. 1361, 1362 (2016).

[27] Andrew Johnson, *Veto Message to the Senate* (Feb. 19, 1866), in Veto Messages of the Presidents of the United States, with the Action of Congress Thereon 289, 292 (Washington, Government Printing Office 1886).

designed to place the constitutionality of the Freedmen's Bureau and civil rights bills . . . beyond doubt."[28]

Given this history, it would be perverse to conclude that the Fourteenth Amendment—the ratification of which cemented the constitutionality of federal funding for the education of black private school students when states refused to educate them—permits states to restrict benefits to private school students, simply because their parents have exercised their right to send them to private school.[29] Thus, to the extent there is any remaining doubt that the Equal Protection Clause tolerates compliance with laws that discriminate based on those who exercise the right to private education, the history of the Fourteenth Amendment dispels it.

### III.    Parents properly preserved for appeal their claim that the Privileges or Immunities Clause is an appropriate alternative source of protection for parental rights.

The district court dismissed Parents' privileges or immunities claim. Add. 17. Parents brought this claim to preserve it for appeal due to ongoing

---

[28] Jacobus tenBroek, *Equal Under Law* 201 (1965); *see also* Cong. Globe, 39th Cong., 1st Sess. 1092 (1866) (statement of Rep. Bingham) (discussing opposition to the Freedmen's Bureau as evidence of the need for the amendment).

[29] Most Republicans did not view education as a positive right that states were "required to establish." But they did believe that a state "may not," under the Fourteenth Amendment, "discriminate if they choose to do so." Michael W. McConnell, *Originalism and the Desegregation Decisions*, 81 Va. L. Rev. 947, 1040–42 (1995) (detailing statements made by congressmen during 1875 debates on school desegregation bills).

disagreement among U.S. Supreme Court justices about whether the Due Process or "Privileges or Immunities Clause is the provision of the Fourteenth Amendment that guarantees substantive rights," such as the right to direct the education of one's children. *Id.* at 33 (quoting *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 240 n.22 (2022)). At least one current justice views the Due Process Clause as a "curious place" to be a "fount" of rights since it refers to "due process" whereas the Privileges or Immunities Clause refers to rights. *See McDonald v. City of Chicago*, 561 U.S. 742, 809–15 (2010) (Thomas, J., concurring). For their part, Parents argue that whatever the source of its protection, their right to direct the upbringing of their children is fundamental and has been infringed by Appellees' regulation for the reasons stated in their complaint. *See generally* App. 33–34. Parents acknowledge that this claim may be foreclosed under current law; they simply preserve it here for appeal, which they have properly done. *See B & T Masonry Constr. Co., v. Pub. Serv. Mut. Ins. Co.*, 382 F.3d 36, 40 (1st Cir. 2004).

## CONCLUSION

For all the reasons above, the district court's holding should be reversed.

Dated: July 18, 2025

Respectfully submitted,

Tiffany Stichel
SCHLOSSBERG, LLC
35 Braintree Hill Park, Suite 401
Braintree, MA 02184
Tel: (781) 848-5028
tstichel@schlossbergllc.com

John C. La Liberte
PIONEER NEW ENGLAND LEGAL
FOUNDATION
185 Devonshire Street, 11th Floor
Boston, MA 02110
Tel: (617) 819-1010
john.laliberte@pioneerlegal.org

/s/ David G. Hodges
David G. Hodges
Renée D. Flaherty
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320
dhodges@ij.org; rflaherty@ij.org

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 23(a)(7)(B)(i) because this brief contains 12,853 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: July 18, 2025

/s/ David G. Hodges
David G. Hodges

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of July 2025, a copy of Appellants'

Opening Brief was sent via CM/ECF to all counsel of record.

/s/ David G. Hodges
David G. Hodges

# ADDENDUM

# <u>TABLE OF CONTENTS</u>

Addendum Page

Memorandum and Order
      filed March 31, 2025................................................................................Add. 1

Order of Dismissal
      filed March 31, 2025..............................................................................Add. 19

Defendants' Memorandum for Motion to Dismiss (pp. 4, 14)
      filed July 30, 2024 ................................................................................Add. 20

Electronic Order Denying Motion for Leave to File Supplemental Authority
      Filed November 7, 2024 ........................................................................Add. 23

20 U.S.C. § 1412(a)(10)(A) .............................................................................Add. 25

Mass. Const. amend. art. XVIII, § 2 ................................................................Add. 48

603 CMR 28.03(1)(e)(3) ..................................................................................Add. 49

M.G.L. c. 71B, § 1 ...........................................................................................Add. 54

M.G.L. c. 71B, § 3 ...........................................................................................Add. 56

M.G.L. c. 71B, § 4 ...........................................................................................Add. 61

M.G.L. c. 71B, § 5 ...........................................................................................Add. 62

United States District Court
District of Massachusetts

```
                                )
ARIELLA HELLMAN, ET AL.         )
                                )
          Plaintiffs,           )
                                )    Civil Action No.
          v.                    )    24—11200-NMG
                                )
DEPARTMENT OF ELEMENTARY AND    )
SECONDARY EDUCATION, ET AL.     )
                                )
          Defendants.           )
                                )
```

### MEMORANDUM & ORDER

GORTON, J.

Plaintiffs in this case challenge the constitutionality of a state regulation governing the provision of special education services in Massachusetts. The regulation requires that publicly funded, special education services for students enrolled in private schools be provided "in a public-school facility or other public or neutral site." Thus, parents who have placed their children in private schools are responsible for transporting for their children off-site if they wish to take advantage of those free services. Plaintiffs allege that this regulation is unconstitutional because it deprives them of their right to direct the upbringing of their children.

-1-

**Add. 1**

Plaintiffs have brought suit against defendants Massachusetts Board of Elementary and Secondary Education ("the Board"), its individual members in their official capacities, the Department of Elementary and Secondary Education ("DESE") and its commissioner in his official capacity (collectively, "defendants") for their roles in promulgating and implementing the purported unconstitutional regulation.

Pending before the Court is defendants' motion to dismiss all counts for failure to state a claim under Fed. R. Civ. P. 12(b)(6) (Docket No. 13).

## I.  Background

### A. Statutory Backdrop

The Individuals with Disabilities Education Act ("IDEA") is a federal grant program to support states in providing special education services. 20 U.S.C. § 1412(a).  Among other statutory prerequisites to receive funding, a participating state must create a plan for providing a "free appropriate public education ('FAPE') in the least restrictive environment possible" for any child in the state who has a qualifying disability. Johnson v. Boston Pub. Schs., 906 F.3d 182, 185 (1st Cir. 2018) (internal quotation marks omitted)(quoting 20 U.S.C. § 1412(a)(10)). These comprehensive plans, called Individualized Education Programs ("IEPs"), are tailored to each child's needs, in

-2-

consultation with the child's parents, teachers, and school officials. See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386, 400 (2017) (internal quotation marks omitted).

The IDEA does not require identical treatment for disabled students in public schools and those placed voluntarily in private schools. The 1997 Amendments to the IDEA clarified that disabled children who have been voluntarily placed in private schools do not have "an individually enforceable right to receive special education and related services." Gary S. v. Manchester Sch. Dist., 241 F. Supp. 2d 111, 114 (D.N.H. 2003), aff'd 374 F.3d 15 (1st Cir. 2004). Rather, a school district is required only to spend a proportionate amount of its IDEA funding on special education services in private schools. Id. at 114-15.

IDEA specifies that only students who attend public schools are to receive this benefit; private school students are not entitled "the panoply of services available to disabled public school students under the rubric of [FAPE]." Gary S. v. Manchester Sch. Dist., 374 F.3d 15, 17 (1st Cir. 2002).

Massachusetts, like all state recipients of IDEA funds, must provide services to students at least as comprehensive as those outlined in IDEA. The state goes above and beyond its

-3-

**Add. 3**

federally-mandated obligations by guaranteeing to all children, regardless of whether they are enrolled in public or private school, an individual right to special education. M.G.L.c. 71B, § 3.

At the same time, Massachusetts is also subject to a provision of its state constitution which restricts the use of public funds to support private schools ("the Anti-Aid Amendment"). The provision reads, in relevant part,

> No grant, appropriation or use of public money . . . shall be made or authorized by the commonwealth or any political subdivision thereof for the purpose of founding, maintain or aiding any . . . primary or secondary school . . . which is not publicly owned.

Mass Const. art. 18, § 2.

To comport with its obligations under the Anti-Aid Amendment, the Board promulgated a regulation which, among other things, requires that school districts to ensure that publicly funded special education services "are provided in a public-school facility or other public or neutral site." 603 C.M.R. § 28.03(1)(e)(1).

**B. Facts**

According to the complaint, plaintiffs Ariella and David Hellman ("the Hellmans") are the parents of E.H., a student who attends a private elementary school in Brookline, Massachusetts. E.H. has attention deficit hyperactivity disorder ("ADHD") and

-4-

is eligible for publicly-funded special education services through the Public Schools of Brookline ("PSB").  The Hellmans initially enrolled their son with PSB for preschool, where he received special needs education pursuant to Massachusetts law. Once the Hellmans transferred E.H. to a private school, they were required to transport E.H. to a "public or neutral site" if they wished to continue taking advantage of the free special needs educational services.

Plaintiffs Josh Harrison and Miriam Segura-Harrison (the "Harrisons") allege an almost identical set of facts.  Similar to the Hellmans, they have a son with special needs.  They have decided to send their son, H.H. to Shaloh House, a private Jewish elementary school in Brighton.  Because H.H. attends a private school, he is not able to receive the special needs educational services to which he is entitled at his school.

Both the Hellmans and Harrisons (collectively, "plaintiffs") claim that they have effectively been barred from services to which they are entitled.  They assert that the additional transportation requirements imposed by the state would force them to leave work several times a day, several days each week, to take their son to a place where such services are available.  Moreover, the travel would be unduly disruptive and burdensome for their children.  As such, plaintiffs contend,

-5-

they were faced with the choice of relinquishing either 1) their son's statutorily conferred right to special education services or 2) their fundamental right, protected by the U.S. Constitution, to enroll their child in private school. Faced with that choice, the parents have chosen to forego the free special education because it is impracticable, unduly burdensome, disruptive, stigmatizing, stressful, inefficient and counterproductive.

Plaintiffs receive some special needs education for their children through Gateway, a nonprofit student service group in the Jewish community, but Gateway does not provide as many services as plaintiffs are entitled to under Massachusetts law.

**C. Procedural History**

Plaintiffs filed their three-count complaint in this Court in May, 2024. The complaint names the Massachusetts Department of Education and several individual city officials as defendants.

Count I alleges a violation of plaintiffs' rights under the Substantive Due Process Clause of the Fourteenth Amendment. Plaintiffs contend that the state limits the exercise of their fundamental right to direct the upbringing of their children.

Count II alleges a violation of the Equal Protection Clause of the Fourteenth Amendment because the state law discriminates

-6-

against parents who choose to exercise their fundamental
constitutional right to direct the upbringing of their children.

Count III alleges a violation of the Privileges or
Immunities Clause, raising the same substantive arguments as in
Count I but asserting that

> some Supreme Court justices have opined that this Clause,
> rather than (or in addition to) the Due Process Clause, is
> the source of protection for substantive rights - including
> unenumerated rights - against the states.

Defendants now move to dismiss all claims pursuant to Fed.
Rs. Civ. P. 12(b)(1) and (b)(6). Plaintiffs assent to the
dismissal of their claims against the Board and the Department
on Eleventh Amendment grounds and therefore this Court will
dismiss those defendants from this action without further
analysis of the jurisdictional issues in the claims against
them.

## II.  **Motion to Dismiss**

### A. **Legal Standard**

To survive a motion to dismiss pursuant to Fed. R. Civ. P.
12(b)(6), the subject pleading must state a claim for relief
that is actionable as a matter of law and "plausible on its
face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell
Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is
facially plausible if, after accepting as true all non-

conclusory factual allegations, the "court [can] draw the reasonable inference that the defendant is liable for the misconduct alleged." Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Iqbal, 556 U.S. at 678). The reviewing court "may not disregard properly pleaded factual allegations even if actual proof of those facts is improbable." Ocasio-Hernandez, 640 F.3d at 12.

When rendering that determination, a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein and facts susceptible to judicial notice. Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011). A court also may not disregard properly pled factual allegations even if "actual proof of those facts is improbable." Ocasio-Hernandez, 640 F.3d at 12 (quoting Twombly, 550 U.S. at 556). Rather, the necessary "inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw." Id. at 13. The assessment is holistic:

> the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible.

Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernandez, 640 F.3d at 14).

-8-

**Add. 8**

## B. Application

### 1. Substantive Due Process

Count I alleges a violation of the Due Process Clause of the Fourteenth Amendment, in that the regulation unlawfully conditions receipt of a benefit on the non-exercise of a constitutional right.

A substantive due process claim requires plaintiffs to show that they were deprived of a protected life, liberty or property interest. <u>Rivera</u> v. <u>Rhode Island</u>, 402 F.3d 27, 33-36 (1st Cir. 2005). The kinds of liberty and property interests protected by substantive due process are "much narrower" than those protected under the procedural due process framework. <u>Gonzalez-Fuentes</u> v. <u>Molina</u>, 607 F.3d 864, 880 n.13 (1st Cir. 2010). Plaintiffs must specifically name "fundamental" rights and liberties which are "deeply rooted in this Nation's history and tradition," <u>Washington</u> v. <u>Glucksberg</u>, 521 U.S. 702, 720 (1997), or "implicit in the concept of ordered liberty." <u>Palko</u> v. <u>Connecticut</u>, 302 U.S. 319, 325 (1937).

The parties diverge substantially in their framing of the "fundamental right" of which plaintiffs are allegedly deprived.

Defendants do not dispute that the Supreme Court has expressly recognized the right of parents to send their children to private school, <u>Pierce</u> v. <u>Soc'y of Sisters</u>, 268 U.S. 510,

-9-

Add. 9

534-35 (1925), but they contend that the right asserted in the
complaint goes much farther, encompassing a

> right to receive special education services at the
> state's expense . . . at the location of one's
> choosing.

Defendants argue that neither the Supreme Court nor the First
Circuit has ever recognized such a right.

Plaintiffs insist that defendants' characterization of the
fundamental right asserted is overly broad and that their
children have a statutory right to state-funded special
education services, pursuant to Massachusetts law.  The
constitutional violation arises, they say, from the fact that
their children are being deprived of their statutory right by
virtue of the parent-plaintiffs' exercise of their
constitutional right, established in <u>Pierce</u>, to enroll their
children in private school.

A decision of the United States District Court for the
District of New Hampshire in <u>Gary S.</u> v. <u>Manchester School
District</u>, affirmed by the First Circuit, is directly on point.
There, as in this case, the court faced the question of whether
the state's special education law violated plaintiff-parents'
Fourteenth Amendment rights.  The state law in question entitled
parents who had enrolled their children in public school only to
a hearing if the parents were dissatisfied with the services

-10-

**Add. 10**

rendered to their child, pursuant to IDEA. 241 F. Supp. 2d at
113. Parents of children enrolled in private school brought
suit alleging that the state law impermissibly conditioned their
right to a hearing on relinquishing their right to send their
children to private school. Id. (cleaned up).

The district court concluded, and the First Circuit
affirmed, that the case fit "comfortably" within the
longstanding caselaw from the Supreme Court and First Circuit
which

> consistently refused to invalidate laws which condition a
> parent's ability to obtain educational benefits on the
> parent's relinquishment of her right to send her child to
> private school.

374 F.3d 15, 23 (2004) (citing Norwood v. Harrison, 413 U.S.
455, 462 (1973); Strout v. Albanese, 178 F.3d 57, 66 (1st Cir.
1999); Harris v. McRae, 448 U.S. 297, 318 (1980); Maher v. Roe,
432 U.S. 464, 477 (1977)).

This Court concludes that the case at bar is controlled by
that precedent.

Plaintiffs seek to distinguish the ruling in Gary S. by
asserting that it was contingent on the fact that private school
students in New Hampshire have no statutory entitlement to
special needs education services. By contrast, plaintiffs
contend, all Massachusetts children are entitled by state

-11-

**Add. 11**

statute to receive special education services in the "least restrictive environment" under M.G.L.c. 71B, § 1. Regulations promulgated by the School Board define the

> "least restrictive environment" [to mean] to the maximum extent appropriate [in their] regular education environment.

603 C.M.R. 28.02.

That distinction does not alter the substantive due process analysis. The "equally available" benefits to which the First Circuit refers in Gary S., by comparison, are federally guaranteed unemployment benefits. Plaintiff's framing of their claim removes it from the realm of federal substantive due process entirely because the right being deprived is one conferred by state statute, as opposed to a "fundamental right" protected by the U.S. Constitution. See St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist., 919 F.3d 1003, 1009 (7th Cir. 2019) ("State-specific policies do not augment fundamental rights."). Plaintiffs' claim thus relates only to state law, i.e., whether the state regulation requiring private school students to receive publicly-funded special education services off-site denies plaintiffs' children (not the plaintiffs themselves) of their state statutory rights to receive special education services in the "least restrictive environment."

-12-

Furthermore, the state statute does not define the "least restrictive environment" in the way plaintiff claims, i.e., to require the provision of special education services on the premises of the school that the child attends.  The Court replicates the entire provision for the sake of clarity:

> Least Restrictive Environment (LRE) shall mean the educational placement assures that, to the maximum extent appropriate, students with disabilities, including students in public or private institutions or other care facilities, are educated with students who are not disabled, and that special classes, separate school, or other removal of students with disabilities from the general education environment occurs only when the nature or severity of the student's disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

603 C.M.R. § 28.02(12) (emphasis added).  The term "regular school environment" does not appear in the regulation.  To the extent plaintiffs rely on the phrase "general school environment," it is clear that, when viewed in the full context of the provision, the phrase means only that students requiring special needs services ought to be integrated, to the maximum extent appropriate, with students not requiring those services.[1] The "general school environment" to which the regulation refers

---

[1] The federal statute, 20 U.S.C. § 1412, similarly states, "[D]isabled children should be educated with nondisabled children to the maximum extent appropriate," thus "embod[ying] a statutory preference for 'mainstreaming,' or the maximum possible integration of handicappd children with nonhandicapped children." Doe v. Brookline Sch. Comm., 722 F.2d 910 (1st Cir. 1983).

-13-

Add. 13

is not "the schools that [children] attend," as plaintiffs

assert.  As such, defendants do not deny "benefits equally

available to all" so long as they seek to ensure that private

school students, just like public school students, are

integrated into learning environments with nondisabled students

"to the maximum extent appropriate."

Therefore, any distinction between the fact pattern here

and that in Gary S. is without a difference.  There is no

fundamental right that the state law burdens.  At most, just as

in Gary S., plaintiffs allege no more than burdened access to

publicly-funded benefits.  The Court finds, consistent with

Supreme Court and First Circuit precedent, that plaintiffs fail

to state a violation of their substantive due process rights.

### 2. Equal Protection

To state a claim an equal protection violation, the

plaintiff must allege that

> compared to others, similarly situated, [he] was
> selectively treated . . . based on impermissible
> considerations such as race, religion, intent to inhibit or
> punish the exercise of constitutional rights, or malicious
> or bad faith intent to injure a person.

Marrero-Gutierrez v. Molina, 491 F.3d 1, 9 (1st Cir. 2007);

Rubinovitz v. Rogato, 60 F.3d 906, 909-10 (1st Cir. 1995).

Selective treatment aimed at fundamental interests must

withstand strict scrutiny.  Mills v. State of Maine, 118 F.3d

-14-

37, 46 (1st Cir. 1997). Otherwise, the classification may stand so long as "there is any reasonably conceivable state of facts that could provide a rational basis." Heller, 509 U.S. at 320.

The same deficiency that doomed plaintiffs' substantive due process claim undermines their equal protection claim: the complaint does not demonstrate that the regulation restricts a constitutionally protected fundamental right. See supra. Plaintiffs do not demonstrate that the regulation was "inten[ded] to inhibit or punish" parent-plaintiffs for exercising a constitutionally protected fundamental right. Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 7 (1st Cir. 2001).

As such, the state law is subject to rational basis review, wherein

> [the] statute is presumed constitutional, and [t]he burden
> is on the one attacking the legislative arrangement to
> negative every conceivable basis which might support it,
> whether or not the basis has a foundation in the record.

Heller v. Doe, 509 U.S. 312, 320-21 (1993) (citations and internal quotation marks omitted).

Plaintiffs do not overcome their heavy burden. It is axiomatic that a state has a legitimate and neutral interest in promoting compliance with its valid laws. See Lorillard Tobacco Co. v. Reilly, 84 F. Supp. 2d 180, 186 (D. Mass. 2000), rev'd,

in part, on other grounds, <u>Consolidated Cigar Corp.</u> v. <u>Reilly</u>,
218 F.3d 30 (1st Cir. 2000); <u>New Motor Vehicle Bd. of Cal.</u> v.
<u>Orrin W. Fox Co.</u>, 434 U.S. 1345, 1351 (1977) (finding that the
state has an interest in ensuring its legitimate laws are
followed). Defendants aver that the challenged regulation was
promulgated for the purpose of complying with the Anti-Aid
Amendment and this Court finds that is a legitimate interest to
survive rational basis review.

### 3. Privileges or Immunities

Finally, plaintiffs assert the same substantive arguments
but lodge them instead under the auspices of the Privileges or
Immunities Clause of the Fourteenth Amendment. That clause
provides,

> No State shall make or enforce any law which shall abridge
> the privileges or immunities of citizens of the United
> States.

U.S. Cons. amend. XIV.

Defendants cite "longstanding Supreme Court precedent"
starting with the <u>Slaughter-House </u>Cases, 83 U.S. 36 (1872),
which refuse to expand the rights protected under the Privileges
or Immunities clause to unenumerated rights guaranteed by the
states.

Plaintiffs make no attempt to resuscitate their claim,
conceding that it "may be foreclosed under current law." They

-16-

**Add. 16**

suggest only that they seek to "preserve [the claim] for appeal" to the Supreme Court, where

> one currently serving justice views the Due Process Clause as a "curious place" to be a "fount" of rights since it refers to "due process" whereas the Privileges or Immunities clause refers to rights.

(Quoting McDonald v. City of Chicago, 561 U.S. 742, 809-15 (2010) (Thomas, J., concurring)).

Whether or not plaintiffs disagree with current law, this Court is bound to follow it. Hutto v. Davis, 454 U.S. 370, 375 (1982) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of [the Supreme Court] must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be."). This Court will not "jump the gun" by invalidating a centuries-old precedent when a majority of the Supreme Court declined to do so in the very decision cited by plaintiffs:

> For many decades, the question of the rights protected by the Fourteenth Amendment against state infringement has been analyzed under the Due Process Clause of that Amendment and not under the Privileges or Immunities Clause. We therefore decline to disturb the Slaughter-House holding.

McDonald, 561 U.S. at 758.

Plaintiffs are welcome to exercise their right of appeal and try their hand at overturning Slaughter-House, but this judicial officer lacks the pay grade, especially when plaintiffs

-17-

provide the Court with no justification to do so beyond the
suggestion by some that treating the Due Process Clause as the
"fount" of rights is "curious." <u>Id.</u> at 809 (Thomas, J.,
concurring).

ORDER

For the foregoing reasons, defendant's motion to dismiss
(Docket No. 13) is **ALLOWED**.

**So ordered.**

_Nathaniel M. Gorton_
Nathaniel M. Gorton
United States District Judge

Dated:  March 31, 2025

**Add. 18**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action
No: 1:24-cv-11200-NMG

Ariella Hellman et al

v.

Department of Elementary and Secondary Education et al

ORDER OF DISMISSAL

GORTON, D.J.

In accordance with the Court's Order entered on March 31, 2025, it is hereby ORDERED that the above-entitled action be and hereby is dismissed.

By the Court,

 /s/ Nicole Cowan
Docket Clerk

March 31, 2025

Add. 19

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARIELLA and DAVID HELLMAN, on their own behalf and as next friends of their child, E.H.; and JOSH HARRISON and MIRIAM SEGURA-HARRISON, on their own behalf and as next friends of their child, H.H., <br><br>            Plaintiffs, <br><br>            v. <br><br> MASSACHUSETTS BOARD OF ELEMENTARY AND SECONDARY EDUCATION; KATHERINE CRAVEN, in her official capacity as Chair of the Board; MATT HILLS, in his official capacity as Vice-Chair of the Board; DR. ERICKA FISHER, in her official capacity as a member of the Board; ELA GARDINER, in her official capacity as a member of the Board; FARZANA MOHAMED, in her official capacity as a member of the Board; MICHAEL MORIARTY, in his official capacity as a member of the Board; DALIDA ROCHA, in her official capacity as a member of the Board; PAYMON ROUHANIFARD, in his official capacity as a member of the Board; MARY ANN STEWART, in her official capacity as a member of the Board; DR. PATRICK TUTWILER, in his official capacity as a member of the Board; DR. MARTIN WEST, in his official capacity as a member of the Board; RUSSELL D. JOHNSTON, in his official capacity as Acting Secretary of the Board and Commissioner of DESE, and MASSACHUSETTS DEPARTMENT OF ELEMENTARY AND SECONDARY EDUCATION, <br><br>            Defendants. | CIVIL ACTION <br> No. 24-CV-11200-NMG |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

of the state constitution, known as the "Anti-Aid Amendment," provides that "[n]o grant, appropriation or use of public money … shall be made or authorized by the commonwealth or any political subdivision thereof for the purpose of founding, maintaining or aiding any … primary or secondary school … which is not publicly owned." Mass. Const. art. 18, § 2.

Pursuant to Chapter 71B, and to comply with the Anti-Aid Amendment, the Board promulgated a regulation governing the provision of publicly funded special-education services to children whose parents have enrolled them in private school (the "Regulation"). The Regulation states that "school district[s] shall provide to such students genuine opportunities to participate in the public school special-education program consistent with state constitutional limitations." 603 C.M.R. § 28.03(1)(e)(1). And for such private school students, the Regulation requires that school districts "ensure that special-education services funded with state or local funds are provided in a public-school facility or other public or neutral site. When services are provided using only federal funds, services may be provided on private school grounds." *Id.* § 28.03(1)(e)(3).

The Regulation, however, applies only to children whose parents have voluntarily enrolled them in private school. For children with particularly complex special-education needs, a school district may determine that it cannot itself provide the degree of services necessary for a free appropriate public education. *Doucette v. Georgetown Pub. Schs.,* 936 F.3d 16, 29 (1st Cir. 2019). Under these circumstances, the school committee may pay for "private placement" at a school that specializes in serving students with special-education needs to ensure a FAPE for all public-school students. *C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 284-85 (1st Cir. 2008); *see Doucette,* 936 F.3d at 29 ("Indeed, the right to a school placement outside of the normal public-school system when an appropriate education is not otherwise possible arises from the IDEA's guarantee of a FAPE."). Massachusetts law therefore allows school committees to "enter

4

**Add. 21**

Plaintiffs therefore fail to allege that their claims implicate a "fundamental right" ever recognized by the Supreme Court or the First Circuit.

### 2. The Board's Regulation Is Rationally Related to a Legitimate Government Interest.

Because Plaintiffs have not plausibly alleged that the Regulation infringes on a fundamental right, rational-basis review applies. Under this forgiving standard, a "statute is presumed constitutional, and [t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Heller v. Doe by Doe*, 509 U.S. 312, 320-21 (citations and internal quotation marks omitted); *Gonzalez-Droz v. Gonzalez-Colón*, 660 F.3d 1, 9-10 (1st Cir. 2011) (applying same standard to review of regulation).

Here, Plaintiffs not only fail to make any plausible allegation negating the rationality of the regulatory scheme, but also themselves identify a rational basis for the Regulation, acknowledging that it was promulgated to comply with the Anti-Aid Amendment. Compl. ¶ 43.[8] *See Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99, 107-08 (1st Cir. 2015) (affirming dismissal of substantive due process claim on motion to dismiss where Plaintiff's pleading failed to negate rational justifications for government action). The Regulation strikes a balance, effecting the State Legislature's policy judgment to provide special-education services to children in private school that are comparable to those provided to public school students, while simultaneously complying with the state constitutional Anti-Aid amendment.

---

[8] The adoption of the Anti-Aid Amendment served several legitimate purposes. *See Commonwealth v. School Comm. of Springfield*, 382 Mass. 665, 673 (1981). "[O]ne important purpose of art. 46 was to tighten the prohibition of public support for religious education" where "[p]roponents of such an amendment urged that liberty of conscience was infringed whenever a citizen was taxed to support the religious institutions of others." *Id.* (cleaned up). "A secondary purpose was to protect State and municipal treasuries from the growing pressure of interest groups in search of private appropriations." *Id.*

**Add. 22**

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | Activity in Case 1:24-cv-11200-NMG Hellman et al v. Department of Elementary and Secondary Education et al Order on Motion for Leave to File |
| **Date:** | Thursday, November 7, 2024 10:22:04 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## United States District Court

## District of Massachusetts

### Notice of Electronic Filing

The following transaction was entered on 11/7/2024 at 10:21 AM EST and filed on 11/7/2024

| | |
|---|---|
| **Case Name:** | Hellman et al v. Department of Elementary and Secondary Education et al |
| **Case Number:** | 1:24-cv-11200-NMG |
| **Filer:** | |
| **Document Number:** | 22(No document attached) |

**Docket Text:**
**Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered DENYING [21] Motion for Leave to File *Notice of Supplemental Authority in Further Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss*. (Cowan, Nicole)**

**1:24-cv-11200-NMG Notice has been electronically mailed to:**

Timothy James Casey    timothy.casey@mass.gov, Sherrie.Costa@mass.gov, adlawefilings@state.ma.us

Tiffany L. Stichel    tstichel@sabusinesslaw.com, tstichel@schlossbergllc.com

Rebecca R. Krumholz    Rebecca.krumholz@mass.gov, AdLawefilings@state.ma.us

Bryan Thomas Noonan    noonan.bryan@gmail.com, bnoonan@schlossbergllc.com

Renee Flaherty    rflaherty@ij.org

David Hodges    dhodges@ij.org, awild@ij.org, gbecker@ij.org

**1:24-cv-11200-NMG Notice will not be electronically mailed to:**

United States Code Annotated

Title 20. Education

Chapter 33. Education of Individuals with Disabilities (Refs & Annos)

Subchapter II. Assistance for Education of All Children with Disabilities

20 U.S.C.A. § 1412

§ 1412. State eligibility

Currentness

**(a) In general**

A State is eligible for assistance under this subchapter for a fiscal year if the State submits a plan that provides assurances to the Secretary that the State has in effect policies and procedures to ensure that the State meets each of the following conditions:

**(1) Free appropriate public education**

**(A) In general**

A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school.

**(B) Limitation**

The obligation to make a free appropriate public education available to all children with disabilities does not apply with respect to children--

**(i)** aged 3 through 5 and 18 through 21 in a State to the extent that its application to those children would be inconsistent with State law or practice, or the order of any court, respecting the provision of public education to children in those age ranges; and

**(ii)** aged 18 through 21 to the extent that State law does not require that special education and related services under this subchapter be provided to children with disabilities who, in the educational placement prior to their incarceration in an adult correctional facility--

**(I)** were not actually identified as being a child with a disability under section 1401 of this title; or

**(II)** did not have an individualized education program under this subchapter.

**(C) State flexibility**

Add. 25

A State that provides early intervention services in accordance with subchapter III to a child who is eligible for services under section 1419 of this title, is not required to provide such child with a free appropriate public education.

**(2) Full educational opportunity goal**

The State has established a goal of providing full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal.

**(3) Child find**

**(A) In general**

All children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.

**(B) Construction**

Nothing in this chapter requires that children be classified by their disability so long as each child who has a disability listed in section 1401 of this title and who, by reason of that disability, needs special education and related services is regarded as a child with a disability under this subchapter.

**(4) Individualized education program**

An individualized education program, or an individualized family service plan that meets the requirements of section 1436(d) of this title, is developed, reviewed, and revised for each child with a disability in accordance with section 1414(d) of this title.

**(5) Least restrictive environment**

**(A) In general**

To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

**(B) Additional requirement**

**(i) In general**

A State funding mechanism shall not result in placements that violate the requirements of subparagraph (A), and a State shall not use a funding mechanism by which the State distributes funds on the basis of the type of setting in which a child is served that will result in the failure to provide a child with a disability a free appropriate public education according to the unique needs of the child as described in the child's IEP.

**(ii) Assurance**

If the State does not have policies and procedures to ensure compliance with clause (i), the State shall provide the Secretary an assurance that the State will revise the funding mechanism as soon as feasible to ensure that such mechanism does not result in such placements.

**(6) Procedural safeguards**

**(A) In general**

Children with disabilities and their parents are afforded the procedural safeguards required by section 1415 of this title.

**(B) Additional procedural safeguards**

Procedures to ensure that testing and evaluation materials and procedures utilized for the purposes of evaluation and placement of children with disabilities for services under this chapter will be selected and administered so as not to be racially or culturally discriminatory. Such materials or procedures shall be provided and administered in the child's native language or mode of communication, unless it clearly is not feasible to do so, and no single procedure shall be the sole criterion for determining an appropriate educational program for a child.

**(7) Evaluation**

Children with disabilities are evaluated in accordance with subsections (a) through (c) of section 1414 of this title.

**(8) Confidentiality**

Agencies in the State comply with section 1417(c) of this title (relating to the confidentiality of records and information).

**(9) Transition from subchapter III to preschool programs**

Children participating in early intervention programs assisted under subchapter III, and who will participate in preschool programs assisted under this subchapter, experience a smooth and effective transition to those preschool programs in a manner consistent with section 1437(a)(9) of this title. By the third birthday of such a child, an individualized education program or, if consistent with sections 1414(d)(2)(B) and 1436(d) of this title, an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 1435(a)(10) of this title.

**Add. 27**

**(10) Children in private schools**

**(A) Children enrolled in private schools by their parents**

**(i) In general**

To the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this subchapter by providing for such children special education and related services in accordance with the following requirements, unless the Secretary has arranged for services to those children under subsection (f):

**(I)** Amounts to be expended for the provision of those services (including direct services to parentally placed private school children) by the local educational agency shall be equal to a proportionate amount of Federal funds made available under this subchapter.

**(II)** In calculating the proportionate amount of Federal funds, the local educational agency, after timely and meaningful consultation with representatives of private schools as described in clause (iii), shall conduct a thorough and complete child find process to determine the number of parentally placed children with disabilities attending private schools located in the local educational agency.

**(III)** Such services to parentally placed private school children with disabilities may be provided to the children on the premises of private, including religious, schools, to the extent consistent with law.

**(IV)** State and local funds may supplement and in no case shall supplant the proportionate amount of Federal funds required to be expended under this subparagraph.

**(V)** Each local educational agency shall maintain in its records and provide to the State educational agency the number of children evaluated under this subparagraph, the number of children determined to be children with disabilities under this paragraph, and the number of children served under this paragraph.

**(ii) Child find requirement**

**(I) In general**

The requirements of paragraph (3) (relating to child find) shall apply with respect to children with disabilities in the State who are enrolled in private, including religious, elementary schools and secondary schools.

**(II) Equitable participation**

The child find process shall be designed to ensure the equitable participation of parentally placed private school children with disabilities and an accurate count of such children.

**(III) Activities**

In carrying out this clause, the local educational agency, or where applicable, the State educational agency, shall undertake activities similar to those activities undertaken for the agency's public school children.

**(IV) Cost**

The cost of carrying out this clause, including individual evaluations, may not be considered in determining whether a local educational agency has met its obligations under clause (i).

**(V) Completion period**

Such child find process shall be completed in a time period comparable to that for other students attending public schools in the local educational agency.

**(iii) Consultation**

To ensure timely and meaningful consultation, a local educational agency, or where appropriate, a State educational agency, shall consult with private school representatives and representatives of parents of parentally placed private school children with disabilities during the design and development of special education and related services for the children, including regarding--

**(I)** the child find process and how parentally placed private school children suspected of having a disability can participate equitably, including how parents, teachers, and private school officials will be informed of the process;

**(II)** the determination of the proportionate amount of Federal funds available to serve parentally placed private school children with disabilities under this subparagraph, including the determination of how the amount was calculated;

**(III)** the consultation process among the local educational agency, private school officials, and representatives of parents of parentally placed private school children with disabilities, including how such process will operate throughout the school year to ensure that parentally placed private school children with disabilities identified through the child find process can meaningfully participate in special education and related services;

**(IV)** how, where, and by whom special education and related services will be provided for parentally placed private school children with disabilities, including a discussion of types of services, including direct services and alternate service delivery mechanisms, how such services will be apportioned if funds are insufficient to serve all children, and how and when these decisions will be made; and

**(V)** how, if the local educational agency disagrees with the views of the private school officials on the provision of services or the types of services, whether provided directly or through a contract, the local educational agency shall

provide to the private school officials a written explanation of the reasons why the local educational agency chose not to provide services directly or through a contract.

### (iv) Written affirmation

When timely and meaningful consultation as required by clause (iii) has occurred, the local educational agency shall obtain a written affirmation signed by the representatives of participating private schools, and if such representatives do not provide such affirmation within a reasonable period of time, the local educational agency shall forward the documentation of the consultation process to the State educational agency.

### (v) Compliance

#### (I) In general

A private school official shall have the right to submit a complaint to the State educational agency that the local educational agency did not engage in consultation that was meaningful and timely, or did not give due consideration to the views of the private school official.

#### (II) Procedure

If the private school official wishes to submit a complaint, the official shall provide the basis of the noncompliance with this subparagraph by the local educational agency to the State educational agency, and the local educational agency shall forward the appropriate documentation to the State educational agency. If the private school official is dissatisfied with the decision of the State educational agency, such official may submit a complaint to the Secretary by providing the basis of the noncompliance with this subparagraph by the local educational agency to the Secretary, and the State educational agency shall forward the appropriate documentation to the Secretary.

### (vi) Provision of equitable services

#### (I) Directly or through contracts

The provision of services pursuant to this subparagraph shall be provided--

##### (aa) by employees of a public agency; or

##### (bb) through contract by the public agency with an individual, association, agency, organization, or other entity.

#### (II) Secular, neutral, nonideological

Special education and related services provided to parentally placed private school children with disabilities, including materials and equipment, shall be secular, neutral, and nonideological.

**(vii) Public control of funds**

The control of funds used to provide special education and related services under this subparagraph, and title to materials, equipment, and property purchased with those funds, shall be in a public agency for the uses and purposes provided in this chapter, and a public agency shall administer the funds and property.

**(B) Children placed in, or referred to, private schools by public agencies**

**(i) In general**

Children with disabilities in private schools and facilities are provided special education and related services, in accordance with an individualized education program, at no cost to their parents, if such children are placed in, or referred to, such schools or facilities by the State or appropriate local educational agency as the means of carrying out the requirements of this subchapter or any other applicable law requiring the provision of special education and related services to all children with disabilities within such State.

**(ii) Standards**

In all cases described in clause (i), the State educational agency shall determine whether such schools and facilities meet standards that apply to State educational agencies and local educational agencies and that children so served have all the rights the children would have if served by such agencies.

**(C) Payment for education of children enrolled in private schools without consent of or referral by the public agency**

**(i) In general**

Subject to subparagraph (A), this subchapter does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.

**(ii) Reimbursement for private school placement**

If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

**(iii) Limitation on reimbursement**

The cost of reimbursement described in clause (ii) may be reduced or denied--

**(I)** if--

**(aa)** at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

**(bb)** 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);

**(II)** if, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in section 1415(b)(3) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

**(III)** upon a judicial finding of unreasonableness with respect to actions taken by the parents.

**(iv) Exception**

Notwithstanding the notice requirement in clause (iii)(I), the cost of reimbursement--

**(I)** shall not be reduced or denied for failure to provide such notice if--

**(aa)** the school prevented the parent from providing such notice;

**(bb)** the parents had not received notice, pursuant to section 1415 of this title, of the notice requirement in clause (iii)(I); or

**(cc)** compliance with clause (iii)(I) would likely result in physical harm to the child; and

**(II)** may, in the discretion of a court or a hearing officer, not be reduced or denied for failure to provide such notice if--

**(aa)** the parent is illiterate or cannot write in English; or

**(bb)** compliance with clause (iii)(I) would likely result in serious emotional harm to the child.

**(11) State educational agency responsible for general supervision**

**(A) In general**

The State educational agency is responsible for ensuring that--

**(i)** the requirements of this subchapter are met;

**(ii)** all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency--

**(I)** are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities; and

**(II)** meet the educational standards of the State educational agency; and

**(iii)** in carrying out this subchapter with respect to homeless children, the requirements of subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.) are met.

**(B) Limitation**

Subparagraph (A) shall not limit the responsibility of agencies in the State other than the State educational agency to provide, or pay for some or all of the costs of, a free appropriate public education for any child with a disability in the State.

**(C) Exception**

Notwithstanding subparagraphs (A) and (B), the Governor (or another individual pursuant to State law), consistent with State law, may assign to any public agency in the State the responsibility of ensuring that the requirements of this subchapter are met with respect to children with disabilities who are convicted as adults under State law and incarcerated in adult prisons.

**(12) Obligations related to and methods of ensuring services**

**(A) Establishing responsibility for services**

The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (B) and the State educational agency, in order to ensure that all services described in subparagraph (B)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under clause (iii). Such agreement or mechanism shall include the following:

**(i) Agency financial responsibility**

An identification of, or a method for defining, the financial responsibility of each agency for providing services described in subparagraph (B)(i) to ensure a free appropriate public education to children with disabilities, provided that the financial responsibility of each public agency described in subparagraph (B), including the State medicaid agency and other public insurers of children with disabilities, shall precede the financial responsibility of the local educational agency (or the State agency responsible for developing the child's IEP).

**(ii) Conditions and terms of reimbursement**

The conditions, terms, and procedures under which a local educational agency shall be reimbursed by other agencies.

**(iii) Interagency disputes**

Procedures for resolving interagency disputes (including procedures under which local educational agencies may initiate proceedings) under the agreement or other mechanism to secure reimbursement from other agencies or otherwise implement the provisions of the agreement or mechanism.

**(iv) Coordination of services procedures**

Policies and procedures for agencies to determine and identify the interagency coordination responsibilities of each agency to promote the coordination and timely and appropriate delivery of services described in subparagraph (B)(i).

**(B) Obligation of public agency**

**(i) In general**

If any public agency other than an educational agency is otherwise obligated under Federal or State law, or assigned responsibility under State policy pursuant to subparagraph (A), to provide or pay for any services that are also considered special education or related services (such as, but not limited to, services described in section 1401(1) relating to assistive technology devices, 1401(2) relating to assistive technology services, 1401(26) relating to related services, 1401(33) relating to supplementary aids and services, and 1401(34) of this title relating to transition services) that are necessary for ensuring a free appropriate public education to children with disabilities within the State, such public agency shall fulfill that obligation or responsibility, either directly or through contract or other arrangement pursuant to subparagraph (A) or an agreement pursuant to subparagraph (C).

**(ii) Reimbursement for services by public agency**

If a public agency other than an educational agency fails to provide or pay for the special education and related services described in clause (i), the local educational agency (or State agency responsible for developing the child's IEP) shall provide or pay for such services to the child. Such local educational agency or State agency is authorized to claim reimbursement for the services from the public agency that failed to provide or pay for such services and such public agency shall reimburse the local educational agency or State agency pursuant to the terms of the interagency agreement or other mechanism described in subparagraph (A)(i) according to the procedures established in such agreement pursuant to subparagraph (A)(ii).

**(C) Special rule**

The requirements of subparagraph (A) may be met through--

**(i)** State statute or regulation;

**(ii)** signed agreements between respective agency officials that clearly identify the responsibilities of each agency relating to the provision of services; or

**(iii)** other appropriate written methods as determined by the Chief Executive Officer of the State or designee of the officer and approved by the Secretary.

**(13) Procedural requirements relating to local educational agency eligibility**

The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this subchapter without first affording that agency reasonable notice and an opportunity for a hearing.

**(14) Personnel qualifications**

**(A) In general**

The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this subchapter are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities.

**(B) Related services personnel and paraprofessionals**

The qualifications under subparagraph (A) include qualifications for related services personnel and paraprofessionals that--

**(i)** are consistent with any State-approved or State-recognized certification, licensing, registration, or other comparable requirements that apply to the professional discipline in which those personnel are providing special education or related services;

**(ii)** ensure that related services personnel who deliver services in their discipline or profession meet the requirements of clause (i) and have not had certification or licensure requirements waived on an emergency, temporary, or provisional basis; and

**(iii)** allow paraprofessionals and assistants who are appropriately trained and supervised, in accordance with State law, regulation, or written policy, in meeting the requirements of this subchapter to be used to assist in the provision of special education and related services under this subchapter to children with disabilities.

Add. 35

**(C) Qualifications for special education teachers**

The qualifications described in subparagraph (A) shall ensure that each person employed as a special education teacher in the State who teaches elementary school, middle school, or secondary school--

**(i)** has obtained full State certification as a special education teacher (including participating in an alternate route to certification as a special educator, if such alternate route meets minimum requirements described in section 2005.56(a)(2)(ii) [1] of title 34, Code of Federal Regulations, as such section was in effect on November 28, 2008), or passed the State special education teacher licensing examination, and holds a license to teach in the State as a special education teacher, except with respect to any teacher teaching in a public charter school who shall meet the requirements set forth in the State's public charter school law;

**(ii)** has not had special education certification or licensure requirements waived on an emergency, temporary, or provisional basis; and

**(iii)** holds at least a bachelor's degree.. [2]

**(D) Policy**

In implementing this section, a State shall adopt a policy that includes a requirement that local educational agencies in the State take measurable steps to recruit, hire, train, and retain personnel who meet the applicable requirements described in this paragraph to provide special education and related services under this subchapter to children with disabilities.

**(E) Rule of construction**

Notwithstanding any other individual right of action that a parent or student may maintain under this subchapter, nothing in this paragraph shall be construed to create a right of action on behalf of an individual student for the failure of a particular State educational agency or local educational agency staff person to meet the applicable requirements described in this paragraph, or to prevent a parent from filing a complaint about staff qualifications with the State educational agency as provided for under this subchapter.

**(15) Performance goals and indicators**

The State--

**(A)** has established goals for the performance of children with disabilities in the State that--

**(i)** promote the purposes of this chapter, as stated in section 1400(d) of this title;

**(ii)** are the same as the State's long-term goals and measurements of interim progress for children with disabilities under section 6311(c)(4)(A)(i) of this title;

**(iii)** address graduation rates and dropout rates, as well as such other factors as the State may determine; and

**(iv)** are consistent, to the extent appropriate, with any other goals and standards for children established by the State;

**(B)** has established performance indicators the State will use to assess progress toward achieving the goals described in subparagraph (A), including measurements of interim progress for children with disabilities under section 6311(c)(4)(A)(i) of this title; and

**(C)** will annually report to the Secretary and the public on the progress of the State, and of children with disabilities in the State, toward meeting the goals established under subparagraph (A), which may include elements of the reports required under section 6311(h) of this title.

**(16) Participation in assessments**

**(A) In general**

All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 6311 of this title, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs.

**(B) Accommodation guidelines**

The State (or, in the case of a districtwide assessment, the local educational agency) has developed guidelines for the provision of appropriate accommodations.

**(C) Alternate assessments**

**(i) In general**

The State (or, in the case of a districtwide assessment, the local educational agency) has developed and implemented guidelines for the participation of children with disabilities in alternate assessments for those children who cannot participate in regular assessments under subparagraph (A) with accommodations as indicated in their respective individualized education programs.

**(ii) Requirements for alternate assessments**

The guidelines under clause (i) shall provide for alternate assessments that--

**(I)** are aligned with the challenging State academic content standards under section 6311(b)(1) of this title and alternate academic achievement standards under section 6311(b)(1)(E) of this title; and

**(II)** if the State has adopted alternate academic achievement standards permitted under section 6311(b)(1)(E) of this title, measure the achievement of children with disabilities against those standards.

**(iii) Conduct of alternate assessments**

The State conducts the alternate assessments described in this subparagraph.

**(D) Reports**

The State educational agency (or, in the case of a districtwide assessment, the local educational agency) makes available to the public, and reports to the public with the same frequency and in the same detail as it reports on the assessment of nondisabled children, the following:

**(i)** The number of children with disabilities participating in regular assessments, and the number of those children who were provided accommodations in order to participate in those assessments.

**(ii)** The number of children with disabilities participating in alternate assessments described in subparagraph (C)(ii)(I).

**(iii)** The number of children with disabilities participating in alternate assessments described in subparagraph (C)(ii)(II).

**(iv)** The performance of children with disabilities on regular assessments and on alternate assessments (if the number of children with disabilities participating in those assessments is sufficient to yield statistically reliable information and reporting that information will not reveal personally identifiable information about an individual student), compared with the achievement of all children, including children with disabilities, on those assessments.

**(E) Universal design**

The State educational agency (or, in the case of a districtwide assessment, the local educational agency) shall, to the extent feasible, use universal design principles in developing and administering any assessments under this paragraph.

**(17) Supplementation of State, local, and other Federal funds**

**(A) Expenditures**

Funds paid to a State under this subchapter will be expended in accordance with all the provisions of this subchapter.

**(B) Prohibition against commingling**

Funds paid to a State under this subchapter will not be commingled with State funds.

**(C) Prohibition against supplantation and conditions for waiver by Secretary**

Except as provided in section 1413 of this title, funds paid to a State under this subchapter will be used to supplement the level of Federal, State, and local funds (including funds that are not under the direct control of State or local educational agencies) expended for special education and related services provided to children with disabilities under this subchapter and in no case to supplant such Federal, State, and local funds, except that, where the State provides clear and convincing evidence that all children with disabilities have available to them a free appropriate public education, the Secretary may waive, in whole or in part, the requirements of this subparagraph if the Secretary concurs with the evidence provided by the State.

**(18) Maintenance of State financial support**

**(A) In general**

The State does not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year.

**(B) Reduction of funds for failure to maintain support**

The Secretary shall reduce the allocation of funds under section 1411 of this title for any fiscal year following the fiscal year in which the State fails to comply with the requirement of subparagraph (A) by the same amount by which the State fails to meet the requirement.

**(C) Waivers for exceptional or uncontrollable circumstances**

The Secretary may waive the requirement of subparagraph (A) for a State, for 1 fiscal year at a time, if the Secretary determines that--

**(i)** granting a waiver would be equitable due to exceptional or uncontrollable circumstances such as a natural disaster or a precipitous and unforeseen decline in the financial resources of the State; or

**(ii)** the State meets the standard in paragraph (17)(C) for a waiver of the requirement to supplement, and not to supplant, funds received under this subchapter.

**(D) Subsequent years**

If, for any year, a State fails to meet the requirement of subparagraph (A), including any year for which the State is granted a waiver under subparagraph (C), the financial support required of the State in future years under subparagraph (A) shall be the amount that would have been required in the absence of that failure and not the reduced level of the State's support.

**(19) Public participation**

Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.

**(20) Rule of construction**

In complying with paragraphs (17) and (18), a State may not use funds paid to it under this subchapter to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.

**(21) State advisory panel**

**(A) In general**

The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State.

**(B) Membership**

Such advisory panel shall consist of members appointed by the Governor, or any other official authorized under State law to make such appointments, be representative of the State population, and be composed of individuals involved in, or concerned with, the education of children with disabilities, including--

**(i)** parents of children with disabilities (ages birth through 26);

**(ii)** individuals with disabilities;

**(iii)** teachers;

**(iv)** representatives of institutions of higher education that prepare special education and related services personnel;

**(v)** State and local education officials, including officials who carry out activities under subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.);

**(vi)** administrators of programs for children with disabilities;

**(vii)** representatives of other State agencies involved in the financing or delivery of related services to children with disabilities;

**(viii)** representatives of private schools and public charter schools;

**(ix)** not less than 1 representative of a vocational, community, or business organization concerned with the provision of transition services to children with disabilities;

**(x)** a representative from the State child welfare agency responsible for foster care; and

**(xi)** representatives from the State juvenile and adult corrections agencies.

**(C) Special rule**

A majority of the members of the panel shall be individuals with disabilities or parents of children with disabilities (ages birth through 26).

**(D) Duties**

The advisory panel shall--

**(i)** advise the State educational agency of unmet needs within the State in the education of children with disabilities;

**(ii)** comment publicly on any rules or regulations proposed by the State regarding the education of children with disabilities;

**(iii)** advise the State educational agency in developing evaluations and reporting on data to the Secretary under section 1418 of this title;

**(iv)** advise the State educational agency in developing corrective action plans to address findings identified in Federal monitoring reports under this subchapter; and

**(v)** advise the State educational agency in developing and implementing policies relating to the coordination of services for children with disabilities.

**(22) Suspension and expulsion rates**

**(A) In general**

The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities--

**(i)** among local educational agencies in the State; or

Add. 41

**(ii)** compared to such rates for nondisabled children within such agencies.

**(B) Review and revision of policies**

If such discrepancies are occurring, the State educational agency reviews and, if appropriate, revises (or requires the affected State or local educational agency to revise) its policies, procedures, and practices relating to the development and implementation of IEPs, the use of positive behavioral interventions and supports, and procedural safeguards, to ensure that such policies, procedures, and practices comply with this chapter.

**(23) Access to instructional materials**

**(A) In general**

The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register.

**(B) Rights of State educational agency**

Nothing in this paragraph shall be construed to require any State educational agency to coordinate with the National Instructional Materials Access Center. If a State educational agency chooses not to coordinate with the National Instructional Materials Access Center, such agency shall provide an assurance to the Secretary that the agency will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.

**(C) Preparation and delivery of files**

If a State educational agency chooses to coordinate with the National Instructional Materials Access Center, not later than 2 years after December 3, 2004, the agency, as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials, shall enter into a written contract with the publisher of the print instructional materials to--

**(i)** require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or

**(ii)** purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats.

**(D) Assistive technology**

In carrying out this paragraph, the State educational agency, to the maximum extent possible, shall work collaboratively with the State agency responsible for assistive technology programs.

Add. 42

**(E) Definitions**

In this paragraph:

**(i) National Instructional Materials Access Center**

The term "National Instructional Materials Access Center" means the center established pursuant to section 1474(e) of this title.

**(ii) National Instructional Materials Accessibility Standard**

The term "National Instructional Materials Accessibility Standard" has the meaning given the term in section 1474(e)(3)(A) of this title.

**(iii) Specialized formats**

The term "specialized formats" has the meaning given the term in section 1474(e)(3)(D) of this title.

**(24) Overidentification and disproportionality**

The State has in effect, consistent with the purposes of this chapter and with section 1418(d) of this title, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in section 1401 of this title.

**(25) Prohibition on mandatory medication**

**(A) In general**

The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 801 et seq.) as a condition of attending school, receiving an evaluation under subsection (a) or (c) of section 1414 of this title, or receiving services under this chapter.

**(B) Rule of construction**

Nothing in subparagraph (A) shall be construed to create a Federal prohibition against teachers and other school personnel consulting or sharing classroom-based observations with parents or guardians regarding a student's academic and functional performance, or behavior in the classroom or school, or regarding the need for evaluation for special education or related services under paragraph (3).

**(b) State educational agency as provider of free appropriate public education or direct services**

Add. 43

If the State educational agency provides free appropriate public education to children with disabilities, or provides direct services to such children, such agency--

**(1)** shall comply with any additional requirements of section 1413(a) of this title, as if such agency were a local educational agency; and

**(2)** may use amounts that are otherwise available to such agency under this subchapter to serve those children without regard to section 1413(a)(2)(A)(i) of this title (relating to excess costs).

**(c) Exception for prior State plans**

**(1) In general**

If a State has on file with the Secretary policies and procedures that demonstrate that such State meets any requirement of subsection (a), including any policies and procedures filed under this subchapter as in effect before the effective date of the Individuals with Disabilities Education Improvement Act of 2004, the Secretary shall consider such State to have met such requirement for purposes of receiving a grant under this subchapter.

**(2) Modifications made by State**

Subject to paragraph (3), an application submitted by a State in accordance with this section shall remain in effect until the State submits to the Secretary such modifications as the State determines necessary. This section shall apply to a modification to an application to the same extent and in the same manner as this section applies to the original plan.

**(3) Modifications required by the Secretary**

If, after the effective date of the Individuals with Disabilities Education Improvement Act of 2004, the provisions of this chapter are amended (or the regulations developed to carry out this chapter are amended), there is a new interpretation of this chapter by a Federal court or a State's highest court, or there is an official finding of noncompliance with Federal law or regulations, then the Secretary may require a State to modify its application only to the extent necessary to ensure the State's compliance with this subchapter.

**(d) Approval by the Secretary**

**(1) In general**

If the Secretary determines that a State is eligible to receive a grant under this subchapter, the Secretary shall notify the State of that determination.

**(2) Notice and hearing**

The Secretary shall not make a final determination that a State is not eligible to receive a grant under this subchapter until after providing the State--

**(A)** with reasonable notice; and

**(B)** with an opportunity for a hearing.

**(e) Assistance under other Federal programs**

Nothing in this chapter permits a State to reduce medical and other assistance available, or to alter eligibility, under titles V and XIX of the Social Security Act with respect to the provision of a free appropriate public education for children with disabilities in the State.

**(f) By-pass for children in private schools**

**(1) In general**

If, on December 2, 1983, a State educational agency was prohibited by law from providing for the equitable participation in special programs of children with disabilities enrolled in private elementary schools and secondary schools as required by subsection (a)(10)(A), or if the Secretary determines that a State educational agency, local educational agency, or other entity has substantially failed or is unwilling to provide for such equitable participation, then the Secretary shall, notwithstanding such provision of law, arrange for the provision of services to such children through arrangements that shall be subject to the requirements of such subsection.

**(2) Payments**

**(A) Determination of amounts**

If the Secretary arranges for services pursuant to this subsection, the Secretary, after consultation with the appropriate public and private school officials, shall pay to the provider of such services for a fiscal year an amount per child that does not exceed the amount determined by dividing--

**(i)** the total amount received by the State under this subchapter for such fiscal year; by

**(ii)** the number of children with disabilities served in the prior year, as reported to the Secretary by the State under section 1418 of this title.

**(B) Withholding of certain amounts**

Pending final resolution of any investigation or complaint that may result in a determination under this subsection, the Secretary may withhold from the allocation of the affected State educational agency the amount the Secretary estimates will be necessary to pay the cost of services described in subparagraph (A).

**(C) Period of payments**

The period under which payments are made under subparagraph (A) shall continue until the Secretary determines that there will no longer be any failure or inability on the part of the State educational agency to meet the requirements of subsection (a)(10)(A).

**(3) Notice and hearing**

**(A) In general**

The Secretary shall not take any final action under this subsection until the State educational agency affected by such action has had an opportunity, for not less than 45 days after receiving written notice thereof, to submit written objections and to appear before the Secretary or the Secretary's designee to show cause why such action should not be taken.

**(B) Review of action**

If a State educational agency is dissatisfied with the Secretary's final action after a proceeding under subparagraph (A), such agency may, not later than 60 days after notice of such action, file with the United States court of appeals for the circuit in which such State is located a petition for review of that action. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Secretary. The Secretary thereupon shall file in the court the record of the proceedings on which the Secretary based the Secretary's action, as provided in section 2112 of Title 28.

**(C) Review of findings of fact**

The findings of fact by the Secretary, if supported by substantial evidence, shall be conclusive, but the court, for good cause shown, may remand the case to the Secretary to take further evidence, and the Secretary may thereupon make new or modified findings of fact and may modify the Secretary's previous action, and shall file in the court the record of the further proceedings. Such new or modified findings of fact shall likewise be conclusive if supported by substantial evidence.

**(D) Jurisdiction of court of appeals; review by United States Supreme Court**

Upon the filing of a petition under subparagraph (B), the United States court of appeals shall have jurisdiction to affirm the action of the Secretary or to set it aside, in whole or in part. The judgment of the court shall be subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

**CREDIT(S)**

(Pub.L. 91-230, Title VI, § 612, as added Pub.L. 108-446, Title I, § 101, Dec. 3, 2004, 118 Stat. 2676; amended Pub.L. 114-95, Title IX, §§ 9214(d)(2), 9215(ss)(3), Dec. 10, 2015, 129 Stat. 2164, 2182.)

---

### Footnotes

1    So in original. Probably should be "200.56(a)(2)(ii)".

2    So in original.

20 U.S.C.A. § 1412, 20 USCA § 1412
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

---

**End of Document**                                           © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

Case: 25-1417    Document: 00118315677    Page: 120    Date Filed: 07/21/2025    Entry ID: 6737264

Art. XVIII. Free exercise of religion; support of public..., MA CONST Amend....

Massachusetts General Laws Annotated
   Constitution or Form of Government for the Commonwealth of Massachusetts [Annotated]
      Articles of Amendment

M.G.L.A. Const. Amend. Art. 18

Art. XVIII. Free exercise of religion; support of public schools; use of public money or credit for schools and institutions

Currentness

SECTION 1. No law shall be passed prohibiting the free exercise of religion.

SEC. 2. No grant, appropriation or use of public money or property or loan of credit shall be made or authorized by the commonwealth or any political subdivision thereof for the purpose of founding, maintaining or aiding any infirmary, hospital, institution, primary or secondary school, or charitable or religious undertaking which is not publicly owned and under the exclusive control, order and supervision of public officers or public agents authorized by the commonwealth or federal authority or both, except that appropriations may be made for the maintenance and support of the Soldiers' Home in Massachusetts and for free public libraries in any city or town, and to carry out legal obligations, if any, already entered into; and no such grant, appropriation or use of public money or property or loan of public credit shall be made or authorized for the purpose of founding, maintaining or aiding any church, religious denomination or society. Nothing herein contained shall be construed to prevent the commonwealth from making grants-in-aid to private higher educational institutions or to students or parents or guardians of students attending such institutions.

SEC. 3. Nothing herein contained shall be construed to prevent the commonwealth, or any political division thereof, from paying to privately controlled hospitals, infirmaries, or institutions for the deaf, dumb or blind not more than the ordinary and reasonable compensation for care or support actually rendered or furnished by such hospitals, infirmaries or institutions to such persons as may be in whole or in part unable to support or care for themselves.

SEC. 4. Nothing herein contained shall be construed to deprive any inmate of a publicly controlled reformatory, penal or charitable institution of the opportunity of religious exercises therein of his own faith; but no inmate of such institution shall be compelled to attend religious services or receive religious instruction against his will, or, if a minor, without the consent of his parent or guardian.

SEC. 5. This amendment shall not take effect until the October first next succeeding its ratification and adoption by the people.

M.G.L.A. Const. Amend. Art. 18, MA CONST Amend. Art. 18
Current through amendments approved February 1, 2024.

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   Add. 48   1

Code of Massachusetts Regulations
  Title 603: Department of Elementary and Secondary Education
    Chapter 28.00: Special Education (Refs & Annos)

603 CMR 28.03

28.03: School District Administration and Personnel

Currentness

(1) <u>General Responsibilities of the School District.</u>

(a) General. Each school district shall provide or arrange for the provision of special education and related services for eligible students in accordance with the provisions of state and federal law and regulation.

1. The school district shall provide training to all school district staff, including general and special educators, administrators, and paraprofessionals, on the requirements of special education.

2. The school district shall provide such staff training in analyzing and accommodating diverse learning needs of all students in the general education classroom.

3. The school district shall provide such staff training in methods of collaboration among teachers, paraprofessionals, and teacher assistants to accommodate diverse learning needs.

4. The district shall conduct, in cooperation with the parent advisory council, at least one workshop annually within the school district on the rights of students and their parents and guardians under state and federal special education laws.

(b) Facilities. The school district shall provide facilities and classrooms for eligible students to maximize the inclusion of such students into the life of the school. Facilities and classrooms serving only students with disabilities shall be at least equal in all physical respects to the average standards of general education facilities and classrooms. Resource rooms and separate classrooms for students with disabilities shall be given the same priority as general education programs for access to and use of instructional and other space in public schools in order to minimize the separation or stigmatization of eligible students.

1. All eligible students shall have access to school facilities including, but not limited to, those areas necessary to implement the student's IEP.

2. School districts shall provide whatever equipment and make whatever physical adaptations are necessary to comply with 603 CMR 28.03(1)(b), including acoustical and lighting treatments to remove physical communication barriers for students who are deaf or hard of hearing.

3. The Department may make unannounced inspections of facilities.

4. The following examples illustrate aspects of this requirement and shall not be construed as limiting or defining its scope:

a. Placing a classroom serving only older students with disabilities in a part of the school building in which all the classrooms are occupied by elementary school students would violate the requirements of 603 CMR 28.03(1)(b).

b. Placing a sign saying "special class" on the front of a substantially separate classroom would violate the requirements of 603 CMR 28.03(1)(b).

c. Placing all special education facilities together in one part of a school building would violate the requirements of 603 CMR 28.03(1)(b).

d. Moving classrooms of students with disabilities to locations apart from the general education program because of financial or construction considerations violates the requirements of 603 CMR 28.03(1)(b).

(c) Change of Residence.

1. When an eligible student or student's family changes residence from one Massachusetts school district to another, the last IEP written by the former school district and accepted by the parent shall be provided in a comparable setting without delay until a new IEP is developed and accepted.

2. If a student found eligible in another state moves to Massachusetts, the new Massachusetts district of residence shall provide the student with a free appropriate public education, including special education services comparable to those in the IEP from the former state, in consultation with the parents, until the Massachusetts district determines if it will accept the finding of eligibility and/or the current IEP developed for the student in the former state of residence. If the Massachusetts district determines that the finding of eligibility and the IEP developed for the student continues to accurately represent the needs of the student, then the Massachusetts district shall continue to implement the IEP. If the Massachusetts district determines that a new evaluation is necessary to determine continued eligibility or services, or a parent or another person concerned with the child's development requests an evaluation, the district shall immediately provide written notice to the parents as required under 603 CMR 28.04(1).

(d) Preschool Screening. Each school district shall conduct screening for three and four year olds and for all children who are of age to enter kindergarten. Such screening shall be designed to review a child's development and to assist in identification of those children who should be referred for an evaluation to determine eligibility for special education services.

1. The school district shall submit information to the Department describing the screening program and its elements as part of the local special education plan, when so requested.

2. Participation in the screening program for three and four year olds shall be optional on the part of the parents.

(e) Private Schools at Private Expense. Nothing in 603 CMR 28.00 shall be construed to limit the rights of parents to have their children educated at private schools, completely at private expense. To the extent that public school districts provide and pay for special education services for eligible students enrolled in private schools at private expense, the following requirements shall apply:

1. Each school district shall provide special education designed to meet the needs of eligible students who are attending private schools at private expense and whose parents reside in the jurisdiction of the school district. The school district shall provide to such students genuine opportunities to participate in the public school special education program consistent with state constitutional limitations.

2. The school district shall provide or arrange for the provision of evaluation services and an IEP for any eligible private school student whose parent resides in the jurisdiction of the school district. The evaluation may take place in the public school, the private school, or an appropriate contracted facility, provided that the school district shall ensure that a representative of the student's private school is invited to participate as a member of the Team pursuant to 603 CMR 28.05.

3. The school district shall provide or arrange for the provision of the special education described by the student's IEP provided that school districts shall ensure that special education services funded with state or local funds are provided in a public school facility or other public or neutral site. When services are provided using only federal funds, services may be provided on private school grounds.

4. Special education provided by the school district to a private school student shall be comparable in quality, scope, and opportunity for participation to that provided to public school students with needs of equal importance. Programs in which both public and private school students participate may not include classes that are separated on the basis of school enrollment or the religious affiliation of the students.

(f) Early Literacy Screening. Effective July 1, 2023, each school district shall at least twice per year assess each student's reading ability and progress in literacy skills, from kindergarten through at least third grade, using a valid, developmentally appropriate screening instrument approved by the Department. Consistent with M.G.L. c. 71B, § 2 and the Department's dyslexia and literacy guidelines, if such screenings determine that a student is significantly below relevant benchmarks for age-typical development in specific literacy skills, the school shall determine which actions within the general education program will meet the student's needs, including differentiated or supplementary evidence-based reading instruction and ongoing monitoring of progress. Within 30 school days of a screening result that is significantly below the relevant benchmarks, the school shall inform the student's parent or guardian of the screening results and the school's response and shall offer them the opportunity for a follow-up discussion.

(2) Administrator of Special Education. Each school district shall appoint a person to be its Administrator of Special Education. The Administrator shall supervise all special education for the school district and shall ensure compliance with all federal and state special education laws. As appropriate, and in accordance with the requirements of M.G.L. c. 71B, § 3A, the Administrator may designate other school district personnel to carry out some of the duties of the Administrator.

(3) Responsibilities of the School Principal.

(a) Instructional Support. The principal shall implement the plan developed and adopted by the district to ensure that efforts have been made or will be made to meet the needs of diverse learners in the general education program. As part of his/her responsibilities, the principal shall promote instructional practices responsive to student needs and shall ensure that adequate instructional support is available for students and teachers. Instructional support shall include remedial instruction for students, consultative services for teachers, availability of reading instruction at the elementary level, appropriate services for linguistic minority students, and other services consistent with effective educational practices and the requirements of M.G.L. c. 71B, § 2. The principal may consult with the Administrator of Special Education regarding accommodations and interventions for students. Such efforts and their results shall be documented and placed in the student record. Additionally, if an individual student is referred for an evaluation to determine eligibility for special education, the principal shall ensure that documentation on the use of instructional support services for the student is provided as part of the evaluation information reviewed by the Team when determining eligibility.

(b) Coordination with Special Education. The principal with the assistance of the Administrator of Special Education shall coordinate the delivery and supervision of special education services within each school building.

(c) Educational Services in Home or Hospital. Upon receipt of a physician's written order verifying that any student enrolled in a public school or placed by the public school in a private setting must remain at home or in a hospital on a day or overnight basis, or any combination of both, for medical reasons and for a period of not less than 14 school days in any school year, the principal shall arrange for provision of educational services in the home or hospital. Such services shall be provided with sufficient frequency to allow the student to continue his or her educational program, as long as such services do not interfere with the medical needs of the student. The principal shall coordinate such services with the Administrator of Special Education for eligible students. Such educational services shall not be considered special education unless the student has been determined eligible for such services, and the services include services on the student's IEP.

(4) Standard Procedures and Forms. The Department may prepare standard forms to assist school districts in meeting state and federal special education requirements.

(a) The school district shall use forms that, at a minimum, contain the elements of those forms issued by the Department.

(b) School districts shall maintain required data on eligible students receiving special education services, shall ensure that such data remains current and accurate, and, on request, shall report such data in the form required by the Department and in accordance with 603 CMR 10.00: *School Finance and Accountability* and the guidelines for reporting student and financial data.

(5) Waivers. A school district, collaborative, or approved special education school program may submit in writing a proposal for approval by the Department for the satisfaction of any requirement in 603 CMR 28.00 in a manner different from that specified in 603 CMR 28.00. The Department may approve such proposal if it shows substantial promise of contributing to improvements in the methods for meeting the goals of 603 CMR 28.00 and if such proposal does not conflict with any provision of law. No such proposal shall be implemented until approved by the Department.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    4

(6) <u>Enforcement: Withholding of Funds.</u> The Department may withhold funds for special education from cities, towns, school districts, or private schools or agencies that do not comply with regulations or statutes related to special education or do not carry out plans for such compliance within a reasonable period of time; provided, however, that nothing in 603 CMR 28.03(6) shall be construed to prevent the Department from withholding state and federal funds to the extent it deems necessary consistent with state and federal law, or from taking such other enforcement action as may be authorized by law.

**Credits**

History: 1481 Mass. Reg. 73, amended eff. Oct. 28, 2022.

The Massachusetts Administrative Code titles are current through Register No. 1550, dated June 20, 2025. Some sections may be more current; see credits for details.

Mass. Regs. Code tit. 603, § 28.03, 603 MA ADC 28.03

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XII. Education (Ch. 69-78a)
      Chapter 71B. Children with Special Needs (Refs & Annos)

M.G.L.A. 71B § 1

§ 1. Definitions

Currentness

The following words as used in this chapter shall have the following meanings, unless the context clearly requires otherwise:

"Department", the department of education.

"Free appropriate public education", special education and related services as consistent with the provisions set for in the 20 U.S.C. 1400 et seq., its accompanying regulations, and which meet the education standards established by statute or established by regulations promulgated by the board of education.

"Least restrictive environment", the educational placement that assures that, to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services, cannot be achieved satisfactorily.

"Regular education", the school program and pupil assignment which normally leads to college preparatory or technical education or to a career.

"School age child", any person of ages three through twenty-one who has not attained a high school diploma or its equivalent.

"School age child with a disability", a school age child in a public or non-public school setting who, because of a disability consisting of a developmental delay or any intellectual, sensory, neurological, emotional, communication, physical, specific learning or health impairment or combination thereof, is unable to progress effectively in regular education and requires special education services, including a school age child who requires only a related service or related services if said service or services are required to ensure access of the child with a disability to the general education curriculum. The term "specific learning impairment" shall be defined pursuant to 24 CFR 300.7(c)(10), the definition of specific learning disability contained in federal regulations implementing the Individual with Disabilities Education Act in effect on January 1, 2000. The term "emotional impairment" shall be defined pursuant to 34 CFR 300.7(c)(4), the definition of "emotional disturbance" contained in federal regulations implementing the Individual with Disabilities Education Act in effect on January 1, 2000. No child shall be determined to be a student with a disability solely because such child's behavior violates the school's disciplinary code and no child shall be determined to be a student with a disability solely because such child shall have failed the statewide assessment tests authorized pursuant to section 1I of chapter 69. The use of the word disability in this section shall not be used to provide a basis for labeling or stigmatizing the child or defining the needs of the child and shall in no way limit the services, programs, and integration opportunities provided to such child.

"School age child requiring special education", a child with a disability who requires special education as determined in accordance with the provisions of this chapter and the regulations set forth by the board.

Add. 54

"Special education", educational programs and assignments including, special classes and programs or services designed to develop the educational potential of children with disabilities including, but not limited to, educational placements of children by school committees, the departments of public health, mental health, developmental services, youth services and children and families in accordance with the provisions of this chapter and the regulations set forth by the board.

**Credits**

Added by St.1972, c. 766, § 11. Amended by St.1978, c. 552, § 18; St.1986, c. 599, § 19; St.1991, c. 138, §§ 136, 137; St.1991, c. 514, § 1; St.1992, c. 286, § 149; St.1996, c. 450, § 128; St.2000, c. 159, §§ 149 to 152; St.2008, c. 176, § 64, eff. July 8, 2008; St.2008, c. 451, § 52, eff. June 30, 2009.

M.G.L.A. 71B § 1, MA ST 71B § 1
Current through the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

---

End of Document                                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
    Part I. Administration of the Government (Ch. 1-182)
        Title XII. Education (Ch. 69-78a)
            Chapter 71B. Children with Special Needs (Refs & Annos)

M.G.L.A. 71B § 3

§ 3. Identification of school age children with a disability; diagnosis of disability;
proposal of program; evaluations and assessments of child and program

Currentness

In accordance with the regulations, guidelines and directives of the department issued jointly with the departments of mental health, developmental services, public health, youth services, and the commission for the blind and the commission for the deaf and hard of hearing and with assistance of the department, the school committee of every city, town or school district shall identify the school age children residing therein who have a disability, as defined in section 2, diagnose and evaluate the needs of such children, propose a special education program to meet those needs, provide or arrange for the provision of such special education program, maintain a record of such identification, diagnosis, proposal and program actually provided and make such reports as the department may require. Until proven otherwise, every child shall be presumed to be appropriately assigned to a regular education program and presumed not to be a school age child with a disability or a school age child requiring special education.

The department shall take all steps necessary to monitor and enforce compliance with this section no less than every three years, including but not limited to investigations, on-site visits and public hearings, and shall provide assistance in planning and implementing any necessary corrective actions to ensure that no school committee provides special education services to a child pursuant to this chapter unless an evaluation conducted pursuant to this section determines that the child has a disability, as defined in section 1. The department shall further take any and all steps necessary to monitor and enforce compliance with all other provisions of this chapter, including but not limited to the requirement that school committees educate children in the least restrictive environment, as defined in section 1. The department shall also ensure that teachers and administrators are fully informed about their responsibilities for implementing the provisions of this chapter and are provided with technical assistance and training necessary to assist them in such effort.

No school committee shall refuse a school age child with a disability admission to or continued attendance in public school without the prior written approval of the department, and without complying with state and federal requirements for disciplining students with disabilities, where applicable. During the pendency of administrative or judicial proceedings, a court of competent jurisdiction shall have the authority to change a child's educational placement, including removing the child from school, in any circumstances when the school committee shows that the child's behavior poses a substantial likelihood of injury to himself or others; provided, however, that the foregoing shall not be construed to abrogate any authority concerning discipline for such a child which is available to a school committee under said regulations and procedures or any other law. No child who is so refused or removed shall be denied an alternative form of education approved by the department, as provided for in section 10, through a tutoring program at home, through enrollment in an institution operated by a state agency, or through any other program which is approved for the child by the department.

No child shall be placed in a special education program without prior consultation, evaluation, reevaluation, and consent as set forth and implemented by regulations promulgated by the department. To insure that parents can participate fully and effectively with school personnel in the consideration and development of appropriate educational programs for their child, a school committee shall, upon request by a parent, provide timely access to parents and parent-designated independent evaluators

Add. 56

and educational consultants for observations of a child's current program and of any program proposed for the child, including both academic and non-academic components of any such program. Parents and their designees shall be afforded access of sufficient duration and extent to enable them to evaluate a child's performance in a current program and the ability of a proposed program to enable such child to make effective progress. School committees shall impose no conditions or restrictions on such observations except those necessary to ensure the safety of children in a program or the integrity of the program while under observation or to protect children in the program from disclosure by an observer of confidential and personally identifiable information in the event such information is obtained in the course of an observation by a parent or a designee.

Within five days after the referral of a child enrolled in a regular education program by a school official, parent or guardian, judicial officer, social worker, family physician, or person having custody of the child for purposes of determining whether such child requires special education, the school committee shall notify the parents or guardians of such child in writing in the primary language of the home of such referral, the evaluation procedure to be followed, and the child's right to an independent evaluation at clinics or facilities approved by the department under regulations adopted jointly by the department and the departments of mental health, developmental services and public health and the right to appeal from any evaluation, first to the department, and then to the courts; provided, however, that a school district shall not be required to refer a child for an evaluation solely because the child presents a risk of or fails to be promoted at the end of the school year; and provided further, that a school district shall not be required to refer a child for an evaluation solely because such child failed the statewide assessment tests authorized pursuant to section 1*l* of chapter 69.

Within thirty days after said notification the school committee shall provide an evaluation as hereinafter defined. The parents or guardians of such child shall be consulted about the content of such evaluation and the evaluators being used. Said evaluation shall include an assessment of the child's current educational status by a representative of the local school department, an assessment by a classroom teacher who has dealt with the child in the classroom, a complete medical assessment by a physician, an assessment by a psychologist, an assessment by a nurse, social worker, or a guidance or adjustment counselor of the general home situation and pertinent family history factors; and assessments by such specialists as may be required in accordance with the diagnosis including when necessary, but not limited to an assessment by a neurologist, an audiologist, an ophthalmologist, a specialist competent in speech, language and perceptual factors and a psychiatrist. Whenever the evaluation of the Individualized Education Program team indicates that the child has a disability that affects social skills development or that the child is vulnerable to bullying, harassment or teasing because of the child's disability, the Individualized Education Program shall address the skills and proficiencies needed to avoid and respond to bullying, harassment or teasing. Whenever an evaluation indicates that a child is blind, as defined in section one hundred and thirty-six of chapter six, said evaluation shall also include an assessment of the appropriateness of Braille instruction for the child. Such assessment shall include (i) the child's efficiency in reading and writing print as compared with children who do not have a disability; (ii) the child's stamina in using print before fatigue occurs; (iii) the child's prognosis for further sight loss; and (iv) the child's present competence in Braille and a detailed explanation as to whether instruction is appropriate, conducted by a certified teacher of students with visual impairments. Any such instruction found to be essential to meet such child's disability shall be available at a frequency and duration sufficient to meet fully the educational needs of the child. Braille instruction may be used in combination with other special education services appropriate to the child's educational needs. Whenever an evaluation indicates that a child has a disability on the autism spectrum, which includes autistic disorder, Asperger's disorder, pervasive developmental disorder not otherwise specified, childhood disintegrative disorder, or Rhett's Syndrome, as defined in the most recent edition of the Diagnostic and Statistical Manual of the American Psychiatric Association, the Individualized Education Program (IEP) team, as defined by regulations of the department, shall consider and shall specifically address the following: the verbal and nonverbal communication needs of the child; the need to develop social interaction skills and proficiencies; the skills and proficiencies needed to avoid and respond to bullying, harassment or teasing; the needs resulting from the child's unusual responses to sensory experiences; the needs resulting from resistance to environmental change or change in daily routines; the needs resulting from engagement in repetitive activities and stereotyped movements; the need for any positive behavioral interventions, strategies, and supports to address any behavioral difficulties resulting from autism spectrum disorder; and other needs resulting from the child's disability that impact progress in the general curriculum, including social and emotional development. A child's Individualized Education

Program, as defined in 20 USC § 1401 (14), shall include a statement of measurable annual goals, including academic and functional goals, and a description of benchmarks or short-term objectives.

The department jointly with the departments of mental health, developmental services and public health shall issue regulations to specify qualifications for persons assessing said child.

These departments through their joint regulations may define circumstances under which the requirement of any or all of these assessments may be waived so long as an evaluation appropriate to the educational needs of the child is provided. Those persons assessing said child shall maintain a complete and specific record of diagnostic procedures attempted and their results, the conclusions reached, the suggested courses of special education best suited to the child's educational needs, and the specific benefits expected from such action. A suggested special education program may include family guidance or counseling services. When the suggested course of study is other than regular education those persons assessing said child shall present a method of monitoring the benefits of such special education and conditions that would indicate that the child should return to regular classes, and a comparison of expected outcomes in regular class placement.

If a child with a disability requires special education and related services in accordance with the provisions of the federal Individuals with Disabilities Education Act of 1975, the provisions of this chapter, and federal and state regulations promulgated pursuant thereto, such services shall be made available.

Upon completion of said evaluation, the child's parents may obtain an independent evaluation at school committee expense, from child evaluation clinics or facilities approved by the department jointly with the departments of mental health, mental retardation and public health, provided that the school committee may initiate within five school working days of the request, a hearing with the bureau of special education appeals to show that its evaluation is appropriate, in accordance with the provisions of the Individuals with Disabilities Education Act and regulations promulgated pursuant thereto; provided, however, that the parents may choose, on a voluntary basis, to share the costs of the independent evaluation with the school committee pursuant to a sliding fee scale established in regulations issued by the department pursuant to this section, in which case the school committee shall pay its share of the costs in accordance with the scale; provided, that, if the child's family income does not exceed 400 per cent of the federal poverty level established by the United States department of health and human services, parents shall pay no cost; provided, however, that the secretary of health and human services under section 13C of chapter 118E shall establish rates for educational assessments conducted or performed by psychologists and other trained certified educational personnel notwithstanding the provisions of any general or special law or rule or regulation to the contrary. A parent may obtain an independent evaluation at private expense from any specialist.

The written record and clinical history from both the evaluation provided by the school committee and independent evaluation, if any, shall be made available to the parents, guardians, or persons with custody of the child. Separate instructions, limited to the information required for adequate care of the child, shall be distributed only to those persons directly concerned with the care of the child. Otherwise said records shall be confidential.

The department may hold hearings through the bureau of special education appeals regarding said evaluation, said hearings to be held in accordance with the provisions of chapter thirty A. The parents, guardians, or persons with custody may refuse the education program suggested by the initial evaluation and request said hearing by the department into the evaluation of the child and the appropriate education program. The hearing officer shall order such educational placement and services as he deems appropriate and consistent with this chapter to assure the child receives a free and appropriate public education in the least restrictive environment; provided, however, that a presumption shall exist to direct such placement to the regular educational environment. The hearing officer may determine, in accordance with the rules, regulations and policies of the respective agencies, that services shall be provided by the department of children and families, the department of mental retardation, the department of mental health, the department of public health, or any other state agency or program, in addition to the program and related services to be provided by the school committee. Such order may provide for: the placement or services requested by the school committee, the placement or services requested by the parent, either of those placements or

services with modifications, or such alternative programs or services as may be required to assure such development of such child. Said parents, guardians or persons with custody may either consent to or reject such placement, program or services. If rejected, and the program desired by the parents, guardian or person with custody is a regular education program, the department and the local school committee shall provide the child with the educational program chosen by the parent, guardian or persons with custody except where such placement would seriously endanger the health or safety of the child, substantially disrupt the program for other students or, if the child is currently placed in a special education program, deny the child a free appropriate public education. In such circumstances the local school committee may proceed to the superior court with jurisdiction over the residence of the child to make such showing. Said court upon such showing shall be authorized to place the child in an appropriate education program.

At any time, school committees and parents, guardians, or persons with custody of a student may voluntarily agree to seek resolution of any dispute through mediation provided by the bureau of special education appeals, provided, that the mediation process may not be used to deny or delay a parent's right to a due process hearing or to delay or deny any other rights afforded under this chapter and the federal Individuals with Disabilities Education Act of 1975, as so amended and shall be scheduled as soon as practicable after such agreement.

If the parents, guardians or persons with custody reject the educational placement recommended by the department and desire a program other than a regular education program, they may proceed to the superior court with jurisdiction over the residence of the child and said court shall be authorized to order the placement of the child in an appropriate education program.

During the course of the evaluations, assessments, or hearings provided for above, a child shall be placed in a regular education program unless such placement endangers the health or safety of the child or substantially disrupts such education program for other children.

No parent or guardian of any child placed in a special education program shall be required to perform duties not required of a parent or guardian of a child in a regular school program.

The educational progress of any child placed in a special education program shall be reviewed at least annually as set forth above. If such evaluation suggests that the initial evaluation was in error or that a different program or medical treatment would now benefit the child more, appropriate reassignment or alteration in treatment shall be recommended to the parents, guardians or persons having custody of the child. If the evaluation of the special education program shows that said program does not provide educational benefit to the child in the least restrictive environment, then such child shall be reassigned. If the evaluation shows that the child no longer needs special education services, the team shall recommend that the child no longer be considered a school age child with disabilities for the purposes of this chapter.

Evaluations and assessments of children and special education programs shall remain confidential and be used solely for the administration of special education in the commonwealth, including, but not limited to, inspection by the department and regional and state advisory councils to insure that every special education program does benefit the children there assigned.

The school committee of any city, town, or school district shall establish a parent advisory council on special education. Membership shall be offered to all parents of children with disabilities and other interested parties. The parent advisory council duties shall include but not be limited to: advising the school committee on matters that pertain to the education and safety of students with disabilities; meeting regularly with school officials to participate in the planning, development, and evaluation of the school committee's special education programs. The parent advisory council shall establish by-laws regarding officers and operational procedures. In the course of its duties under this section, the parent advisory council shall receive assistance from the school committee without charge, upon reasonable notice, and subject to the availability of staff and resources.

If a student's individual education plan necessitates special education services in a day or residential facility or an educational collaborative, the IEP team shall consider whether the child requires special education services and supports to promote the

Add. 59

student's transition to placement in a less restrictive program. If the student requires such services, then the IEP shall include a statement of any special education services and supports necessary to promote the child's transition to placement in a less restrictive program.

**Credits**

Added by St.1972, c. 766, § 11. Amended by St.1978, c. 552, § 20; St.1986, c. 599, § 22; St.1989, c. 653, § 51; St.1991, c. 138, §§ 139, 140, 340; St.1996, c. 151, § 226; St.1996, c. 374, § 4; St.1997, c. 43, §§ 69, 70; St.2000, c. 159, §§ 156 to 168; St.2002, c. 184, § 83; St.2003, c. 26, § 214, eff. July 1, 2003; St.2006, c. 57, eff. July 6, 2006; St.2008, c. 176, § 66, eff. July 8, 2008; St.2008, c. 363, eff. Jan. 8, 2009; St.2008, c. 451, § 54, eff. June 30, 2009; St.2010, c. 92, §§ 7, 8, eff. May 3, 2010; St.2010, c. 131, § 54, eff. July 1, 2010; St.2012, c. 224, § 58, eff. Nov. 4, 2012; St.2013, c. 140, eff. Feb. 18, 2014.

M.G.L.A. 71B § 3, MA ST 71B § 3
Current through the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

**Add. 60**

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XII. Education (Ch. 69-78a)
      Chapter 71B. Children with Special Needs (Refs & Annos)

M.G.L.A. 71B § 4

§ 4. Agreements between school committees or with public or private schools

Currentness

The school committee of any city, town or school district may, to meet its obligations under section three, with the approval of the department enter into an agreement with any other school committee to jointly provide special education or, subject to the consent of the parent or guardian affected thereby and subject to constitutional limitations, may enter into an agreement with any public or private school, agency, or institution to provide the necessary special education within the city, town or school district; provided, however, that every school committee, where feasible, shall be associated with an educational collaborative providing services to children with a disability which disability occurs in a low incidence in the population of children requiring special education.

In the case of an agreement between school committees to jointly provide special education, said agreement shall designate one city, town or school district as the operating agent. Funds received by such operating agent from other cities, towns or school districts or appropriated by such operating agent for the purposes of such agreement, in addition to gifts and grants shall be deposited with and held as a separate account by its treasurer. The school committee may apply said funds to the costs of programs operated pursuant to the agreement without further appropriation.

**Credits**

Added by St.1972, c. 766, § 11. Amended by St.2000, c. 159, § 169.

M.G.L.A. 71B § 4, MA ST 71B § 4
Current through the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
    Part I. Administration of the Government (Ch. 1-182)
        Title XII. Education (Ch. 69-78a)
            Chapter 71B. Children with Special Needs (Refs & Annos)

M.G.L.A. 71B § 5

§ 5. Costs or obligations; payment; budget

Currentness

Any school committee which provides or arranges for the provision of special education pursuant to the provisions of section three shall pay for such special education personnel, materials and equipment, tuition, room and board, transportation, rent and consultant services as are necessary for the provision of special education; provided, however, that the school committee shall not be obligated to pay for health care goods or services to the extent that such goods or services constitute medically necessary treatment for disease, illness, injury, or bodily dysfunction which would be covered by a third party payor but for a school-aged child's eligibility for such goods and services under this chapter; provided, further, that the determination of medical necessity shall be made by the third party payor under its standard program of utilization review, that the school-aged child with a disability or his parent or guardian if he is a minor shall have the right to freedom of choice in the election of the provider of health care goods and services, and that the provider of health care goods and services does not have a direct or indirect financial relationship to the school committee; and provided, further, that school committees may accept payment for health care goods and services provided by certified school committee employees from third party payors other than the program of medical care and assistance established under chapter one hundred and eighteen E except as provided under section seventy-two of chapter forty-four. Where no such third party payor is available, school committees are not relieved of their responsibilities under this chapter.

Notwithstanding the provisions of section 27C of chapter 29 or any other general or special law to the contrary, if a child with a disability for whom a school committee currently provides or arranges for the provision of special education in an approved private day or residential school placement, including placement in a pediatric nursing home pursuant to the provisions of section 3, or his parent or guardian moves to a different school district on or after July 1 of any fiscal year, such school committee of the former community of residence shall pay the approved budgeted costs, including necessary transportation costs, of such day or residential placement, including placement in a pediatric nursing home, of such child for the balance of such fiscal year; provided, however, that if such move occurs between April 1 and June 30, such school committee of the former community of residence shall pay such costs for the balance of the fiscal year in which the move occurred as well as for the subsequent fiscal year. The school committee of the new community of residence shall assume all responsibilities for reviewing the child's progress, monitoring the effectiveness of the placement, and reevaluating the child's needs from the date of new residence; provided, however, that during the period when the financial obligation of the former community of residence for such day or residential placement continues pursuant to this section, the school committee of such new community of residence shall provide the school committee of the former community of residence with notice of any such review, monitoring, and reevaluation, and an opportunity to participate; and provided, further, that the school committee of such new community of residence shall be financially responsive for any increase, and the obligation of the school committee of such former community of residence shall be reduced by any decrease, in the costs of such day or residential placement during such period which results from any such review, monitoring or reevaluation.

A school committee which incurs costs or obligations under the provision of this section shall include within its annual budget an amount of money to comply with said provisions. Said amount shall be added to the annual budget appropriation for school purposes in each city or town for the support of public schools for the purposes of, and enforceable pursuant to, section thirty-

Add.62

four of chapter seventy-one, notwithstanding any general or special laws or charter provisions which limit the amount of money that may be appropriated in any city or town for school purposes.

**Credits**

Added by St.1972, c. 766, § 11. Amended by St.1973, c. 318, § 1; St.1981, c. 351, § 123; St.1982, c. 314; St.1989, c. 653, § 52; St.1991, c. 138, §§ 142, 143; St.1992, c. 133, § 434; St.1992, c. 286, § 150; St.1993, c. 50, § 19; St.1997, c. 43, §§ 71, 72; St.1998, c. 194, § 130; St.2000, c. 159, § 170.

M.G.L.A. 71B § 5, MA ST 71B § 5

Current through the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.