# United States Court of Appeals
## For the First Circuit

No. 25-1417

ARIELLA HELLMAN, on their own behalf and as next friend of their child, E.H.; DAVID HELLMAN, on their own behalf and as next friend of their child, E.H.; JOSH HARRISON, on their own behalf and as next friend of their child, H.H.; MIRIAM SEGURA-HARRISON, on their own behalf and as next friend of their child, H.H.,

Plaintiffs, Appellants,

v.

MASSACHUSETTS DEPARTMENT OF ELEMENTARY AND SECONDARY EDUCATION; KATHERINE CRAVEN, in the official capacity as Chair of the Board; MATTHEW B. HILLS, in the official capacity as Vice-Chair of the Board; DR. ERICKA FISHER, in the official capacity as a member of the Board; ISABELLA CHAMBERLAIN, in the official capacity as a member of the Board; FARZANA MOHAMED, in the official capacity as a member of the Board; DR. ERICKA FISHER, in the official capacity as a member of the Board; DÁLIDA ROCHA, in the official capacity as a member of the Board; KRISTEN SMIDY, in the official capacity as a member of the Board; MARY ANN STEWART, in the official capacity as a member of the Board; DR. AMY KERSHAW, in the official capacity as a member of the Board; DR. MARTIN WEST, in the official capacity as a member of the Board; PEDRO MARTINEZ, in the official capacity as Acting Secretary of the Board and Commissioner of DESE; MASSACHUSETTS BOARD OF ELEMENTARY AND SECONDARY EDUCATION,[*]

Defendants, Appellees.

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Russell D. Johnston has been substituted by Pedro Martinez, Dr. Patrick Tutwiler has been substituted by Dr. Amy Kershaw, and Board of Elementary and Secondary Education Members Ela Gardiner, Michael Moriarity, and Paymoun Rouhanifard have been substituted by Isabella Chamberlain, Ericka Fisher, and Kristen Smidy.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

———————————

Before

Gelpí, Thompson, and Montecalvo,
Circuit Judges.

———————————

David G. Hodges, with whom Renée D. Flaherty, Institute for Justice, John C. La Liberte, Pioneer Public Interest Law Center, Tiffany Stichel, and Schlossberg, LLC, were on brief for appellants.

Timothy J. Casey, Assistant Attorney General, with whom Andrea Joy Campbell, Attorney General of Massachusetts, was on brief, for appellees.

Donald A. Daugherty, Jr., Martha A. Astor, and Defense of Freedom Institute on brief for amicus curiae Defense of Freedom Institute.

———————————

March 20, 2026

———————————

**GELPÍ**, <u>**Circuit Judge**</u>.  Massachusetts grants all of the state's students with disabilities an individual entitlement to publicly funded special education services.  But state regulations distinguish between public and private school students when determining where those services may be provided.  While public school students may generally receive services at their schools of enrollment, private school students may receive services only at a public school or another public or neutral location.  This distinction reflects, in part, a provision of the Massachusetts Constitution that prohibits the state from providing direct aid to private schools.

The parents of E.H. and H.H. -- two children with disabilities enrolled in private schools -- challenge this regulation under the Fourteenth Amendment.  They claim it violates the Due Process, Equal Protection, and Privileges or Immunities Clauses by interfering with their fundamental constitutional right to enroll their children in private school.  The district court dismissed their complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  We now affirm.

**I.**

**A. Statutory and Regulatory Background**

We begin with an overview of the relevant statutory and regulatory schemes.  The Individuals with Disabilities Education Act ("IDEA") is a federal grant program that supports states in

- 3 -

providing special education services for children with disabilities. 20 U.S.C. §§ 1400 et seq. In exchange for federal funding, participating states commit to providing all such students "within their jurisdiction 'a free appropriate public education ('FAPE') in the least restrictive environment possible.'" Johnson v. Bos. Pub. Schs., 906 F.3d 182, 185 (1st Cir. 2018) (quoting Sebastian M. v. King Philip Reg'l Sch. Dist., 685 F.3d 79, 81 (1st Cir. 2012)).

A FAPE includes "both 'specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability' and 'such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education.'" Id. (quoting 20 U.S.C. § 1401(9), (26)(A), (29)). A FAPE is primarily delivered according to an Individualized Education Program ("IEP") -- a written plan developed by a team that includes the child's parents, teachers, and school officials that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Id. (quoting Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386, 399 (2017)); 20 U.S.C. § 1414(d)(1)(A), (B).

The "[l]east restrictive environment" is defined as the educational placement that assures:

- 4 -

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

The IDEA does not require identical treatment for students in public schools and students in private schools. As to special education specifically, students with disabilities enrolled in private schools do not have "an individually enforceable right to receive special education and related services." See Gary S. v. Manchester Sch. Dist., 241 F. Supp. 2d 111, 114 (D.N.H. 2003), aff'd, 374 F.3d 15 (1st Cir. 2004); 20 U.S.C. § 1412(a)(10)(C)(i). Instead, the IDEA requires that private schools receive a proportionate share of a state's IDEA funds. 20 U.S.C. § 1412(a)(10)(A)(i).

As a recipient of IDEA funds, Massachusetts maintains a plan for the provision of special education services. But Massachusetts state law goes beyond the federal baseline by providing all children with disabilities -- including children in private schools -- an individually enforceable right to special

education services.[1]  Mass. Gen. Laws ch. 71B ("M.G.L. c. 71B"), §§ 1, 3.  To implement that right, the Massachusetts Board of Elementary and Secondary Education (the "Board") must "promulgate" regulations to ensure that children with disabilities receive a "[FAPE] in the least restrictive environment . . . ." Id. § 2.[2]

Pursuant to Chapter 71B, the Board promulgated regulations governing publicly funded special education services for students in private school at private expense.[3]  Those regulations require "[e]ach school district . . . [to] provide special education designed to meet the needs of eligible students" who are enrolled in private schools, 603 Mass. Code Regs.

---

[1] Before Congress enacted the IDEA Amendments of 1997, it was unclear whether states were required to make a FAPE available to students with disabilities voluntarily placed in private school. Gary S., 241 F. Supp. 2d at 114-15.  Massachusetts had done so. In 2020, the state legislature decided to continue that practice, though it was then clear that it was not required under the IDEA. See 1999 Mass. Acts 941.

[2] Massachusetts state law defines "[FAPE]" and "[l]east restrictive environment" substantially the same way as the IDEA. See M.G.L. c. 71B, § 1.

[3] The relevant regulations only govern students enrolled in private schools by their parents.  They do not, however, apply to children that the government places in private schools when it determines a public school is unable to educate them.  M.G.L. c. 71B, § 4; see also id. § 10.  When enrolled in private school under these circumstances, the child is considered a "publicly funded student[]" under the IDEA, 603 Mass. Code Regs. § 28.06, which entitles the child to "all the rights the child[] would have if served by" the public school district, 20 U.S.C. § 1412(a)(10)(B).
Unless otherwise specified, we use "students in private school" or "private school students" interchangeably to refer only to students enrolled in private school by their parents.

§ 28.03(1)(e)(1), which includes developing an IEP and delivering the services recommended therein, id. § 28.03(1)(e)(2), (3).  The regulations further require that the special education provided to private school students be "comparable in quality, scope, and opportunity for participation to that provided to public school students with needs of equal importance."  Id.  § 28.03(1)(e)(4).

Central to this appeal, the regulations require that "special education services funded with state or local funds [be] provided in a public school facility or other public or neutral site" (the "Place Regulation").  Id. § 28.03(1)(e)(3)  (emphasis added).  In practice, this provision means that private school students must leave their schools to receive special education services, while public school students receive services on site.

The Board promulgated the Place Regulation because Massachusetts's state constitution restricts the use of public funds to support private schools ("the Anti-Aid Amendment").  The constitutional provision reads: "No grant, appropriation or use of public money . . . shall be made or authorized by the Commonwealth or any political subdivision thereof for the purpose of founding, maintaining  or  aiding  any . . . primary  or  secondary school . . . which is not publicly owned."  Mass. Const. amend. art. XVIII, § 2.  Thus, Massachusetts's statutory and regulatory scheme governing the provision of special education services seeks to (1) extend those services to students enrolled in private

- 7 -

schools, without (2) running afoul of the state constitution.  With this necessary background, we now turn to the facts underlying this appeal.

### B. Factual Background[4]

Appellants Ariella and David Hellman have a son, E.H., who attends a private elementary school in Massachusetts.  E.H. has attention-deficit/hyperactivity disorder (ADHD), and so he is eligible for publicly funded special education services under state law.  The Hellmans pursued these services and obtained an IEP, which recommends that E.H. receive two hours of academic support and thirty minutes of counseling and learning center time per week.  The Hellmans are working parents, and their jobs prevent them from transporting their son to and from school multiple times per week, so they had decided to enroll E.H. in public school.  But because the Hellmans "observe Jewish law and want their children to receive an education informed by Judaism," they later withdrew E.H. from public school and enrolled him at a private Jewish school.

Because E.H. cannot receive services at his private school, and the Hellmans consider transporting E.H. several times

---

[4] Because this appeal follows a motion to dismiss, we pull our facts from the Hellmans' and the Harrisons' complaint.  Shash v. Biogen, Inc., 84 F.4th 1, 6 (1st Cir. 2023) ("When reviewing a motion to dismiss, we recount the underlying facts as alleged in the complaint . . . .").

per week to be "unduly burdensome, disruptive, stigmatizing, stressful, inefficient," and a "detract[ion] from the education at . . . religious school[]," they have elected to forgo the state's publicly funded services.

Appellants Josh Harrison and Miriam Segura-Harrison's son, H.H., also attends a private elementary school in Massachusetts. H.H. has ADHD, developmental coordination disorder, and dyslexia. Like E.H., H.H. is eligible for publicly funded special education services. The Harrisons pursued the state's services and obtained an IEP, which recommends that H.H. receive four hours of self-regulation instruction, along with nearly two hours each of reading instruction, occupational therapy, and psychological services per week. Like the Hellmans, the Harrisons have forgone the state's publicly funded services because they are Jewish and believe such education would be best for their son and because the only way H.H. could receive the services is if they transport him to and from his private school. They too believe doing so would be "unduly burdensome, disruptive, stigmatizing, stressful, inefficient," and a "detract[ion] from the education at . . . religious school[]."

E.H. and H.H. receive some special education services through a nonprofit student service group, but it does not provide the full panoply of support that could be received in a public

school or -- absent the Place Regulation -- could be provided by Massachusetts in their private schools.

## C. Procedural Background

E.H. and H.H.'s parents (the "Parents") sued the Board, its individual members in their official capacities, the Massachusetts Department of Elementary and Secondary Education, and its commissioner in his official capacity (collectively, the "State Appellees") pursuant to 42 U.S.C. § 1983.[5]  They claimed the Place Regulation violates the Due Process, Equal Protection, and Privileges or Immunities Clauses of the Fourteenth Amendment to the United States Constitution.[6]  The State Appellees moved to dismiss all claims for failure to state a claim, and the district court granted the motion.  The Parents timely appealed.

## II.

The Parents raise several arguments on appeal.  First, they assert the district court erred in both its interpretation of the Place Regulation and its application of Supreme Court

---

[5] The district court dismissed the Board and the Department of Elementary and Secondary Education after the Parents agreed that the Eleventh Amendment barred claims against those state agencies.

[6] We note that there are two versions of the Privileges and Immunities Clause, the first in Article IV § 2 (Privileges and Immunities Clause) and the second in the Fourteenth Amendment (Privileges or Immunities Clause), with distinct applications. (Note the use of "and" instead of "or.")  The Parents' claims arise from the Clause in the Fourteenth Amendment, to wit, the Privileges or Immunities Clause.

precedent.    They  maintain  that  a  true  reading  of  the  Place
Regulation conditions their access to the state's services on their
relinquishment of their fundamental right to direct the upbringing
of  their  children  and  penalizes  them  by  making  it  extremely
difficult  or  impossible  for  them  to  exercise  the  right.    Next,
they  assert  that  the  Place  Regulation  discriminates  against
parents who choose to exercise their fundamental right to direct
the upbringing of their children.   Lastly, they argue that, to the
extent that substantive protection for parental rights lies in the
Privileges  or  Immunities  Clause,  rather  than  the  Due  Process
Clause, they preserve a Privileges or Immunities Clause claim for
appeal.   We address each argument *seriatim*.

Because this appeal comes to us from a grant of a motion
to dismiss, we review each claim de novo and may affirm on any
ground supported by the record.   Analog Techs., Inc. v. Analog
Devices, Inc., 105 F.4th 13, 17 (1st Cir. 2024).   "To survive a
motion  to  dismiss,  a  complaint  must  contain  sufficient  factual
matter, accepted as true, to state a claim to relief that is
plausible on its face."   Mehta v. Ocular Therapeutix, Inc., 955
F.3d 194, 205 (1st Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S.
662, 678 (2009)); see also Fed. R. Civ. P. 12(b)(6).

### A. Substantive Due Process Claim

The  Parents'  first  claim  arises  under  the  substantive
component of the Due Process Clause of the Fourteenth Amendment,

- 11 -

which provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  At its core, substantive due process asks whether the government has a good enough reason to deprive a person of life, liberty, or property.  See Erwin Chemerinsky, Substantive Due Process, 15 Touro L. Rev. 1501, 1501 (1999).  Some liberties are considered especially important, or "fundamental," and the government faces a higher bar before it can interfere with them. See Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997).

Consistent with that principle, we employ a three-step[7] framework to evaluate substantive due process claims.  "First, we ask whether a party has adequately alleged a right recognized as fundamental."  Foote v. Ludlow Sch. Comm., 128 F.4th 336, 347 n.14 (1st Cir. 2025), petition for cert. filed., No. 25-77 (U.S. July 18, 2025).[8]  Next, "we assess whether the government conduct

_____

[7] Substantive due process claims challenging executive actions ordinarily have a preceding analytical step, considering whether the behavior of the governmental officer "shocks the conscience." Foote v. Ludlow Sch. Comm., 128 F.4th 336, 346 (1st Cir. 2025), petition for cert. filed., No. 25-77.  The parties agree that because the Place Regulation is "legislative," not "executive" in nature, we need not also consider whether the Place Regulation "shocks the conscience."

[8] There is a petition for certiorari pending before the Supreme Court in Foote.  See Pet. for a Writ of Cert. at i, Foote v. Ludlow Sch. Comm., No. 25-77 (U.S. July 18, 2025).  And the Supreme Court recently reinstated an injunction blocking a law that, "in critical respects, is a carbon copy" of the one we held was valid in Foote.  See Mirabelli v. Bonta, 607 U.S. __, __ (2026) (Kagan, J., dissenting).  We nonetheless rely on Foote only insofar

at issue is alleged to have restricted that right." Id. "[I]f the answer is yes, the conduct is alleged to have restricted a fundamental right, then we examine whether the restriction satisfies the appropriate level of heightened scrutiny." Id. If the answer is no, we examine whether the government conduct survives rational basis review. Id.

### 1.

We begin at step one: whether the Parents have adequately alleged a right recognized as fundamental. The Supreme Court has been very careful in defining fundamental rights, recognizing only those rights that are "objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Glucksberg, 521 U.S. at 720-21 (citations omitted). Applying that standard, the Court has long recognized that parents have a fundamental liberty interest in directing the upbringing and education of children under their control. See id. at 720; Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-35 (1925). This liberty interest is commonly referred to as the Meyer or Pierce right because it finds its origin in two Supreme Court cases, Meyer v. Nebraska, 262 U.S. 390 (1923), and Pierce v. Society of Sisters, 268 U.S. 510 (1925). Meyer struck down a state

as it provides a framework for assessing a substantive due process claim, not for the merits analysis in this case.

- 13 -

law prohibiting the teaching of any subject except in English. 262 U.S. at 400, 403.  Pierce struck down a law mandating public school education.  268 U.S at 535 ("The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only.").

The Parents claim that the Place Regulation infringes on their Pierce right to send their children to private school because it conditions a state benefit on the non-exercise of that right. The State Appellees attempt to frame the Parents' asserted right more narrowly, as a nonexistent constitutional "right to state-funded special-education services" at the location of one's choosing.  Thus, according to the State Appellees, the Parents have failed to assert infringement of a fundamental right, as required to bring a substantive due process claim.

We think the Parents have the better argument on this point.  Although parties must carefully define asserted fundamental rights, Glucksberg, 521 U.S. at 721, in its parental rights cases, the Court has not defined the right by focusing narrowly on the particular conduct challenged.  See, e.g., Meyer, 262 U.S. at 400, 403 (not defining the parents' right as the right to allow their child to learn German); Pierce, 268 U.S. at 534-35 (not defining the right as the right to send their child to religious school); Troxel v. Granville, 530 U.S. 57, 72-73 (2000)

- 14 -

(not defining the right as the right to prevent a grandparent from visiting their grandchild).  Instead, it has asked "whether the [governmental] conduct at issue f[alls] within the broader, well-established parental right to direct the upbringing of one's child."  Foote, 128 F.4th at 348.  That includes the right to choose private schooling.

We understand the complaint to allege that the denial of a state statutory right (access to publicly funded special education services) burdens the Parents' Pierce right to enroll their children in private school.  This allegation is enough to get past step one.  See id. at 348-49 (declining to require "microscopic granularity" in defining parental rights).

**2.**

Onto step two: whether the Parents have alleged that "the government conduct at issue . . . restricted that [fundamental] right."  Id. at 347 n.14.  On this point, the Parents argue that the Place Regulation conditions access to special education services on their "non-exercise" of the right to enroll their children in private school.  But that framing does not carry their claim past step two.  The Place Regulation does not bar parents from choosing private school.  Nor does it penalize that choice.  It merely defines the terms on which the state will provide publicly funded services to students whose parents choose to send their children to private school.

- 15 -

That distinction matters under Supreme Court precedent. The Court has repeatedly distinguished state interference with a protected activity from a decision to fund an alternative activity. See Maher v. Roe, 432 U.S. 464, 474-77 (1977); Harris v. McRae, 448 U.S. 297, 315-18 (1980).  In Maher v. Roe and Harris v. McRae, the Court held that federal and state restrictions on funding for abortion did not infringe on the then-recognized fundamental right to an abortion.[9]  Roe, 432 U.S. at 474; McRae, 448 U.S. at 318. The Court explained that the government may leave a constitutional choice available while declining to finance, facilitate, or administer that choice on the claimant's preferred terms.  See Roe, 432 U.S. at 474; McRae, 448 U.S. at 318.

That principle applies with full force to the Pierce right.  In Norwood v. Harrison, the Court addressed a challenge to a Mississippi program providing "free textbooks to all the children of the State," including those in segregated private schools.  413 U.S. 455, 457-58 (1973).  The plaintiffs alleged that, "by supplying textbooks to students [in segregated private schools]," the state unconstitutionally aided racially segregated education. Id. at 457.  In its defense, the state argued that denying textbooks to private schools would contravene the Pierce right.

---

[9] Even though McRae and Roe's holdings are no longer existing law, see Dobbs v. Jackson Women's Health Org., 597 U.S. 215 (2022), we rely on them insofar as they can still shed light on how we analyze fundamental rights under substantive due process doctrine.

Id. at 461-62.  But the Court rejected that argument, reasoning that while the Pierce right protects the choice of educational forum from meaningful state interference, Fields v. Palmdale Sch. Dist., 427 F.3d 1197, 1207 (9th Cir. 2005), it does not constitutionalize equal access to public benefits for students whose parents opted for private schooling, Norwood, 413 U.S. at 462 ("[Pierce] said nothing of any supposed right of private or parochial schools to share with public schools in state largesse, on an equal basis or otherwise.").[10]

Indeed, the Court has expressly rejected the inference that because parents may choose private school, the state must therefore ensure they have equal financial or programmatic access to support that choice.  It has explained:

> It cannot be that because [the] government may not . . . prevent parents from sending their child to a private school, [the] government, therefore, has an affirmative constitutional obligation to ensure that all persons have the financial resources to . . . send their children to private schools.

McRae, 448 U.S. at 318 (citing Pierce, 268 U.S. 510); see also Roe, 432 U.S. at 477 ("Pierce casts no shadow over a State's power

---

[10] The Parents think Norwood stands only for the proposition that the state need not grant equal aid to private schools when it has competing constitutionally mandated standards forbidding state-sponsored discrimination.  But that reads Norwood too narrowly.  Norwood squarely rejected the premise that a parental right to choose private education carries with it a right to public aid.  See Norwood, 413 U.S. at 461 ("Appellees fail to recognize the limited scope of Pierce"); see also id. at 462.

to favor public education by funding it -- a policy choice pursued in some States for more than a century.").[11]

Naturally, that is what we held in Gary S. when the parents of private school students challenged federal and state special education schemes under the Due Process and Equal Protection Clauses. 374 F.3d at 17, 23. The federal law at issue was the IDEA, which did not grant private school children an individually enforceable right to special education services. Id. And the state law at issue entitled only parents of children in public school to a hearing if they were dissatisfied with the state's services. Id. The parents of private school students argued these laws impermissibly "condition[ed] access to a government benefit on the relinquishment of a constitutional right." Id. at 23. We rejected their argument and held that the "non-funding" of private school programs "d[id] not significantly interfere with the [parents'] fundamental right to direct the upbringing and education of children under their control." Id. at 22. In doing so, we relied on the same non-subsidy line of Supreme Court cases described above.

_____

[11] The Parents seek to distinguish McRae and Roe by claiming that they do not argue that the state "must fund their rights." Rather, "[t]hey only argue that when the [state] legislature chooses to provide a generally available benefit, as it has done here, [the state] cannot deny that benefit simply because would-be recipients exercise their Pierce right in a way [the state] disfavor[s]." But that argument relies on a set of free exercise cases that do not apply here. We explain that point below.

All of these cases demonstrate that, while parents have a protected right to choose private education, the state does not "restrict" that right merely by declining to subsidize the private school option or by offering public services to privately enrolled students on different logistical terms than to publicly enrolled students.   Measured against this principle, the Parents' allegations do not hold up.   The complaint does not plausibly allege that Massachusetts has barred private education, which the Court held unconstitutional in Meyer, 262 U.S. at 403, or that Massachusetts has compelled public education, which the Court held unconstitutional in Pierce, 268 U.S at 534-35.   It does not allege that Massachusetts has deprived parents of meaningful access to the private school option.   Foote, 128 F.4th at 354 ("A cognizable parental rights claim under the Due Process Clause . . . generally requires restraining conduct by the government." (citing Anspach v. City of Phila., 503 F.3d 256, 266 (3d Cir. 2007)).   Nor does it allege that the state structured the special education regime to penalize those exercising their right to enroll their children in private school, rather than to administer publicly funded services through public infrastructure.   Cf. Gary S., 241 F. Supp. 2d at 118-19 (suggesting a different result if the program was designed to penalize private school students); Alston v. Spiegel, 988 F.3d 564, 571 (1st Cir. 2021) (explaining that conclusory statements need not be credited at the motion to dismiss stage).

- 19 -

What the complaint alleges, at most, is an increased logistical burden: privately enrolled students must receive publicly funded services at a neutral or public location rather than on the private school campus.  That is a consequence of how the state chooses to deliver public benefits -- not a meaningful intrusion on the underlying forum choice protected by Meyer and Pierce.

The structure of the regime underscores the point.  As pleaded, the Parents retain three options.  They may (1) enroll their children in public school and receive the full range of publicly funded services on site; (2) enroll their children in private school and access those same publicly funded services at a neutral or public location; or (3) enroll their children in private school and opt out of publicly funded services altogether. Those options preserve the constitutionally protected choice -- public or private schooling -- while setting permissible conditions on the administration of public services.  If anything, the asserted burden here is more attenuated than in Gary S.: Massachusetts does provide publicly funded services to privately enrolled students; it simply provides them at locations the state selects.  That does not infringe on the Pierce right within the meaning of step two.

The Parents offer two reasons Gary S. should not control: (1) Massachusetts law, unlike the IDEA, creates an individually

- 20 -

enforceable entitlement to services for private school students; and (2) the line of cases underscoring the Supreme Court's application of the Free Exercise Clause (regarding "equal benefits") supports reversal in the present matter. Neither argument prevails.

First, the fact that state law grants private school students an individually enforceable right does not alter our conclusion. Statutes may create broader statutory rights, but in doing so, they do not redefine the scope of the federal fundamental right. Parents for Priv. v. Barr, 949 F.3d 1210, 1232 (9th Cir. 2020) ("Although state and federal statutes may expand upon constitutional protections by creating new statutory rights, statutes do not alter the protections afforded by the Constitution itself."). Put simply, "[s]tate-specific policies do not augment fundamental rights." St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist., 919 F.3d 1003, 1009 (7th Cir. 2019). The Due Process inquiry remains whether a state's action restricts the constitutional right itself. And for the reasons expressed above and in Gary S., no such restriction is plausibly alleged.

Second, the Parents' attempt to analogize this case to the Free Exercise "equal benefits" cases does not work. At the threshold level, the argument depends on the premise that state law guarantees private school students' access to on-site special

education services.  The State Appellees dispute that premise, and we think they are right.

Recall that Chapter 71B requires that "to the maximum extent appropriate" children with disabilities be "educated with children who are not disabled" and that "removal of children with disabilities from the regular educational environment [shall] occur[] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services, cannot be achieved satisfactorily."  M.G.L. c. 71B, § 1.  In the Parents' view, given this statutory entitlement, the Place Regulation cannot require private school students to categorically receive services outside of their regular classroom.

But that reading misconstrues the statute.  Although the statute discourages removal from the "regular educational environment," it defines that phrase in programmatic terms: "the school program and pupil assignment which normally leads to college preparatory or technical education or to a career."  Id.  The definition says nothing about where the program must be delivered. Properly understood, then, the "least restrictive environment" requires that schools, to the maximum extent appropriate, educate students with disabilities alongside nondisabled peers in a program that normally leads to college, technical education, or a

career.  But it does not mandate that those services be delivered in any particular classroom or physical location.

That understanding resolves the Parents' claim.  Because the statute does not guarantee on-site delivery of services, there is no "equally available benefit" that the Place Regulation denies children whose parents choose to place them in private school.  So this case is indistinguishable from Gary S., and our prior analysis is sufficient to affirm the dismissal of the Parents' claim.

Nonetheless, the Parents argue that even under our reading of state law, their children are still denied the otherwise "equally available benefit" of being educated with other children who are not disabled.  They argue the Place Regulation requires their children, and only their children, to receive services in isolation or alongside other students with disabilities.  So we proceed to consider the Parents' argument that relies on the Free Exercise line of cases and ultimately conclude the argument fails.

The crux of the Parents' argument is that once the state establishes an otherwise generally available benefit, it may not deny that benefit to a student simply because their parents exercise their fundamental right to enroll their child in private school.  But every case they cite arises under the Free Exercise Clause, not the parental rights doctrine involved here.  (The Parents did not bring a Free Exercise claim; the Place Regulation applies to all private schools, secular and religious alike.)  And

- 23 -

those holdings have no bearing on their parental rights claim. They rest on a distinct, First Amendment principle that prohibits the state from imposing even indirect coercion or penalties on religious exercise.  See, e.g., Carson v. Makin, 596 U.S. 767, 778 (2022) ("The Free Exercise Clause of the First Amendment protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" (quoting Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 450 (1988))); see also Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U.S. 449, 463 (2017) (same); Espinoza v. Mont. Dep't of Revenue, 591 U.S. 464, 478, 484 (2020) (same).

That principle does not apply to the parental right. See St. Joan Antida High Sch. Inc., 919 F.3d at 1008 ("A direct and substantial interference [with the Pierce right] is required [to trigger heightened scrutiny]."). As we said, the fundamental parental right protects the right of parents to send their children to private school, such that a state cannot ban private schooling, Meyer, 262 U.S. at 403, or mandate attendance at public schools, Pierce, 268 U.S at 535.  But it does not require the state to extend public benefits on identical terms to private and public school students to protect the parents' choice of forum.  Norwood, 413 U.S. at 462 ("It is one thing to say that a State may not prohibit the maintenance of private schools [under Pierce] and quite another to say that such schools must . . . receive state

aid."); cf. Carson, 596 U.S. at 781 (holding that a state program limiting generally available tuition assistance program to students seeking to enroll in non-secular schools "discriminat[es] against religion").  To the contrary, the Pierce right does not limit the state's authority to maintain and support a public school system -- even where doing so creates practical incentives favoring public education.[12]  See, e.g., Meyer, 262 U.S. at 402; Cornerstone Christian Schs. v. Univ. Interscholastic League, 563 F.3d 127, 138 n.12 (5th Cir. 2009).  So we cannot follow the Parents' attempt to apply free exercise reasoning to the parental right context.

To wrap up, the Parents' claim is foreclosed by Gary S., and their attempts to distinguish the case are unpersuasive. Hence, the district court correctly dismissed this claim.

**3.**

Because the Place Regulation does not restrict the Parents' right to enroll their children in private school, we proceed to step three of the substantive due process analysis and apply rational basis review.  See Foote, 128 F.4th at 347 n.14. "A law survives rational basis review so long as the law is rationally related to a legitimate governmental interest," Cook v. Gates, 528 F.3d 42, 55 (1st Cir. 2008), and it "is neither

---

[12] For the same reasons, the Parents' reliance on Loffman v. Cal. Dep't of Educ., 119 F.4th 1147 (9th Cir. 2024), is misplaced.

arbitrary, unreasonable nor irrational." D'Angelo v. N.H. Sup. Ct., 740 F.3d 802, 806 (1st Cir. 2014) (quoting LCM Enters., Inc. v. Town of Dartmouth, 14 F.3d 675, 679 (1st Cir. 1994)).[13] Massachusetts identifies its interests as providing special education services to private school students while complying with the Anti-Aid Amendment.  And because Massachusetts has identified a legitimate government interest, the Parents bear the burden of "negati[ng] every conceivable basis" for the law.  Heller v. Doe, 509 U.S. 312, 320 (1993) (citation omitted).  To that end, they have three retorts.

First, the Parents counter that the state's services aid students, not schools, and so it would not contravene the Massachusetts Constitution to provide special education services on site in private schools.  They cite Zobrest v. Catalina Foothills School District, 509 U.S. 1, 13 (1993), to support that proposition.  Zobrest, however, arose in the context of an Establishment Clause challenge where the Supreme Court considered whether neutral government aid to individuals could be attributed to the state as support for religion.  Id. at 3.  The Court's

---

[13] We note that D'Angelo concerned an Equal Protection challenge.  But "[b]ecause the analysis of whether a law passes rational basis review is the same under the Equal Protection Clause and the Due Process Clause, we draw our understanding of the rational-basis standard from cases examining challenges brought under both provisions."  Ass'n to Pres. and Protect Loc. Livelihoods v. Sidman, 147 F.4th 40, 55 n.7 (1st Cir. 2025).

description of the aid as flowing to students -- rather than to schools -- served the limited purpose of denying that claim.  Id. at 13-14.

By contrast, in more analogous cases, the Supreme Court has recognized that similar arrangements "are a form of financial assistance inuring to the benefit of the private schools themselves."  Norwood, 413 U.S. at 463-64.  That makes sense because, as the State Appellees explain: "If public schools had to send their own special-education teachers and other resources to private schools, then those expenses would not have to be borne by the private schools, making it easier for them to fund their operations."  In any case, even if the Place Regulation swept more broadly than necessary in trying to avoid aiding private schools, "[r]ational basis review tolerates classifications that may be overinclusive or underinclusive."  Hope v. Comm'r of Ind. Dep't of Corr., 66 F.4th 647, 651 (7th Cir. 2023) (citing St. Joan Antida High Sch. Inc., 919 F.3d at 1010).  We therefore are not convinced by this first argument.

Next, the Parents argue that it is irrational for the Place Regulation to distinguish between students placed in private school by their parents and those placed in private school by the state.  See supra note 3.  But this contention ignores that Massachusetts treats those groups differently because they are in private schools for different reasons.  When Massachusetts places

a child in private school, it has already determined that the public system cannot provide the services required for a FAPE. M.G.L. c. 71B, § 4.  Funding that placement is therefore part of the state's obligation to educate the child.  See Doucette v. Georgetown Pub. Schs., 936 F.3d 16, 29 (1st Cir. 2019) ("[T]he right to a school placement outside of the normal public-school system when an appropriate education is not otherwise possible arises from the IDEA's guarantee of a FAPE.").  And, under Massachusetts law, that scheme does not violate the Anti-Aid Amendment.  Commonwealth v. Sch. Comm. of Springfield, 417 N.E.2d 408, 418 (Mass. 1981) (holding that this scheme does not violate the Anti-Aid Amendment because it "does not, in any way, support the on-going maintenance of private schools by lessening the financial burden of those who have elected a private school education").

Lastly, the Parents claim the Place Regulation is irrational because it allegedly contravenes the statute it implements.  But as we explained in Part II.A.2, nothing in the statutory text requires that the services be provided on-site at the student's school.

Thus, we conclude that the Place Regulation at issue here, which provides publicly funded special education services to private school students only at public schools or other public or neutral locations, is a reasonable means of advancing

Massachusetts's legitimate interests.  That is, the Place Regulation allows Massachusetts to extend special education services to all students while complying with its constitution. Accordingly, we affirm the district court's decision to dismiss this claim.

### B. Equal Protection Claim

For much the same reasons that the Parents lack a substantive due process claim, they do not have a viable Equal Protection claim.  The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  Any government action that discriminates against a person on the basis of a suspect classification, or for "the exercise of a fundamental right," must stand up to heightened scrutiny.  Zablocki v. Redhail, 434 U.S. 374, 388 (1978).  But where government action does not discriminate on either basis, equal protection review, like substantive due process, is "limited to a deferential, rational basis standard."  A.C. v. McKee, 23 F.4th 37, 46 (1st Cir. 2022) (quoting D'Angelo, 740 F.3d at 806).

Here, the Parents again invoke Pierce's fundamental parental right as the basis for their Equal Protection claim.  But as we have already explained, the Place Regulation does not burden their parental right as recognized in Pierce.  So rational basis review applies to this claim as well.  Massachusetts claims the

- 29 -

same state interests as before: the extension of special education services to private school students, without running afoul of its constitution.   On this issue, the Parents claim that Romer v. Evans, 517 U.S. 620 (1996), precludes the Place Regulation from surviving rational basis review.[14]   We disagree.

In Romer, the Supreme Court held that an amendment to the Colorado Constitution, which broadly prohibited state and local governments from adopting or enforcing measures that treated sexual orientation as a basis for legal protection, did not pass rational basis.   Id. at 624, 632.   In arguing that Romer applies here, the Parents point to the following observation from the Court: "A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense."   Id. at 633.   They think this statement resolves their claim.

But Romer turned on features absent here: the "unprecedented" character of a law "disqualif[ying] a class of persons from the right to seek specific protection from the law," id. at 633, and the fact that the "breadth [of the amendment] [wa]s

_____

[14] The Parents also argue that the history of the Fourteenth Amendment precludes us from holding that the Place Regulation survives rational basis review.   Because the Parents did not present this argument in the district court, it is waived.   White v. Hewlett Packard Enter. Co., 985 F.3d 61, 68 n.6 (1st Cir. 2021).

- 30 -

so discontinuous with the reasons offered for it that [it] seem[ed] inexplicable by anything but animus," id. at 632.  Massachusetts's Place Regulation bears none of those hallmarks.  Far from withdrawing protection, it extends special education services to private school students -- which it is not required to do under federal law.  And there is no allegation that the Place Regulation resulted from animus towards private school students.

With the Parents' arguments dealt with, our conclusion is straightforward.  Massachusetts may classify public and private school students for the delivery of publicly funded special education services.  That classification is a rational -- and permissible -- means of administering public resources in compliance with the Massachusetts Constitution.  Once again, we affirm the district court's decision to dismiss this claim.

### C. Privileges or Immunities Claim

The Parents' third and final claim, which the district court also dismissed, arises under the Privileges or Immunities Clause of the Fourteenth Amendment.  The Privileges or Immunities Clause provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."  U.S. Const. amend. XIV, § 1.  The Clause has long been interpreted narrowly and does not operate as a general repository for unenumerated substantive rights.  McDonald v. City of Chi., 561 U.S. 742, 754 (2010).  Instead, it protects only the

rights of national citizenship.[15]   See id. at 755; Gattineri v. Town of Lynnfield, 58 F.4th 512, 516 (1st Cir. 2023) ("[The Privileges or Immunities Clause] provides a citizen of one State 'with the same rights as other citizens of that State.'" (quoting Saenz v. Roe, 526 U.S. 489, 503 (1999))).  Because the Parents do not allege that Massachusetts has infringed on any of those rights, they fail to state a claim under the Privileges or Immunities Clause.  See id.

Still, the Parents invoke a concurring opinion in McDonald to note that "[a]t least one current justice views the Due Process Clause as a 'curious place' to be a 'fount' of rights since it refers to 'due process' whereas the Privileges or Immunities Clause refers to rights."  (quoting 561 U.S. at 809-15 (Thomas, J., concurring)).  And allege that "whatever the source of its protection, their right to direct the upbringing of their children is fundamental and has been infringed by [the state]."

---

[15] The rights of national citizenship include the right

> to come to the seat of government to assert any claim [a citizen] may have upon that government, to transact any business he may have with it, to seek its protection, to share its offices, to engage in administering its functions . . . [and to] become a citizen of any State of the Union by a bona fide residence therein, with the same rights as other citizens of that State.

McDonald, 561 U.S. at 755 (alterations in original) (quoting Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 79-80 (1872)).

The Parents themselves "acknowledge that this claim may be foreclosed under current law," and they provide no further argument.  So their allegation does not carry them far.  Justice Thomas's concurrence notwithstanding, McDonald reaffirmed that the Due Process Clause is the constitutional source of protection for fundamental rights; as such, like the Supreme Court, we "decline to disturb" the traditional doctrinal framework.  McDonald, 561 U.S. at 758 (plurality) ("For many decades, the question of the rights protected by the Fourteenth Amendment against state infringement has been analyzed under the Due Process Clause of that Amendment and not under the Privileges or Immunities Clause. We therefore decline to disturb the Slaughter-House holding.").

### III.

Having concluded that the Parents fail to plausibly allege that the Place Regulation infringes on their fundamental parental right to direct the education of their children, and it otherwise survives rational basis review, we **affirm** the district court's order dismissing their case.

- 33 -